# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>PHILIP JAMES LAYFIELD, aka Philip Samuel Pesin | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>SAMJ18-0070 |

Complaint for violation of Title 18, United States Code, Section 1341: Mail Fraud

| NAME OF MAGISTRATE JUDGE<br>HONORABLE STEVE KIM | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>From in or about February 2016 to the present | PLACE OF OFFENSE<br>Orange County, and Elsewhere within the CDCA | ADDRESS OF ACCUSED (IF KNOWN)<br>Tamarindo, Costa Rica | FILED<br>CLERK, U.S. DISTRICT COURT<br>FEB 2 3 2018<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ____ DEPUTY |
|---|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or about February 2016, and continuing to the present, in Orange County, California, within the Central District of California, defendant PHILIP JAMES LAYFIELD, also known as Philip Samuel Pesin, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud J.N. as to material matters and to obtain money and property from J.N. by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the above-described scheme to defraud, on or about March 9, 2016, caused a check (representing a partial, de minimus payment of funds owed to J.N.) to be placed in an authorized depository for mail matter to be sent and delivered by the United States Postal Service or a private or commercial interstate carrier, according to the directions thereon.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached Affidavit which is incorporated herein by this reference as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>MARK E. SPEIDEL /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>STEVE KIM | DATE<br>February 23, 2018 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA: Mark Aveis, USAO CDCA, Major Frauds Section, (213) 894-4477

REC: Detention

# AFFIDAVIT

I, MARK E. SPEIDEL, being duly sworn, declare and state as
follows:

## I.  INTRODUCTION

1.  I am a Special Agent with the Department of Homeland
Security, Homeland Security Investigations ("HSI"), and have
served in this position for 15 years.  I was previously employed
with the former U.S. Immigration and Naturalization Service
("INS") as a Special Agent for one year and as an INS
Immigration Inspector for four years.  As part of my basic
training, I attended and graduated from the Federal Law
Enforcement Training Center in Glynco, Georgia in 1998.

2.  Since becoming a Special Agent, I have received
training in the investigation of various financial frauds, money
laundering, and bulk cash smuggling, among other federal crimes.
I have also completed the HSI Asset Forfeiture and Financial
Investigations Program.

3.  I have experience in conducting physical and
electronic surveillance, preparing written affidavits for
warrants and wire intercepts, collecting evidence, analyzing
financial records, interviewing suspects and witnesses,
conducting undercover operations, and utilizing confidential
informants.

4.  I have personally conducted investigations related to
mail and wire fraud, money laundering and structuring of
proceeds from illegal activities, bulk cash smuggling, narcotics
trafficking, human trafficking, and public corruption.  In many

1

of the aforementioned investigations, I have utilized undercover police officers and federal agents and served as the handler for informants in cases that resulted in numerous state and federal arrests and convictions, as well as the seizure and forfeiture of U.S. currency and real property.

5.     I am currently assigned to the HSI Fraud Group for the Assistant Special Agent in Charge in Orange County, California. As part of my duties in this assignment, I investigate individuals and organizations engaged in major fraud schemes and the related laundering of proceeds derived therefrom.

## II. **PURPOSE OF AFFIDAVIT**

6.     This affidavit is made in support of a criminal complaint against and request for issuance of an arrest warrant for PHILIP JAMES LAYFIELD, also known as Philip Samuel Pesin ("LAYFIELD"), for mail fraud, in violation of 18 U.S.C. § 1341.

7.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. **SUMMARY OF PROBABLE CAUSE**

8.     Based upon the information described herein, I have probable cause to believe that LAYFIELD, a lawyer, committed

2

mail fraud in connection with a scheme to defraud his former client, J.N., a personal injury plaintiff whom LAYFIELD represented, as evidenced by at least the following acts:

a.    Settling J.N.'s personal injury matter for nearly $4 million, commingling the amount due to J.N. in LAYFIELD's attorney-client trust account beyond the period permitted by applicable ethics rules, and converting those settlement proceeds to his own use and to cover the expenses of LAYFIELD's failing law firm;

b.    Increasing his professional fee by filing an unnecessary civil complaint on J.N.'s behalf;

c.    Failing to provide J.N. timely notice of the availability of the settlement proceeds, and avoiding J.N.'s inquiries regarding the proceeds in order to further enable LAYFIELD to convert those proceeds to his use, to use the proceeds to cover the expenses of LAYFIELD's failing law firm, and to enable LAYFIELD to flee the U.S. for the purpose of dodging the claims of numerous clients whose settlement proceeds he had also converted;

d.    Concealing the embezzlement of J.N.'s portion of the personal injury settlement by lulling J.N. into a false sense of security by causing the mailing of a partial, *de minimus* payment to J.N.;

e.    Further concealing the unlawful disposition of J.N.'s portion of the personal injury settlement by misrepresenting to J.N. the need for a trust, which was never executed;

f.   Closing down his office and relocating to Costa Rica, with the intent to further conceal the fraud and deny J.N. the ability to obtain an accounting of J.N.'s portion of the personal injury case settlement; and

g.   Filing a series of documents with both the State Bar of California and the federal bankruptcy court, which were designed to obfuscate LAYFIELD's control and conversion of funds owed to J.N. and dozens of other former clients.

## IV. **STATEMENT OF PROBABLE CAUSE**

9.   In or about October 2017, I was contacted by and met with an investigator from the Orange County District Attorney's Office, as well as a Deputy District Attorney, who informed me that they had opened an investigation against LAYFIELD for alleged fraud and misappropriation of client settlement funds. The investigator and Deputy D.A. noted that, based upon their investigation to date, they believed this matter might be more appropriately handled by federal authorities for several reasons, including the potentially large number of victims (some of whom were outside the Orange County D.A.'s jurisdiction), the loss amounts, and the fact they believed LAYFIELD had absconded to Costa Rica.   Among other things, the investigator and Deputy D.A. informed me that they had been in contact with victims' counsel, as well as the State prosecutor handling disciplinary proceedings against LAYFIELD.

10.   Shortly thereafter, I commenced the present investigation, which was subsequently joined by IRS-Criminal

Investigation ("IRS-CI") and the Federal Bureau of Investigation ("FBI").

*California State Bar Disciplinary Proceedings Against Philip Layfield and L&B's Shaky Financial Condition*

11. As part of my investigation into this case, I reviewed the California State Bar website for information about LAYFIELD, as well as the following documents: (1) the "First Amended Notice of Disciplinary Charges" (the "State Bar Charges") filed against LAYFIELD by the State Bar on September 26, 2017, in case nos. 17-O-04140, 17-O-04198, and 17-O-04754; (2) LAYFIELD's "Response to First Amended Notice of Disciplinary Charges" filed by or on LAYFIELD's behalf[1] on October 31, 2017 (the "Layfield State Bar Response");[2] and (3) a spreadsheet containing the names, personal identifying information, and settlement amounts owed to former L&B clients, which was provided to me by a State Bar investigator.[3] Having reviewed the State Bar's website and the above-identified documents, I learned the following:

a. LAYFIELD was at all relevant times a duly licensed member of the California State Bar, No. 204836. At

---

[1] This document bears a signature line for "Philip J. Layfield," above which appears a handwritten signature that I compared to the signature on LAYFIELD'S Nevada Driver's License and U.S. Passport. I believe the handwriting on each document was made by one and the same person.

[2] A true and correct copy of the Layfield State Bar Response, obtained from the State Bar's website, is attached hereto as Exhibit "A" and fully incorporated herein by reference.

[3] I have also reviewed correspondence relating to the spreadsheet from the State Bar.

certain times unknown to me, LAYFIELD was also known as "Philip S. Pesin," apparently also a member of the California State Bar using the same bar number.

    b.    LAYFIELD had an interest, if not a controlling interest, in a law firm called Layfield & Wallace from at least 2013 to 2015, when he became a co-owner of a law firm called Layfield & Barrett ("L&B").

    c.    According to the State Bar Charges, LAYFIELD was president and 90% owner of L&B from "in or about 2016" to "in or about May 2017."

    d.    Approximately 73 L&B clients, including J.N., had submitted complaints to the California State Bar indicating that they had not received their settlement funds from L&B. The State Bar estimates that settlement amounts owed to the 73 former L&B clients total at least $8.6 million.

    e.    In documents filed with the California State Bar, LAYFIELD made a number of representations about L&B's financial footing and his expectations for the firm in 2016. For instance, LAYFIELD stated that he had projected "a large profit" for L&B for calendar year 2016, notwithstanding substantial expenses to the firm.[4] LAYFIELD believed that L&B's projected gross revenue for 2016 would be between $14 million and $18 million, with costs of approximately $10 million. LAYFIELD also

---

[4] These expenses included a base salary of $300,000 per year, a 10% equity position in L&B, and a car allowance of $1,200 for attorney J.B.; a base salary of $200,000 per year for attorney S.W.; and a base salary of $120,000 per year for L&B General Counsel T.W. (T.W.'s salary was later increased to $200,000 once he assumed the role of Director of Litigation.)

noted that L&B secured a line of credit in the amount of $4 million.

       f.    LAYFIELD's financial projections for 2016 apparently turned out to be wrong.  LAYFIELD informed the California State Bar that he believed that "[d]uring the first half of 2016, productivity [at L&B] did not rise, but, rather fell, as people were not meeting financial targets, [and] there was a general lack of performance, all of which, collectively caused the L&B Firm to lose money."

       g.    LAYFIELD also noted in the Layfield State Bar Response that, around June 2016, and at least in part due to unrealized financial projections, LAYFIELD fired his Director of Litigation and, "[d]uring the summer of 2016, [LAYFIELD] aggressively began settling cases and ultimately settled several large cases. . . .  As of August 2016, L&B had generated approximately $7 million of revenue, appeared to be profitable through 8 months of the year and [L&B's CEO] produced budgets showing approximately $7 million of additional revenue by the end of the year.  Things began to look like they were improving."

*The J.N. Personal Injury Case - Retainer Agreement*

12.    One of the large cases settled by LAYFIELD in 2016 was J.N.'s case.  As noted above, J.N. was a personal injury plaintiff represented by L&B.  I first learned of J.N. during my October 2017 meeting with the Orange County D.A.  During that meeting, I was informed that J.N. had sued LAYFIELD, alleging that LAYFIELD had misappropriated J.N.'s settlements funds.

13.     As part of my investigation into this case, I
reviewed one of J.N.'s legal filings in the matter of *[J.N.] v.*
*Philip Layfield, et al.*, Orange County Superior Court case no.
30-2017-00930393-CU-BC-CJC, filed by Michael Artinian, Esq.
("Artinian") on July 7, 2017.  Having reviewed that filing, as
well as a memorandum in support of an Ex Parte Application for
Issuance of Right to Attach Order and Writ of Attachment and its
attachments, I learned the following:

a.     As stated in a declaration signed under penalty
of perjury by J.N., "[on] February 24, 2016, [J.N.] was hit by a
vehicle while in a marked cross-walk, where [J.N.] sustained
substantial injuries requiring multiple back surgeries."

b.     Pursuant to a written retainer agreement signed
on or about March 15, 2016, J.N. retained L&B to represent J.N.
in what appears to be the same personal injury incident.  The
retainer agreement specifically stated that J.N. retained L&B
"to pursue any meritorious legal actions which [J.N.] may have
for injury and loss resulting from the incident which occurred
on or about the 24th day of February, 2016."

c.     The retainer agreement provided, among other
things, that L&B would receive a fee of 33 1/3% of any gross
recovery, and that the fee to which L&B was entitled would
increase to 40% of any gross recovery after the "filing of a
lawsuit or formal initiation of legal proceedings," less costs
and other expenses.
//

*J.N.'s Statements Regarding the Retention of L&B*

14.    On February 20, 2018, I interviewed J.N., in the presence of her attorney, Michael Artinian, who told me the following:

a.    J.N. was seriously injured in a motor vehicle accident in late February 2016.

b.    J.N. was 25 years old at the time of the accident and was an unemployed student at Orange Coast Community College.

c.    A friend, T.A., who worked at L&B, referred J.N. to LAYFIELD to represent J.N. in connection with the accident. Shortly thereafter, J.N. met LAYFIELD at his office in Irvine. LAYFIELD told J.N. that he would represent J.N. and that J.N. should expect to receive a substantial amount for J.N.'s injuries.  Also present during the meeting were two other lawyers with L&B, B.K. and T.H.  J.N. understood that B.K. and T.H. would work on the case but that LAYFIELD was responsible for the case.

d.    After the meeting, in or about March 2016, J.N. signed the above-described retainer agreement in the presence of an L&B representative.

*LAYFIELD Settles J.N.'s Personal Injury Case*

e.    In August 2016, J.N. attended a mediation for J.N.'s case.  J.N. did not participate in the mediation itself but, instead, sat outside of an office where LAYFIELD and a representative for the driver who struck J.N. were meeting.  L&B attorneys B.K. and T.H. did not attend or participate in the mediation.  After about 30 minutes, LAYFIELD came out of the

meeting with a document that described a proposed settlement of
$3.9 million. LAYFIELD was excited about the settlement
proposal and encouraged J.N. to accept it, which J.N. did.

        f.    Within a few days after the mediation, J.N. went
to LAYFIELD's office and signed a settlement agreement that was
consistent with what LAYFIELD presented to her at the mediation,
namely, that J.N.'s case would settle for $3.9 million.

        g.    Neither LAYFIELD, B.K., T.H., nor anyone else at
L&B, told J.N. that L&B had filed a lawsuit on or about July 25,
2016, to recover for J.N.'s injuries. J.N. knew nothing about
the lawsuit until J.N. retained Artinian approximately 10 months
after the settlement of J.N.'s personal injury case.

*J.N.'s Unsuccessful Efforts to Recover the Settlement Money*

        h.    Between approximately August 2016 (when J.N.
signed the settlement agreement) and approximately February
2017, J.N. repeatedly contacted LAYFIELD both by phone and by e-
mail to determine when J.N. would receive money from the
settlement of J.N.'s case.[5] LAYFIELD responded with a variety of
excuses, including that there were medical liens against the
settlement proceeds that needed to be resolved before LAYFIELD
could disburse the settlement funds to J.N.

        i.    In or about January or February 2017, J.N.
finally got LAYFIELD to meet with J.N. to explain the delay in
disbursing the settlement funds to J.N. The meeting was held in

---

    [5] Based on the retainer agreement, J.N.'s share of the
settlement proceeds likely exceeded $2.3 million, after
attorneys' fees but before accounting for any liens or other
expenses.

LAYFIELD's office in Irvine and was attended by J.N., J.N.'s
mother, LAYFIELD, and L&B attorney B.K. During that meeting,
LAYFIELD told J.N. that "we will cut you a check" for $25,000 as
an advance against J.N.'s portion of the settlement proceeds,
but that there were delays caused by unresolved medical liens
that prevented full disbursement of the remaining settlement
funds due to J.N. Neither LAYFIELD nor anyone associated with
L&B mentioned at that time that there were any delays to
disbursing the full settlement proceeds to J.N. for any other
reason. LAYFIELD did not explain or provide any specifics about
medical liens and did not state the amount of any such liens.

     j.   Also around January or February 2017, LAYFIELD
told J.N. that J.N. should place her settlement money in a
trust. LAYFIELD told J.N. that, sometimes, family members might
try to take a person's settlement money, but J.N. did not
understand because J.N. had no such problems or concerns and
told LAYFIELD that. J.N. never told anyone associated with L&B
that J.N. had such concerns, but agreed to the trust upon
LAYFIELD's advice. LAYFIELD told J.N. that the trust would be
prepared by attorney M.L.

    *The Mailing*

     k.   In or about March 2017, J.N. received at her
residence, by mail, a check from L&B in the amount of $25,000,
along with a cover letter dated February 15, 2017 stating in
pertinent part that "[L&B] APC would like to thank you for
choosing our firm to represent your legal needs. Enclosed
please find a check in amount /sic/ of $25,000. This is an

advance on your settlement." J.N. assumed that the check represented the advance that LAYFIELD had mentioned during the meeting in January or February 2017. Based upon the totality of the evidence described in this affidavit, including that LAYFIELD was J.N.'s primary point of contact at L&B, LAYFIELD was 90% owner of L&B, and that LAYFIELD told J.N. that "we will cut you a check," I have probable cause to believe that LAYFIELD caused the mailing of this check in furtherance of his scheme to defraud J.N. out of J.N.'s full settlement proceeds of approximately $2,340,000.

l.     After the meeting in LAYFIELD's office in or about January or February 2017, J.N. contacted Medi-Cal and other health care providers to determine whether there were, in fact, any outstanding medical liens against her settlement money. J.N. learned that, at most, if at all, there were approximately $300,000 in charges incurred for J.N.'s medical treatment following J.N.'s accident. At that time, J.N. could not determine whether any of those charges were the subject of a lien against J.N.'s settlement.

m.     Between about March 2017, when J.N. received the $25,000 check from L&B, and June 2017, when J.N. retained a new lawyer, J.N. continued to attempt to contact LAYFIELD and L&B to find out why J.N. had not received the balance of J.N.'s settlement. LAYFIELD again stated, over the phone, and in email, that J.N.'s settlement payment was delayed due to the need to resolve medical liens. During that same period, D.K., whom J.N. understood worked for L&B at L&B's Utah office, told

J.N. that the settlement payment was "held up" by unresolved medical liens.

n. In or about June 2017, J.N. hired Artinian to pursue recovery of J.N.'s settlement money. J.N. had no direct contact with LAYFIELD after about June 2017.[6]

15. On February 20, 2018, during my interview of J.N., J.N.'s lawyer told me that he identified the Medi-Cal charges that were incurred on behalf of J.N. in connection with the accident. The lawyer, Artinian, told me that J.N.'s Medi-Cal charges totaled approximately $300,000, or less than 10% of the $3.9 million gross settlement paid in J.N.'s case, and that those charges had been satisfied by Medi-Cal.

16. During the same interview, Artinian told me that he has practiced personal injury law and is familiar with mediations. He stated that, in his view, the J.N. personal injury matter settled very quickly with no need, either legally (such as to toll the statute of limitations) or strategically, to file a lawsuit. He believed that the only reason LAYFIELD filed the lawsuit was to increase LAYFIELD's fee from 33 1/3% to 40% because, among other things, the lawsuit was filed approximately two weeks before the mediation and the case settled for a large amount as the result of a very short and single mediation session.

---

[6] Based on my search of federal travel databases, I believe LAYFIELD left the United States for Costa Rica in or about June 2017. LAYFIELD returned to the U.S. from Costa Rica in October 2017. He was here for two days before returning to Costa Rica. LAYFIELD again re-entered the United States on February 19, 2018 and is scheduled to depart on February 24, 2018, from Newark airport in New Jersey.

17. During my meeting with J.N. and Artinian, J.N. mentioned that J.N. had exchanged emails with LAYFIELD and his office, as described above. I obtained copies of those emails that had been marked by the California State Bar as exhibits for LAYFIELD's State Bar trial, and noted the following:

a. On January 17, 2017, J.N. emailed L&B attorney B.K., with a "cc" to "accounting@layfieldbarrett.com," stating that "I would like an update on the case, as I have been told that disbursement would have been done by the end of last year. Please send me the current itemization of costs and disbursements timeline."

b. On January 18, 2017, LAYFIELD responded by stating that "[w]e have a medicare issue that we are still working on and expect it to be resolved shortly." LAYFIELD suggested that they meet.

c. On February 2, 2017, LAYFIELD emailed J.N., stating, "I am waiting on a call back from Cal-Optima and still waiting on a couple of final numbers for the expenses. I am hoping to have it in a few hours."

d. On February 3, 2017, LAYFIELD emailed J.N., "Please see the attached cost break-down. As you can see, we are still waiting on a few items to finalize. I will keep you informed."[7]

---

[7] As of the date of this affidavit, I have not yet obtained the "cost break-down" mentioned in LAYFIELD's email. However, based upon the totality of evidence obtained to date, I have probable cause to believe that the total costs and expenses related to J.N.'s case was well below, if not nearly $ 2 million below, the net amount due J.N. from her settlement.

14

e.    On May 19, 2017, D.K., an L&B employee, emailed J.N. with an itemization of the "Total Billings/Liens" for J.N.'s case, in the amount of $227,551.68, of which $199,828.68 was noted as having been "reduced by Layfield & Barrett APC from $266,438.23," and was owed to the "Department of Health Care Services.[8]  I know from reviewing J.N.'s Medi-Cal records that J.N. provided to the California State Bar, and from my training and experience, that the Department of Health Services ("Cal DHS") is an agency of the State of California that collects outstanding balances due for Medi-Cal services.  I also know, from having reviewed a January 18, 2017 statement issued by Cal DHS, that J.N. was a Medi-Cal recipient and that, as of that date, Cal DHS sought reimbursement for charges for J.N.'s February 24, 2016, injury in the amount of $266,438.23, the same pre-discount figure described in the above-referenced email from L&B.  I further know from reviewing a Cal DHS statement issued to J.N. and dated November 21, 2017, or several months after L&B and LAYFIELD had stated that J.N.'s lien-free settlement proceeds were soon to be paid to J.N., that Cal DHS was still owed and had a lien for $266,438.23.

f.    On May 18, 2017, T.W., L&B's general counsel and director of litigation emailed another L&B employee, T.A., who had been trying to find out why J.N.'s settlement proceeds had not been paid to J.N.  T.W. wrote: "[T.A.]-I don't really know anything about this closeout, other than that Phil [LAYFIELD] is

---

[8]   See note 5, above.

15

very hands-on with this one. He's probably the only person who can speak to where this stands and what the plan is."

g.    On June 8, 2017, "Philip Layfield" emailed T.A. and stated that "[J.N.'s] case is just about wrapped up. I need to check with her trust lawyer on a few final items, check on her corporate trustee and make sure her insurance is in place. This should all be wrapped up by the end of the month."

h.    On June 14, 2017, M.L., the trust lawyer, emailed J.N., stating "Was just wondering if you have heard from Phil recently. Despite several attempts, I haven't heard anything back from him since early May." J.N. responded that evening via email to M.L., stating "I am concerned about Phil's absence and lack of communication. . . ." M.L. responded to J.N. that evening, stating, "I just heard from Phil tonight. He's on vacation until next week. We're going to talk when he gets back."

*LAYFIELD's Response to Artinian's Demand on Behalf of J.N.*

18.    During the same interview on February 20, 2018, Artinian told me that, on June 29, 2017, at 8:48 a.m. (PDT), Artinian emailed LAYFIELD as well as others associated with L&B, including T.W. and J.B., whom Artinian understood were LAYFIELD's partners, to demand payment of J.N.'s settlement proceeds.

19.    Artinian gave me a copy of an email dated June 29, 2017 *at 7:37 a.m.*[9] that he told me he received in response to his email to LAYFIELD, described above.  The email was addressed from "info@layfieldbarrett.com" to Artinian, with a "cc" to J.B., whom I believe was LAYFIELD's partner at L&B, and "T.W.," whom I believe was L&B's "director of litigation."  Based on my understanding, explained elsewhere in this affidavit, that LAYFIELD had by that time relocated to Costa Rica, and the context of this email, I have probable cause to believe that LAYFIELD wrote this email.

20.    In the responsive email, LAYFIELD stated the following, among other things:

a.    "L&B does not consent to the use of email communications.  Please direct all communications to our mailing address."[10]

b.    "Our firm spent substantial time and resources with [J.N.] to make sure that [J.N.'s] money was not attacked by *[J.N.'s] family members who were all trying to take [J.N.'s] money*."  (Italics added.)  As stated above, at no time did J.N.

---

[9]    I believe the response time for this email is also PDT and is consistent with having been sent from an easterly time zone.  The time zone for Costa Rica is Central Standard Time, or two hours ahead of PDT (Pacific Daylight Time).

[10]    Based on another email that Artinian received on June 27, 2017 from the same email address, the sender stated that "Please be advised that Layfield & Barrett does not accept email communications on any business matters at this time.  If you have any questions or correspondence, please send to our mailing address of: L&B, APC 382 NE 191st St. #42308 Miami, Florida 33179-3899.  I determined from a Google search that the foregoing address is for a "virtual office," a Google-based photo of which shows that address housed in a small light industrial complex.

either believe that J.N.'s family members were trying to take J.N.'s settlement money, nor did J.N. ever communicate that to either LAYFIELD or anyone associated with LAYFIELD's firm.

      c.   "We anticipated all trust issues and investment issue choices to be resolved within the next two weeks and that [J.N.'s] trust could be funded with [J.N.'s] proceeds. That is the plan and I still believe that should be the plan . . . ." As stated above, neither Artinian nor J.N. received anything from LAYFIELD or anyone with whom he was associated regarding a "trust" or "investment issue choices" after the date of this email.

      d.   "I would appreciate it if everyone would stop with the aggressive and unnecessary behavior. We obtained an absolute home run for this client and are just about complete with all issues."[11]

21.   During my interview of Artinian and J.N. on February 20, 2018, each told me that neither LAYFIELD nor anyone associated with LAYFIELD or his firm mentioned anything about a "trust" or "investment issue choices" after LAYFIELD's June 27 email, described above.

---

[11]   The same email chain contains what appears to be a response to Artinian's demand by T.W., whom LAYFIELD identified in several documents that I have reviewed as L&B's "director of litigation." In his response, T.W. stated that he had had no involvement in J.N.'s case, that he had quit working for L&B approximately four months prior (approximately February-March 2017), and that LAYFIELD had told him that LAYFIELD had been in contact with J.N.

*The Trust*

22.    On February 21, 2018, I spoke by telephone with M.L.,
an attorney whose California Bar license I confirmed via the
California State Bar website.  M.L. told me the following:

        a.    M.L. and LAYFIELD were neighbors in the Orange
County enclave of Coto de Caza during 2014 and until about the
spring of 2017, when LAYFIELD left the neighborhood.

        b.    M.L.'s and LAYFIELD's families socialized a
couple of times, including attending a Duck's hockey game where
they sat in LAYFIELD's private suite.

        c.    In or around January 2017, LAYFIELD asked M.L. to
set up a trust for a LAYFIELD client whom M.L., upon my mention,
recalled as J.N.  LAYFIELD told M.L. that it was a "simple case"
and that J.N. was going to receive a settlement of $2.3
million.[12]  LAYFIELD said nothing about whether the amount of the
settlement was contingent on or subject to offsets by the
resolution of any medical or other liens.  LAYFIELD made it
clear to M.L. that LAYFIELD's firm would pay M.L. to prepare the
trust.  M.L. recalled that his fee for preparing a trust
generally was approximately $4,000-$5,000.

---

[12]    As described elsewhere in this affidavit, the gross
settlement for J.N.'s personal injury matter was $3.9 million,
of which J.N. was to receive 60%, or $2,340,000, pursuant to
J.N.'s retainer agreement with L&B.  As also described elsewhere
in this affidavit, LAYFIELD gave J.N. an "advance" of $25,000
against the settlement, as shown by the check to J.N. dated
March 9, 2017.  Thus, the net proceeds due J.N., less the
$25,000 "advance," were approximately $2,315,000, or,
essentially, the amount that LAYFIELD told M.L. to account for
in the trust.

d.  About two weeks after talking to LAYFIELD about the trust for J.N., M.L. hosted a meeting at his office. LAYFIELD and J.N. attended the meeting.  M.L. does not recall any mention during that meeting about whether J.N.'s family members might take any of the settlement money or whether the amount of the settlement was contingent on or to be offset by the resolution of any medical or other liens.

e.  M.L. prepared the trust about a month after the meeting with LAYFIELD and J.N. and emailed the trust documents to LAYFIELD and J.N.  LAYFIELD emailed M.L., stating that LAYFIELD would review the documents and get back to M.L.

f.  LAYFIELD never got back to M.L.  M.L. has not heard from LAYFIELD since LAYFIELD emailed M.L. saying he (LAYFIELD) would review the documents and get back to M.L.

g.  LAYFIELD never paid M.L. for preparing the trust.

23.  Based upon M.L.'s statements and the totality of the evidence leading up to the meeting at M.L.'s office as described above, I have probable cause to believe that, as of March 9, 2017, the date of the so-called "advance" check: (a) M.L. had already prepared the trust based upon LAYFIELD's instructions; (b) there were no offsets or contingencies for medical or other liens, as LAYFIELD had instructed M.L. to entrust the *entire* $2.3 million to J.N.; and (c) there were no other impediments to disbursing that amount to J.N., in trust or otherwise, other than that LAYFIELD chose not to do so for reasons having nothing to do with J.N.

*Tracing and Diversion of J.N.'s Settlement Proceeds*

24.    In the Layfield State Bar Response, LAYFIELD stated
that one of the "large" cases he settled was "for $3.9 million
in August 2016." LAYFIELD stated that *he* was responsible for
settling the "large" case; he did not mention whether anyone
else associated with L&B was responsible for settling this case.

25.    Although LAYFIELD did not specifically identify the
$3.9 million settlement as relating to J.N.'s personal injury
case in his Response, that $3.9 million appeared, in fact, to be
the settlement of J.N.'s matter, based upon at least the
following evidence:

a.    The Layfield State Bar Response did not dispute
the State Bar's allegation that J.N. was entitled to receive
approximately $2,315,000.

b.    J.N.'s retainer agreement with L&B, described
above, contains a formula that permitted a 40% payment to L&B
after the filing of a lawsuit.

c.    I reviewed a civil complaint, no. 30-2016-
00865617-CU-PA-CJC, which was electronically filed in Orange
County Superior Court on July 25, 2016, that alleged that J.N.
sustained personal injuries when she was struck by a motor
vehicle while crossing a street on February 24, 2016.    The
complaint contains LAYFIELD's typewritten name as the filing
attorney.    I compared the signature next to LAYFIELD's
typewritten name with LAYFIELD's California Driver's License and
U.S. Passport, and believe they were signed by one and the same
person.

d.    In connection with his efforts to recover J.N.'s portion of her personal injury settlement, Artinian obtained, and I reviewed, copies of two checks issued by Kemper/Trinity Universal Insurance Company, each jointly payable to J.N. and L&B, that totaled $3.9 million, as follows: one for $500,000, issued August 25, 2016, for a "loss date: 2/24/2016;" and one for $3.4 million, issued August 25, 2016, for a "loss date: 2/24/2016."

e.    Sixty percent of $3.9 million is $2,340,000. As described below, J.N. later received a check from L&B for $25,000; J.N.'s net proceeds due from the settlement, less that $25,000 credit, is $2,315,000, as alleged in the State Bar Charges and, again, as apparently undisputed in the Layfield State Bar Response.

26.    In the Layfield State Bar Response, LAYFIELD stated that he "was the primary signatory on the Esquire Bank IOLTA account."[13] Elsewhere in the Layfield State Bar Response, LAYFIELD stated that he "was the sole signatory" on this same "trust account."

27.    I reviewed L&B bank records obtained from Esquire Bank, account number ending in -2012, entitled the IOLTA Trust Account ("IOLTA Account"). Having reviewed those records, the State Bar Charges, and the Layfield State Bar Response, I believe this IOLTA Account served as L&B's attorney-client trust account, into which settlement payments were transferred by

---

[13]  "IOLTA" appears to stand for "Interest on Lawyer Trust Account," but the account, as more fully described herein, contained activity for more than just interest.

opposing parties or insurers acting on their behalf. Disbursements would then be made from this IOLTA Account to L&B clients.

28. I also know from speaking to California State Bar Prosecutor Eli Morgenstern that California-licensed attorneys have ethical obligations regarding the management of client funds.

29. I know from my review of the California Rules of Professional Conduct, that it is a violation of California State Bar rules for attorneys to "commingle" funds in their attorney-client trust accounts. Specifically, Rule 4-100, entitled "Preserving Identity of Funds and Property of a Client," requires that:

a. "In the case of funds belonging in part to a client and in part presently or potentially to the member or the law firm, the portion belonging to the member or law firm must be withdrawn at the earliest reasonable time after the member's interest in that portion becomes fixed." Rule 4-100(A)(2).

b. "A member shall . . . [p]romptly notify a client of the receipt of the client's funds, securities, or other properties." Rule 4-100(B)(1).

30. In connection with this investigation, Special Agent Sam Chan of IRS-CI and I reviewed bank records for what appeared to be an operating account for L&B at Esquire Bank (account number ending in -2004), over which LAYFIELD had signatory authority at the relevant time (the "-2004 Operating Account"). Special Agent Chan and I also reviewed records for a personal

account in the name of Philip J. Layfield at USAA Bank (account number ending in -1924) (the "Layfield Personal USAA Account").[14]

31.   Special Agent Chan analyzed the account activity for the IOLTA Account, the -2004 Operating Account, and the Layfield Personal Account in order to trace the deposit of J.N.'s $3.9 million settlement and attempt to determine the use of those proceeds.  Based upon my discussions with Agent Chan and my review of records for those three accounts, I noted the following activity:

a.   J.N.'s settlement from Kemper/Trinity Insurance was paid in two checks deposited into the IOLTA Account, one for $500,000, deposited on August 26, 2016, and the other for $3,400,000, deposited on August 29, 2016.  These deposit records are consistent with and reflect the deposit of the two Kemper/Trinity Insurance checks comprising the $3.9 million gross settlement proceeds for J.N.'s personal injury case.

b.   The running balance in LAYFIELD's IOLTA account just before the deposit of the first of the two J.N. settlement checks was approximately $122,615.

c.   At the same time that J.N. was unsuccessfully attempting to get LAYFIELD to respond to J.N.'s inquiries about the settlement money (between approximately August 29, 2016 and December 12, 2016), at least approximately $685,000 was transferred first from the IOLTA account to the 2004 Operating

---

[14] We obtained these bank records in late January and early February 2018.

Account, and then wire-transferred from the 2004 Operating Account to Layfield's Personal USAA Account, as follows:[15]

| Date | Amount Wired from -2004 Operating Account to Layfield Personal USAA Account |
|---|---|
| 08/30/2016 | $20,000.00 |
| 08/31/2016 | $50,000.00 |
| 09/01/2016 | $50,000.00 |
| 09/02/2016 | $50,000.00 |
| 09/06/2016 | $50,000.00 |
| 09/07/2016 | $50,000.00 |
| 09/12/2016 | $40,000.00 |
| 09/16/2016 | $50,000.00 |
| 09/26/2016 | $45,000.00 |
| 10/03/2016 | $50,000.00 |
| 10/07/2016 | $50,000.00 |
| 10/11/2016 | $25,000.00 |
| 10/19/2016 | $25,000.00 |
| 10/24/2016 | $20,000.00 |
| 10/27/2016 | $30,000.00 |
| 10/31/2016 | $25,000.00 |
| 12/06/2016 | $25,000.00 |
| 12/12/2016 | $30,000.00 |
| **TOTAL** | **$685,000.00** |

32. Additionally, SA Chan has informed me that between August 30, 2016 and February 28, 2017, there were a number of wire transfers from the IOLTA Account directly to Layfield's Personal USAA Account, as follows:

//

//

//

//

//

---

[15] There were other deposits into each of these accounts at the same time.

| Date | Wire from IOLTA to USAA (Acct# 1924) |
|------|--------------------------------------|
| 10/26/2016 | $15,000.00 |
| 10/31/2016 | $35,000.00 |
| 12/15/2016 | $15,000.00 |
| 12/16/2016 | $25,000.00 |
| 12/30/2016 | $60,000.00 |
| 01/09/2017 | $40,000.00 |
| 01/12/2017 | $20,000.00 |
| 02/16/2017 | $7,500.00 |
| 02/24/2017 | $50,000.00 |
| 02/28/2017 | $50,000.00 |
| **TOTAL** | **$317,500.00** |

*LAYFIELD's Failure to Appear at His State Bar Trial*

33.    On February 21, 2018, I reviewed the California State Bar website for LAYFIELD's bar license status and learned that, on January 24, 2018, LAYFIELD failed to appear for his trial to respond to the State Bar Charges. I noted in the publicly available State Bar documents that the State Bar Charges were served on LAYFIELD at the same address that LAYFIELD identified in the Layfield State Bar Response, namely, the virtual address in Miami, Florida, described above.

34.    As a result of his failure to appear, LAYFIELD's license to practice law in California has been suspended. (I understand that LAYFIELD has 55 days to seek relief from default.)

35.    On February 22, 2018, FBI Special Agent Ryan Heaton told me that on that same day he contacted Eli Morgenstern, the California State Bar prosecutor assigned to the LAYFIELD matter. Special Agent Heaton told me that Morgenstern stated that he had not received any information that LAYFIELD had attempted to set-

aside the default. Morgenstern further told Special Agent

Heaton that he (Morgenstern) had not heard from LAYFIELD since

November 2017. Morgenstern also told SA Heaton that during one

of only two telephone calls with LAYFIELD, on either August 19,

2017 or on or about September 22, 2017, Morgenstern asked

LAYFIELD where LAYFIELD was at the time of the call. LAYFIELD

told Morgenstern that he did not have to tell Morgenstern where

LAYFIELD was and that LAYFIELD liked that Morgenstern did not

know where LAYFIELD was.

*L&B/LAYFIELD Client Complaints to the State Bar*

36. During this investigation, I received from

Morgenstern data showing complaints made by approximately 73

clients against LAYFIELD and L&B seeking approximately

$8,696,367.44 in settlements due to the clients for

approximately the same time-period that encompassed LAYFIELD's

dealings with J.N.

*LAYFIELD's Explanation for Non-Payment of Settlements*

37. Law enforcement officers involved in this

investigation have not interviewed LAYFIELD. However, LAYFIELD

in two publicly filed documents, provided his view of the non-

payment of settlements to clients. I believe that the

explanations in those documents are self-serving and not only

conflict with each other but are not supported by the totality

of the circumstances, namely, that LAYFIELD personally

benefitted from J.N.'s settlement proceeds via wire transfers

and kept such usage from J.N. by personally, and without the

involvement of others associated with L&B, concealing his

27

activity through lulling misrepresentations and fraudulent inducements, including causing the mailing of the so-called "advance" check of $25,000 to J.N., as more fully described above.

38.    The first such document is the Layfield State Bar Response (attached hereto as Exhibit "A") in which LAYFIELD made the following claims, among others, none of which address or explain LAYFIELD's direct dealings with J.N.:

a.    "[LAYFIELD] was a model member of the California State Bar [for over 18 years]. This all changed when [LAYFIELD] attempted to grow his law firm into a large national plaintiff firm. In order to grow, [LAYFIELD] was forced to rely on the reasonable conduct of other professionals, both inside and outside the law firm."

b.    The State Bar charges "are solely the result of the failure of L&B's finance department and others set forth [in the Layfield State Bar Response]."

c.    Although LAYFIELD was the "sole signatory on the [IOLTA Account]," he had "granted access, passwords and the ability to transfer monies from that account to many members of the L&B finance team."

d.    The firm's general counsel and "Director of Litigation" "oversaw all settlements."

e.    "[LAYFIELD] reasonably relied on the conduct of others in the operation of the business."

f.    As to the specific State Bar charges, including charges relating to the J.N. settlement (Counts Nine and Ten),

LAYFIELD explained that he delegated to accounting professionals the job of running his "300-plus person organization" and "took immediate steps to remedy the situation." He further claimed that the appointment of a Chapter 11 Trustee deprived him of the ability to determine how or whether client funds were maintained. LAYFIELD also stated that, "[i]f any funds were incorrectly transferred from any of the firm's trust accounts to the firm's operating accounts, it was done under a good faith belief that monies were available to do so." LAYFIELD did not specifically address J.N.'s settlement funds, the purported trust, why the trust was sought at all, the $25,000 advance paid to J.N., or how or why LAYFIELD received wire transfers that appear to have flowed from the receipt of J.N.'s $3.9 million settlement proceeds paid to L&B.[16]

g. LAYFIELD did, however, state in his attachment to the Layfield State Bar Response, that "[t]he system for disbursing funds [out of the IOLTA Account and other client trust accounts] was [that LAYFIELD] would rely on up to date accounting/collections reports generated by [his 'Finance team'] . . . ." Thus, LAYFIELD by his own admission directed the disbursements.

*The L&B Bankruptcy Case*

39. The second document in which LAYFIELD explained his view that others caused the demise of his firm was his

---

[16] The State Bar Charges also allege that LAYFIELD committed similar violations as to five other L&B clients whose settlement proceeds exceed $1 million and who have not been paid.

declaration filed on August 8, 2017 in connection with his
opposition to a petition for involuntary bankruptcy (discussed
below) that was filed by a law firm and former L&B clients,
entitled *In re Layfield & Barrett, APC, Debtor*, U.S. Bankr.
Court, CDCA, no. 17-19548-NB.[17]  In that declaration, bearing
what I believe to be LAYFIELD's signature (based upon
comparisons to the same exemplars and questioned documents
described elsewhere in this affidavit), and signed in
"Tamarindo, Costa Rica," LAYFIELD stated, among other things,
that:

> a.   L&B has assets in the millions of dollars;

> b.   LAYFIELD is "actively working to resolve" dozens
of other cases and the value of the cases "exceeds $50 million,"
with "estimated legal revenues from these cases exceed[ing] $6
million."

> c.   LAYFIELD "is more than capable of handling these
matters . . . ."

> d.   LAYFIELD decided in 2016 and early 2017 to
"commence the winding down of L&B" and to expand to a national
firm that focused on larger cases.  LAYFIELD intended to
"ultimately remove [him]self from the day to day handling of
cases as a trial lawyer, and to manage the marketing side of a
national law practice from Costa Rica . . . ."  "I have not fled

---

[17]   A true and correct copy of this document, without the
accompanying exhibits, is attached hereto as Exhibit "B," and is
incorporated herein by reference.  I obtained a copy of this
document from PACER.

the country."[18]  "I maintain a 2nd residence in California in the same neighborhood for several years."  Other L&B staff were relocated to Costa Rica "in order to set up the office" of L&B's successor.

> e.    "L&B has hundreds of cases and dozens of settlements that require detailed accounting of costs, fees and client distributions.  L&B suffered massive turnover in its finance department and the departure of our controller in March 2017.  I have recently been able to hire two Certified Public Accountants to take over the administration of our [attorney-client trust] accounting.  I will be supervising those accountants."

40.    I reviewed a document entitled "Petitioning Creditors' Emergency Motion for Appointment of An Interim Trustee," filed in the above-referenced bankruptcy case and to which LAYFIELD filed his opposition, described above, and learned the following:

> a.    Four creditors of L&B, a law firm and three individuals, filed the petition to "protect and preserve property of [L&B] and to prevent concealment, waste, loss or conversion of the assets of [L&B] by [LAYFIELD], who continues to control [the IOLTA Account]."

---

[18] I know from my search of import/export data maintained by the federal government that LAYFIELD exported two vehicles from the United States to Costa Rica in May and August, 2017. Additionally, I have reviewed a list of properties owned by LAYFIELD which was compiled by SA Sam Chan from commercial databases.  That list reflects that LAYFIELD sold residential properties in January, April, August, and September 2017.

31

b.    The creditors alleged that there were approximately 140 active or pre-litigation cases at L&B as of June 2017 when L&B collapsed, and L&B failed to notify clients of its collapse and "failed to inform clients regarding funds it received from settlement of cases."

c.    According to declarations signed by LAYFIELD's former partner and CEO, L&B had a case management system that "tracked, among other things, client costs and accounting information needed to discharge the attorney's legal and ethical duties upon receipt of gross settlement proceeds on client matters." However, neither LAYFIELD, his former partner, or L&B's CEO provided access to that information.

d.    In one instance, a former client (and one of the petitioning creditors), M.L. (not attorney M.L., referred to above), received a letter and settlement statement from L&B in March 2016, indicating that M.L.'s case had settled, all liens had been satisfied, and that he was entitled to $287,054.29. The cover letter stated that a check in that amount was enclosed, but no check was enclosed.

e.    From my further review of the docket in the L&B bankruptcy case, I learned that on August 11, 2017, the above-referenced motion was denied. On the same day, the case was converted to one under Chapter 11 of the Bankruptcy Code. On August 16, 2017 the parties stipulated to the appointment of a Chapter 11 trustee. In a "Status Report" filed on behalf of debtor L&B on September 5, 2017, L&B reported that it "had approximately $1,000 in its bank accounts on the date of the

filing [of the bankruptcy case." Finally, on October 10, 2017, debtor L&B's lawyer moved to withdraw (Dkt. 107), stating in a sworn declaration that "since the appointment of the Chapter 11 Trustee, the Debtor's principal Philip Layfield has resigned. As such, I have no client to sign documents such as the [required bankruptcy] schedules . . . . I prepared the documents but cannot file them without signatures. Further, we have not received any payment for services rendered . . . ."

## V.  CONCLUSION

41.  For all the reasons described above, I believe there is probable cause to believe that PHILIP JAMES LAYFIELD, also known as Philip Samuel Pesin, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud J.N. as to material matters to obtain money and property from J.N. by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute this scheme to defraud, caused a

//
//
//
//
//
//
//
//
//

mailing to be placed in an authorized depository for mail matter
to be sent and delivered by the United States Postal Service or
a private or commercial interstate carrier, in violation of 18
U.S.C. § 1341.

/s/
_____
Mark E. Speidel, Special Agent
Department of Homeland
Security

Subscribed to and sworn before me
this 23rd day of February, 2018.

**STEVE KIM**
_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

EXHIBIT "A"  (Layfield State Bar Response)

1  Philip J. Layfield SBN#204836
2  382 NE 191st Street
   Suite 42308
3  Miami, Florida 33179
   (786) 607-7243
4
5  Appearing in Pro Per

kwiktag® 026 803 781

FILED

OCT 3 1 2017

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

6                    **STATE BAR COURT**

7           **HEARING DEPARTMENT-LOS ANGELES**

8
9  IN THE MATTER OF:                    )
                                        )  Case No.: 17-0-04140; 17-0-04198-17-0-
10 PHILIP JAMES LAYFIELD,               )  04754
   NO. 204836                           )
11                                      )  **RESPONSE TO FIRST AMENDED**
                                        )  **NOTICE OF DISCIPLINARY**
12 A MEMBER OF THE STATE BAR.           )  **CHARGES**
                                        )
13                                      )

14

15    COMES NOW, Respondent, Philip James Layfield (hereinafter "Respondent"), on his own

16 behalf, who Responds to the First Amended Notice of Disciplinary Charges.  As a general

17 matter, Respondent generally denies each and every allegation included in the First

18 Amended Notice of Disciplinary Charges ("ANDC").  Respondent further expressly denies

19 that as a direct or proximate result of any acts or omissions on the part of Respondent, any

20

21 ethical violations have occurred.

22

23            **GENERAL BACKGROUND**

24

25    Respondent has no record of discipline in over 18 years of practice.  By all

26 accounts, Respondent was a model member of the California State Bar.  This all changed

27 when Respondent attempted to grow his law firm into a large national plaintiff firm.  In

28

order to grow, Respondent was forced to rely on the reasonable conduct of other professionals, both inside and outside the law firm. Unfortunately, most of those who Respondent relied upon either failed in their specific duties and/or betrayed Respondent. Rather than conduct a full and complete investigation into the allegations, the State Bar Investigators and Prosecutor chose to grandstand and prematurely bring charges. Had the State Bar acted appropriately in the investigation of these matters, they would have discovered that others were truly responsible for the misconduct alleged and that Respondent was doing everything that would and should be expected of an attorney under the circumstances. The reality is that all of the acts alleged in the twelve specific Counts of the ANDC stem from the failure of a law firm which operated as a large and complex business known as Layfield & Barrett, APC (L&B) over a period from January 2017 to June 2017. L&B had a finance department that consisted of approximately 21 professionals under the supervision of the CFO, Jeffrey Pannebaker and the firms' General Counsel Todd Wakefield. The acts complained of in the ANDC are soley the result of the failure of L&B's finance department and others as set forth below.

From the period of June 2017 to the present, there have been many self-serving accounts of what led to the demise of L&B and what ultimately led to the current allegations against Respondent. Although none of the accounts that have been publicized or put in Declarations are accurate, one of the most accurate accounts of what truly happened to L&B is titled "LAYFIELD & BARRETT AND THE TRANSITION," and is attached hereto as Exhibit 1. Respondent acknowledges that this account is incomplete and fails to address each and every issue that arose at L&B during the time period of 2016 and 2017, but it is the most up-to-date and accurate representation that has been circulated to date.

## A.  LAYFIELD & BARRETT WAS PROFITABLE THROUGH AUGUST 2016

Up and through August 2016, Respondent was led to believe that L&B was profitable and poised for substantial growth.  Respondent was provided with financial statements in the Fall of 2016 that showed the firm generating a profit of approximately $2 million from January 2016 through August 2016.  Respondent was provided projections by the finance department and the General Counsel and Director of Litigation in the Fall of 2016 showing full year 2016 profitability of $5 to $7 million.  Although Respondent was the sole signatory on the Esquire Bank Trust Account, Respondent had granted access, passwords and the ability to transfer monies from that account to many members of the L&B finance team.  In fact, Respondent hadn't made one deposit into that account since sometime around 2014.  Since 2014, those duties were delegated to others in the firm under the direction of the firm's General Counsel and Director of Litigation who oversaw all settlements.  Respondent is aware of approximately 4 other Trust accounts at various other banking institutions and in other jurisdictions where Respondent had no access.

## B.  DURING THE PERIOD OF SEPTEMBER 2016 THROUGH MARCH 2017, RESPONDENT REASONABLY RELIED ON THE CONDUCT OF OTHER QUALIFIED PROFESSIONALS

L&B was a large and complex organization with hundreds of people working on its cases, finances, marketing, recruiting, and operations.  Respondent reasonably relied on the conduct of others in the operation of the business.  It would be unreasonable for Respondent to oversee the details of such a large operation.

C. UPON DISCOVERING THAT OTHER PROFESSIONALS FAILED IN THEIR
   BASIC DUTIES, RESPONDENT TOOK REASONABLE STEPS TO MITIGATE
   ANY DAMAGES AND CURE ANY CLIENT ISSUES

Upon learning of the misconduct of others at L&B, Respondent took reasonable steps to obtain proper accounting, keep operations funded and devise a plan to allow the business to continue despite being attacked by many external forces. Not only did Respondent contribute in excess of $500,000 of his personal funds to L&B, Respondent actively worked to resolve any and all issues until Respondent was prevented from acting on behalf of L&B by the Ch. 11 Trustee.

D. IMMEDIATELY AFTER RESPONDENT'S PLANNED RETIREMENT FROM
   THE PRACTICE OF LAW, BARRETT, WAKEFIELD AND OTHERS
   DEVISED A SCHEME TO STEAL MILLIONS OF DOLLARS FROM
   RESPONDENT, L&B AND FORMER L&B CLIENTS

Former Partner of L&B, Joseph Barrett ("Barrett") and former General Counsel, Todd Wakefield ("Wakefield") agreed to reorganize L&B into a new entity called Maximum Legal, LLC ("ML") and agreed to purchase 45% of the new firm from Respondent for $8 million. Respondent provided the financing for the $8 million purchase. In connection with the reorganization, Respondent insisted that substantial referral fees be paid back to L&B in order to satisfy all L&B creditors and clients in order to allow L&B to wind down operations by the end of 2017. Rather than honor the Agreements with Respondent, Barrett and Wakefield formed a different entity called Maximum Legal (California) LLP ("MLCA") and began to divert clients and funds away from ML to MLCA. Wakefield and Barrett sought the advice of Bankruptcy Counsel Martin Brill in order to assist them with their scheme. Brill advised Wakefield and Barrett to file Chapter 11 bankruptcy for

MLCA and file a fictitious business name to call the firm The Barrett Law Firm ("Barrett Law"). Even though Barrett was the actual owner, he and Wakefield attempted to deceive the public into believing that Wakefield was the 100% owner. In connection with the formation of Barrett Law, Barrett sent out a self-serving and false email to the entire local Plaintiff Bar Association announcing the formation of his new law firm and failed to mention that Barrett Law was actually MLCA. This scheme devised by Barrett, Wakefield and their attorney was designed to deprive Respondent of the $8 million owed to him by Wakefield and Barrett and to assist in the improper levying of charges by the State Bar against Respondent.

E. BARRETT AND WAKEFIELD EMBARKED ON A CAMPAIGN OF FALSE INFORMATION IN ORDER TO STEAL MILLIONS OF DOLLARS FROM L&B IN AN ATTEMPT TO SHIFT FOCUS FROM THEIR OWN MISCONDUCT AND USE RESPONDENT AS A SCAPEGOATE

Following the formation of Barrett Law, Barrett and Wakefield met with State Bar Prosecutor Eli Morganstern ("Morganstern") in an attempt to cause Morganstern to take over the operations of L&B under false pretenses. They told Morganstern that L&B was not operational and needed to be taken over despite knowing these claims were false. Morganstern allowed Barrett and Wakefield to send hundreds of letters to clients of L&B, defense counsel assigned to cases L&B was handling and insurance adjusters that owed money to L&B in an attempt to steal money from L&B and its creditors. A true and correct copy of one of these letters is attached at Exhibit "2." Barrett also conspired with other attorneys and filed false declarations with State Court Judges claiming that L&B was not operational and was being shut down by the State Bar. Barrett and Wakefield used these letters and declarations to convince these parties to withhold millions in dollars of

checks owed to L&B for earned fees and costs. These actions deprived L&B creditors and L&B of the money needed to continue operations. These actions harmed L&B clients because it caused L&B to be unable to collect funds and hire the needed accountants and professionals to finalize accounting projects that were necessary for Respondent to discharge is obligations properly and mitigate any damages to clients. On at least one occasion, Barrett and Wakefield were able to divert a check for $1.65 million to Barrett Law which is now the subject of a separate lawsuit filed against Barrett and Wakefield by L&B's lender Advocate Capital.

F.  STATE BAR PROSECUTORS INSERTED THEMSELVES INTO A PRIVATE COMMERCIAL DISPUTE AND ALLOWED WAKEFIELD AND BARRETT TO DESTROY THE GOODWILL AND OPERATIONS OF L&B BY FALSELY CLAIMING THAT THE STATE BAR WAS GOING TO SHUT DOWN L&B'S OPERATIONS

State Bar Investigations are supposed to be private until a Notice of Disciplinary Charges is filed. The reason for this rule is very simple-until an investigation is complete, it can be fatal to a law firm if the existence of an investigation or charges are prematurely made public. They can be even more damaging if State Bar Prosecutors assist a law firm's direct competitors in destroying their law firm. Unfortunately, this is exactly what occurred here. Morganstern shared confidential information with Barrett and assisted him with damaging L&B and Respondent's reputation to the point where it was impossible for L&B or Respondent to function. Morganstern was confronted with these allegations and he admitted to sharing confidential information, but claimed that he did not tell Barrett that he would shut down L&B. The bottom line is that either Barrett is lying or Morganstern is

lying.  In late July 2017, to further harm L&B, Barrett, Wakefield and Morganstern had several meetings.  Out of those meetings, a plan was devised to force L&B into involuntary bankruptcy and cause L&B to lose all profitable clients to MLCA and leave all unprofitable clients with L&B.  Wakefield and Barrett assisted other creditors by filing false declarations and cooperating with the creditors to serve papers on L&B at a location that would ensure that L&B was not provided notice.  On August 3, 2017 an involuntary petition was filed along with an request for an Emergency Hearing.

G.  THE WEEKEND BEFORE L&B WAS FORCED INTO BANKRUPTCY, THE
    FORMER GENERAL COUNSEL OF L&B ACCESSED THE PARK CITY
    OFFICE WITHOUT AUTHORITY AND DESTROYED ACCOUNTING,
    FINANCIAL AND OTHER MANAGEMENT RECORDS.

Knowing that both he and Barrett had provided false declarations under penalty of perjury, former General Counsel, Todd Wakefield, illegally entered the unoccupied offices of L&B in Park City, Utah and deleted all of the files on the L&B servers located in Park City and unplugged the firewalls and fiber optic connections to the internet.  It was also discovered that Wakefield had accessed L&Bs enterprise box.com account and deleted hundreds of folders and files that contained evidence which would directly contradict many of the false claims being made by Barrett & Wakefield.

H.  AFTER L&B WAS FORCED INTO CH. 11, RESPONDENT VOLUNTEERED
    TO SPEND THE NEXT 12 MONTHS WORKING WITH THE CH. 11 TRUSTEE
    TO ASSIST IN REPRESENTING ALL CURRENT L&B CLIENTS, FUND THE
    ACCOUNTING TO DETERMINE WHICH CLIENTS AND CREDITORS WERE
    OWED MONEY AND MAXIMIZE THE RECOVERY TO ALL CLIENTS

Upon learning of the involuntary bankruptcy petition being filed, Respondent hired counsel for L&B and successfully defended the takeover of L&B by the creditors. Respondent spent the next 30 days attempting to devise a plan to reorganize L&B in order to satisfy all of its creditors and its clients. Respondent estimated that approximately $10 million in fees could be earned by L&B over the next 12 months and that it would only cost $50,000 per month to operate L&B. Respondent communicated with its lender Advocate Capital ("Advocate") directly and through counsel. Respondent was led to believe that if he allowed a Chapter 11 Trustee to be appointed, Advocate would cooperate with L&B throughout the Chapter 11 proceedings in order to reorganize and satisfy its creditors. Respondent communicated with the Ch. 11 Trustee immediately upon his appointment. Respondent advised the Trustee that he was ready, able and willing to support the reorganization of L&B and was committing a team of approximately 20 professionals to assist the Trustee in reorganizing L&B. Despite repeated communications to the Trustee over the first two weeks of his appointment, the Trustee never responded to any substantive communications. Respondent learned that the Trustee was electing to "shut down" L&B and liquidate. At an average billing rate of $1000 per hour, the Trustee's motivations are readily apparent. As of early August, Respondent was prohibited from accessing any L&B funds, accounting or even signing any document. As of August 2017, Respondent was stripped of all authority to do anything on behalf of L&B. As a result, Respondent was forced to resign from L&B. Respondent has since learned that the Trustee has taken the position that none of the L&B clients are his responsibility and that all clients are basically "on their own." It appears from the conduct of the Trustee that he is also believing the false narrative of Barrett and Wakefield. Just recently, Respondent was made aware of a communication from a defense lawyer to

Barrett dated August 14, 2017. This letter is attached hereto as Exhibit 3. In this letter, the defense counsel basically calls Barrett out for all of the lies and misrepresentations he has been making regarding L&B. A reading of the letter makes it quite clear that with a level head and just a few hours of work, anyone paying attention could easily refute all of the false stories being told by Barrett and Wakefield. Unfortunately, the State Bar's investigation has been so shoddy and flawed that despite having all of the facts in front of them, they still haven't brought charges against Barrett. Furthermore, as evidence of just how pathetic the State Bar's investigation was in this matter, the State Bar Prosecutor "Morganstern" initially filed charges claiming Respondent was a 100% owner of L&B at all times. During a conference call with Morganstern, Morganstern refused to believe that Barrett was ever an owner and insisted that Respondent provide evidence that Barrett was an owner. This request defied logic because L&B was required to file a Law Corporation Annual Report with the State Bar where all owners, officers, directors and attorneys must be included in the report. For all owners, they are required to sign a personal guarantee. Barrett signed that report every year he was a partner. Morganstern had that report in his office and for some unknown reason, he refused to acknowledge the evidence before him.

### RESPONSE TO COUNTS ONE, FIVE, AND NINE

### RULES OF PROFESSIONAL CONDUCT, RULE 4-100(A)

### [FAILURE TO MAINTAIN CLIENT FUNDS IN TRUST ACCOUNT]

As the President of a 300 plus person organization with multiple offices and a finance department of approximately 21 professionals, Respondent delegated the finance function to a CFO who held a Certified Public Accounting License to oversee the finance department that consisted of dozens of professionals with accounting degrees, master's degrees and charted accounting designations. Upon learning of possible issues with

L&B's accounting, Respondent took immediate steps to remedy the situation. As a result of the conduct of others, including a Chapter 11 Trustee being appointed, Respondent has no ability to determine what if any funds have not been maintained.

## RESPONSE TO COUNTS TWO, SIX AND TEN
## BUSINESS AND PROFESSIONS CODE-SECTION 6106
## [MORAL TURPITUDE-MISAPPROPRIATION]

Business and Professions Code Section 6106 requires the commission of any act of moral turpitude, dishonesty or corruption. The State Bar must prove these elements by clear and convincing evidence. The evidence shows that Respondent worked in good faith to address any and all issues and that no evidence exists to show the underlying intent. As the President of a 300 plus person organization with multiple offices and a finance department of approximately 21 professionals, Respondent delegated the finance function to a CFO who held a Certified Public Accounting License to oversee the finance department that consisted of dozens of professionals with accounting degrees, master's degrees and charted accounting designations. If any funds were incorrectly transferred from any of the firm's trust accounts to the firm's operating accounts, it was done under a good faith belief that monies were available to do so. Upon learning of a potential shortfall in the firm's account, Respondent commissioned a forensic accounting of the firm's accounts. Due to the appointment of the Ch. 11 Trustee, Respondent was never able to complete the accounting. Furthermore, as a result of the misconduct of the State Bar Prosecutor, Barrett and Wakefield, millions of dollars were diverted away from L&B, which should have been used to satisfy client obligations.

## RESPONSE TO COUNTS THREE, SEVEN AND ELEVEN

## RULES OF PROFESSIONAL CONDUCT, RULE 4-100(B)(3)

## [FAILURE TO RENDER ACCOUNTS OF CLIENT FUNDS]

As the President of a 300 plus person organization with multiple offices and a finance department of approximately 21 professionals, Respondent delegated the finance function to a CFO who held a Certified Public Accounting License to oversee the finance department that consisted of dozens of professionals with accounting degrees, master's degrees and charted accounting designations. Upon learning of possible issues, Respondent took immediate steps to remedy the situation. As a result of the conduct of others, including a Chapter 11 Trustee being appointed, Respondent has no ability to render accountings.

## RESPONSE TO COUNTS FOUR, EIGHT AND TWELVE

## RULES OF PROFESSIONAL CONDUCT, RULE 4-100(B)(4)

## [FAILURE TO PAY CLIENT FUNDS PROMPTLY]

As the President of a 300 plus person organization with multiple offices and a finance department of approximately 21 professionals, Respondent delegated the finance function to a CFO who held a Certified Public Accounting License to oversee the finance department that consisted of dozens of professionals with accounting degrees, master's degrees and charted accounting designations. Upon learning of possible issues, Respondent took immediate steps to remedy the situation. As a result of the conduct of others, including a Chapter 11 Trustee being appointed, Respondent has no ability to pay client funds because Respondent is not in control of any client funds. In addition, prior to the appointment of the Ch. 11 Trustee, Respondent was in the process of conducting a

forensic audit to determine what mistakes the prior attorneys and professionals made in order to pay client funds as quickly as possible.

## V.  CONCLUSION

Respondent will be able to demonstrate that the State Bar will not be able to prove a violation of Business & Professions Code Section 6106, which is a requirement of Counts Two, Six and Ten by clear and convincing evidence. Respondent will be able to demonstrate his reasonable reliance on others for all other counts and thus will be fully exonerated on all charges. The State Bar has conducted a shoddy investigation and has acted improperly in the context of these proceedings. The simple fact that the State Bar Prosecutor assisted a private party and competitor of Respondent with diverting millions of dollars in funds away from L&B is enough to warrant terminating sanctions and an immediate investigation into whether charges should be levied against the State Bar Prosecutor for violating the most basic rules of the investigative process.

Dated: October 29, 2017

Respectfully submitted,

Philip J. Layfield

# EXHIBIT 1

# LAYFIELD & BARRETT AND THE TRANSITION

### Background:

Layfield & Barrett ("L&B") (f/k/a Layfield and Wallace and The Layfield Law Firm) has been profitable since inception in 2010. Philip Layfield ("Layfield") has been licensed in the the State of California since 1999. He has been recognized as a Super Lawyer for the last 5 years, has been recognized a a Top Lawyer in Southern California, Multi-Million Dollar Advocates Club, Lawyers of Distinction and was recognized in The Recorder's top verdicts in the state of California for the last 4 years with multiple entries in the top 100[1]. The Layfield Law Firm became Layfield and Wallace in 2013 and then converted to Layfield and Barrett in late 2015. In mid-2015, Layfield recognized the need to bring in more senior lawyers to handle the massive amount of work flowing into the firm. Layfield had hit multiple 7 and 8 figure verdicts and settlements over the previous 24 months across the United States and was generating massive amounts of referral business. Layfield couldn't handle all of the work and couldn't try every single case. Layfield estimated that L&B could do about $7 million of revenue in 2015 with $2 million of profit and doubling those numbers in 2016. Layfield needed to fill 3 key positions: 1. General Counsel/Director of Litigation; 2. Senior Trial Lawyer in Los Angeles; and 3. CFO.

In mid-2015 Joe Barrett, Esquire (Barrett) approached Layfield about joining the L&W Firm. Barrett was being forced out of Kabateck's firm and had nowhere to go. Despite being the CAALA (the Los Angeles Plaintiff Bar Association) President and a Trial Lawyer for almost 30 years, Barrett had no clients and indicated that he wanted to jump start his career . He noted that he hadn't tried a 7 figure case in almost 5 years and had some residual issues from his employment at the Cochran Firm. At the Cochran Firm there had been allegations of massive fraud, receiver appointed, allegations of forging receiver's signature in order to access Firm funds. Layfield learned of these issues and yet decided to give Barrett an opportunity to do a good job – which Barrett promised he was able and willing to provide. Discussions occurred throughout the Fall of 2015 and it was determined that Barrett would start on 1/1/2016. He was given a base salary of $300,000, 10% equity ownership that he purchased with a note and a car allowance of $1200 per month so he could lease a white corvette. As soon as Wallace learned of this, he resigned from the Firm and L&W Amended its Articles of Incorporation to become Layfield & Barrett.

In September 2015, Layfield had the HR department put ads out for a General Counsel position. Ads were placed in Utah, Arizona and California. Todd Wakefield ("Wakefield") contacted Layfield when he saw the ads. Layfield had met Wakefield two years earlier (in 2013) when

---

[1] Layfield is on the Board of Governors for the Consumer Attorneys of California (the Statewide Plaintiff Bar Association), a member of the Leaders Forum of the American Association of Justice (the National Plaintiff Bar Association), a member of Trial Masters http://www.trialmasters.com/membership-list/ and a Member of National Trial Lawyers Top 100; https://www.thenationaltriallawyers.org/top-100-trial-lawyers-directory/?last_name=&city=&association=Civil%20Plaintiff&state=CA-S&pageno=2

Layfield had placed an ad for a $60,000 project manager position in the Park City office for the the Firm. When Layfield interviewed Wakefield for that position in 2013, Wakefield had confessed to not practicing law for the last 2 years as result of suffering from both a cocaine and alcohol addiction problem and just coming off a long rehab stint. Wakefield confessed to Layfield about misappropriating client funds, various bar complaints and entering into a settlement with the Utah State Bar. At the time, in 2013, Layfield passed on hiring Wakefield for the $60,000 project manager role because Layfield perceived Wakefield as being a huge risk to the firm and unstable. When Wakefield contacted Layfield about the General Counsel position two years later, Wakefield convinced Layfield that he had overcome his issues and that he could be a positive contributor to the L&B Firm. Layfield agreed to hire Wakefield as General Counsel at a base salary of $120,000 per year.

At the same time, Layfield received an inquiry from Steven Weinberger, an attorney in Arizona looking to get hired for the same GC position. Weinberger convinced Layfield that he could create a highly profitable Arizona office with immediate cash flow. Layfield hired Weinberger in September 2015 as the Managing Attorney with a base salary of $200,000 per year. Weinberger immediately signed up a large amount of cases, but later there developed problms as Weinberger signed contracts without getting approval from Layfield and otherwise mismanaged his Arizona cases. L&B was forced to pay out hundreds of thousands in case expenses due to agreements Weinberger signed witout consulting with the team as was required. Ultimately, Weinberger was terminated for lack of performance in January 2017 after missing his financial targets by 70% on top line revenue. Weinberger later sued L&B and its partners alleging upaid wages and mishandling of client funds.

During 2015 and linto 2016, L&B utilized a very favorable agreement with 855triallawyers.com KPO Ltd. ("855"), which is now owned by MLS. 855 provided back office services to L&B at a fraction of the cost in the US. This allowed L&B to ramp up its case load and be very efficient at moving cases along. L&B was a complicated and sophisticated organization which was on the cutting edge of law practice management and vision. It was not just merely a law firm but a machine that was designed to work together to market, quantify, litigate and/or settle its cases with a design that was created to cut costs in its marketing platform, provision of services platform and ultimately resolution of its cases. When necessary, Layfield could try cases against the most talented lawyers in the country and win large verdicts.

### The Plan for 2016:

L&B and all of its people, systems and the cases were in place for a large profit year in 2016. Wakefield was tasked to work with the Finance Team to develop case values for all of the cases along with the current Director of Litigation, Andrew Schuh ("Schuh"). Schuh and Wakefield were tasked to work hand in hand on ALL litigation functions. The revenue projections for 2016 predicted gross revenue between $14 and $18 million with costs of approximately $10 million. Advocate Capital increased the firm's line of credit to $4 million[2]. Despite the planning and team formation and projections, January 2016 was a disaster. For reasons discussed later, no revenue came in and even worse Barrett's transition to the firm was a disaster. Barrett failed to mention that he was not proficient on the computer, couldn't put together an

---

[2] Notably Barrett refused to sign a guarantee on that loan by claiming "my wife won't let me."

2

opening statement and confessed to having ADHD so that he was unable to focus on anything. He also confessed to a marijuana habit that caused him to smoke marijuana daily. He was not able to operate by himself. He brought several attorneys from Kabateck's firm with him which was as equally unsuccessful. None of the multiple cases that Barrett promised to bring in materialized. He promised to he could generate massive referrals from his contact, but none of this happened. After 30 years in practice, the cases he did bring over were mismanaged, mishandled and had been grossly underworked. Layfield had to spent inordinate amounts of time coaching Barrett and finding "remedial" seminars and courses to send him to so that he could function at a basic level. Despite having 25 lawyers at the time, Layfield was the only one bringing in revenue. In February 2016, Layfield brought in a $1.1 million fee for a case he settled in December 2015. Unfortunately, that fee was spent before it even hit the door due to the losses experienced in January 2016. During the first half of 2016, productivity did not rise, but, rather fell, as people were not meeting financial targets, there was a general lack of performance, all of which, collectively caused the L&B Firm to lose money. Despite this setback, Layfield believed that he could turn things around. Layfield first fired Schuh as Director of Litigation (in June 2016) and appointed Wakefield in that role. Wakefield received a pay increase to a base salary of $200,000. During the summer of 2016, Layfield aggressively began settling cases and ultimately settled several large cases. One for $1.25 million, one for $1.2 million and another shortly after for $3.9 million in August 2016. As of August 2016, L&B had generated approximately $7 million of revenue, appeared to be profitable through 8 months of the year and Wakefield produced budgets showing approximately $7 million of additional revenue by the end of the year. Things began to look like they were improving.

## The Restructuring of the Finance Department in August 2016

In early August 2016, it was discovered that the CFO Gaurav Nanda and who was hired in early 2015 and appointed by 855 was stealing from the Indian company and that other management team members for 855 were stealing as well. This was uncovered by some employees of 855. Layfield had to terminate everyone in India associated with this improper conduct. Guarav Nanda, the CFO was terminated as well as Abdul Fancy, the Managing Director from 855. The stealing had an effect because Nanda had access to the bank accounts of both L&B and 855. At the time, it didn't appear that Gaurav Nanda had stolen more than $50,000 from any one account. Barrett, who was a partner in the firm at the time and a member of the Board of Directors was of L&B offered no support to Layfield during this time. Barrett was too busy smoking marijuana in Jamaica. After this crisis, Layfield made the decision to restructure the Finance team and immediately move to implementing the NetSuite ERP. This new ERP system was designed to improve visibility, reduce manual entry mistakes and eliminate duplicative data.

The Finance Department was supposed to be set up with the following structure. A Global CFO would oversee everything from the Park City office so they could interact daily with Todd Wakefield in his position. The Global CFO was to oversee several divisions who would each have their own Controller. The Finance Group would have the following divisions: 1. L&B Financial Reporting which would handle A/P, A/R and Financial reporting for L&B; 2. Client Advanced Costs which would handle all costs advanced on cases and manage the reporting with Advocate Capital; and 3. Close-outs, which would work with Todd to get cases closed out. Ultimately, Wakefield was to oversee all of these divisions, including quality control and

accounting. Wakefield recommended his friend Jeff Pannebaker ("Pannebaker") for the Global CFO role and Layfield agreed to his employment.

## Pannebaker as CFO

Layfield agreed to hire Pannebaker and Pannebaker assumed the role of Global CFO in October 2016 and received a base salary of $140,000. Layfield learned in March 2017 that from his hiring in October 2016 Pannebaker through and until April 2017, failed to complete any of the tasks that he was hired to complete: he did not close the books properly, never once accounted for client advanced costs and completely failed in his role to implement the NetSuite ERP system. At the holiday party, held in early December 2016, Layfield learned that Pannebaker had barely even spoken to the majority of his team and failed to manage their workflow and productivity on any level. Pannebaker spent the majority of his time only dealing with Todd Wakefield and Denise Kesler on close-out issues. In essence, L&B had no system in place to review cash flows, revenue forecasts, monthly profit and loss which deproved L&B and Lakefield from any ability to understand the financial condition of the firm. When Pannebaker realized that cash flows were tight and payrolls were going to be delayed, he abruptly resigned with no notice in early April 2017.

## Wakefield and Responsibility For Revenue

From July 2016 to June 2017 Wakefield was tasked with and agreed to oversee the management of the litigation teams and oversee and manage the L&B Firm's financial forecasts through both processing and collecting financial information from the management team members and updating Layfield so that Layfield would be able to release client funds with complete confidence that the internal auditing and reporting was accurate. It was learned later that Wakefield did not employ the management that he had agreed would be completed, including not conducting weekly team meetings with his 10 litigation teams (10 hours per week), not updating case values and resolution times and not providing any real-time information as to present revenue, forecasted revenue and/or timing of receivables. On many occasions, when revenue in excess of $1.5 million per month would be forecasted through Wakefield reports, only later with Wakefield confessing to Layfield that the revenue and collections reports were not accurate (all without correcting the issues of managing the teams and actually collecting revenue). On several occasions, Wakefield would confess to generating only 10% of the monthly revenues that he had projected. Regardless of these problems, Wakefield and Pannebaker would tell Layfield he needed to transfer money from IOLTA accounts to Operating accounts to make payroll and other expenses. Layfield assumed there was sufficient money in these accounts all the way until late January 2017. As 2016 was closing, Layfield became irate with Wakefield and demanded answers. Wakefield promised Layfield that December 2016 would produce $2.5 million in revenue and Q1 of 2017 would produce $5 million of revenue. This all turned out to be false. This is because the ground work that Wakefield was responsible for (and being compensated to perform) was not completed. In retrospect, it is unclear what exactly Wakefield did with his time since it was not the management and reporting that he understood and contracted to complete.

## The Assault on the Firm by Former Employees

4

As 2016 came to an end, many employees were demanding performance bonuses for cases they had resolved. Layfield learned, in early 2017, that the L&B Firm did not have the available cash to pay these bonuses and that Wakefield needed to work with Pannebaker to create a new incentive compensation plan that was tied to overall firm profitability. Netsuite had an incentive compensation module that was purchased to effectuate this plan. Layfield learned, later, that Wakefield and Pannebaker failed to finalize the plan and never did anything to move this forward. L&B began experience serious defections and several employees threatened wage and hour lawsuits. One employee in particular, Mark Bloom, demanded $66,000 in bonus compensation. He was paid in full in early January. At the same time, Barrett and Wakefield met with Sergio Alvarez who was one of the clients Mark Bloom had worked with. Alvarez told Wakefield and Barrett in early January 2017 that Mark Bloom had coerced him to file complaints with the State Bar over a delay in disbursing his funds. Barrett and Wakefield immediately contacted Layfield and came up with a plan to disburse $25,000 per month to Alvarez until his other cases resolved. This client had other issues associated with other cases which required a plan to "reign" this client in.

## The Arizona Office and the Weinberger Lawsuit

In mid-January 2017, Layfield was told by Wakefield that L&B would generate almost $5.5 million in revenue for Q1 2017 with only $2 million of expenses. Layfield believed that any cash shortfalls that may have existed would easily be cured with a $3.5 million profitable quarter. In late January 2017, Wakefield confessed to Layfield that Q1 was going to be way below that projection. Wakefield confessed that approximately $3 million of the $5.5 million was supposed to come from the Arizona office would not be collected. Layfield instructed Wakefield to immediately terminate Weinberger for his gross misconduct and for his intentional misrepresentations of revenue. Weinberger was terminated and he immediately filed an inflammatory lawsuit in Arizona. In the lawsuit, Weinberger accused Layfield and L&B of having accounting issues with its trust accounts and not being in compliance with State Bar rules. Weinberger sent this lawsuit to clients of L&B, Barrett, Wakefield, former employees of L&B and current employees of L&B. Weinberger then engaged in a full assault on the Arizona office by showing this lawsuit to most of the Arizona office clients. Weinberger's behavior resulted in the Arizona office losing 95% of its clients. The office was destroyed and $6 million of expected 2017 revenue evaporated. It should be noted that Weinberger represents that as of August 2017, not one of the cases he stole has settled or generate any legal fees. It is clear that Weinberger should be focus of recovering money for L&B.

## The Irvine Office and the Complaints from the Irvine Attorneys

Following Weinberger's lawsuit, the only remaining attorneys in the Irvine office resigned and complained about accounting issues and delayed client disbursements, which was most likely sparked by the rumors being generated by the Weinberger lawsuit. During this entire time period, Barrett was a member of the board of directors, an equity owner and Wakefield was an officer of L&B. They were all aware of these issues prior to and through the January 2017 timeframe.

5

## The Plan to Regroup and Shift Focus to High Value Cases

By February 2017, it was clear that financial projections were being missed and cash was getting extremely short. Layfield was contributing money his own funds to make payroll. Layfield asked Wakefield and Barrett to defer some of their compensation to help and both refused. Barrett's wife would call and demand immediate wires. On some occasions, Layfield would wire personal funds and those funds would be paid directly to Barrett despite Barrett knowing of client disbursement issues[3]. At the same time a major blow was struck to L&B when Conal Doyle filed a lawsuit on behalf of a former client alleging that Wakefield and Barrett had essentially tried to steal money from a client during the close-out process. Doyle cited to the dozens of interactions he had with Wakefield over the previous nine months. Doyle attached the Weinberger lawsuit as an exhibit to his lawsuit and raised many of the same issues regarding accounting problems as the Weinberger lawsuit. Barrett and Wakefield were on complete notice of accounting problems in February 2017. The Doyle lawsuit was highly publicized in the Daily Journal. Layfield felt this was a death sentence for the firm going forward. Layfield decided to retire from the practice of law by the end of 2017. Layfield explained to Wakefield and Barrett that he believed that a new national entity must be created to avoid the negative publicity being generated w/re L&B. Barrett and Wakefield agreed and the decision to form Maximum Legal was agreed upon by all three lawyers. Maximum Legal was going to focus on single event plaintiff cases with values in excess of $1 million and mass tort cases.

## The Cash Shortfalls Emerging with Lack of Visibility

By March 2017, L&B was experiencing massive cash flow issues as a result of Wakefield's missed revenue targets and his complete incompetence in managing the settlement process. It became clear that approximately $2 million in fees were stuck in the mud and not imminently collectible because Wakefield didn't supervise anybody in collecting funds. Attorneys would fail to get settlement agreements signed, fail to file motions to get settlement approved (sometimes as long as 6 months) and fail to engage in the mostsimple of tasks to generate money. Pannebakerdid not assist in any fashion as he was expected to do; rather than assisting in collecting, he demanded moving cash from IOLTA to operating to cover expenses. He would come up with iteration upon iteration of how to move money from IOLTA to Operating. Eventually Layfield realized that money was not available to move the amounts Pannebaker was requesting. When Layfield refused to move the monies, Pannebaker abruptly resigned. Layfield could not agree to move the funds because the funds were not available and nobody could explain why several million dollars was not being collected.

## The 2017 Budget Prepared by Wakefield Showing a Full Recovery

In April 2017, Layfield demanded that Wakefield redo the 2017 budget to get a real-time plan to get to the point that actual viability could be ascertained. The budget created by Wakefield showed a full recovery by summer of 2017. Layfield was confident that if any accounting shortfalls existed, they could easily be recovered from the large profits on the horizon. Layfield took the collection process away from Wakefield and assigned it to the COO Rita Mims. Mims relayed that the collection process was in complete disarray and made an attempt to seriously

---

[3] Apparently, Barrett was under a very strict payment program in order to avoid immediate foreclosure of his home.

attack and consolidate the collection process. Mims began collecting funds in late April 2017, but it seemed a little bit too little too late.

### The Actual 2016 results come in

By April 2016, the financial results of L&B came in. It showed revenue of approximately $11 million with a loss of almost $2.7 million. At that time Layfield knew a massive problem existed, but he didn't have completed accountings in order to review the accounting in real-time. Layfield asked the remaining L&B controller, Shyam Bandepalli to review the results, requested updated financials for 2017 and asked him to conduct an audit of all close outs. By April, L&B owed the 855 company almost $1.4 million in past invoices and many employees of 855 began abruptly quitting or refusing to work. Bandepalli was one of the people that refused to work. Layfield had no ability to get information, but knew that if the financial results came in, there was a chance of resolving all accounting and payment issues.

### The Destruction of the Bangalore Office

By late April 2017, the Bangalore 855 office was in trouble. Nobody was getting paid because of the lack of cash flow from unpaid L&B invoices and as a result folks were leaving in droves. It was impossible to get work done and Pannebaker, who had agreed to oversee (and get paid to oversee) failed to do so and then resigned in the midst of this crisis.

### The Plan Between Layfield, Barrett & Wakefield to form a new firm

Despite the massive problems at L&B, it appeared that there was an opportunity to resolve all issues to everyone's satisfaction. Layfield settled a case for $5.25 million in March 2017 and then settled another one two weeks later for $3.5 million. Layfield also had several other large cases that he was working to resolve at the same time. Layfield had historically brought in and resolved the largest cases with the largest results. He had, historically, generated more money than the entire firm combined. At this time, in April 2017, the documents for the ML transition ("Transition") were ready to sign and the Master Association Agreement was executed. The main focus of the Transition was to ensure L&B had enough assets/revenue to pay any and all client claims and all creditors. Barrett and Wakefield were clear in the goals. Barrett and Wakefield were more than happy to leave all of the baggage behind at L&B and move on. They were excited about their increased equity percentages and Wakefield was ecstatic about his raise from $200,000 to $300,000 upon becoming a partner. All documents were executed and the plan was in place.

### Layfield, Barrett & Wakefield

The main issue during this entire process was obtaining the final complete and accurate accounting so that L&B's clients and creditors were paid. During this time bar complaints were filed and many clients were irate at the delays. Unfortunately, with no accounting staff and almost no money coming in to pay anybody, things ground to a halt. Approximately $3 million of receivables was set to come in from Layfield's settlements and it appeared that another $2 to $3 million would be coming during the summer of 2017. Layfield had serious discussion with

7

Wakefield and Barrett about the accounting issues. Layfield expressed to Wakefield and Barrett that since he was retiring from the practice of law, he would allow Wakefield and Barrett to point the finger at him so they wouldn't be disciplined and so they could continue working at ML in order to generate money and pay the notes owed to Layfield. At that point, Wakefield came up with some plans to insulate himself and Barrett. Wakefield suggested that Barrett resign from the board of directors retroactively and have his equity interest in L&B rescinded. Wakefield backdated a resignation of Barrett from the Board of Directors of L&B.

Between Layfield's departure on June 13, 2017 and the filing of the lawsuit by Nguyen, things were very tense between the former partners. Barrett began an email assault on Layfield regarding client issues. Barrett thought as part of the pact that he should send emails in an attempt to create the fiction that he had no idea about the accounting problems and that he had just learned of these issues. In reality, the pact was that Barrett could inquire about these issues and Layfield would respond by saying that he would take care of things. Barrett would often reply to those emails with a two thumbs up emoji. Eventually, Barrett went overboard and began sending dozens of emails each day and would bombard Layfield's email box with late night multi-page emails. Layfield become so irritated with Barrett that he eventually had to block Barrett's emails. Layfield expressed extreme frustration with Barrett over these issues and explained to Barrett that his emails were not helpful and would be perceived as a desperate measure to shift blame to Layfield.

After the Ch. 11 bankruptcy was filed for ML, Wakefield and Barrett refused to answer any of Layfield's calls and basically went silent.

## The L&B IOLTA accounts:

Layfield was the primary signatory on the Esquire Bank IOLTA account. Layfield was aware of 3 other IOLTA accounts, but he does not recall if he was ever given online access to any of the other IOLTA accounts held at Wells Fargo. On several occasions, Layfield had given his online passwords to the IOLTA and operating accounts at Esquire Bank to various member of the Finance team, which included Pannebaker. The system for disbursing funds was Layfield would rely on up to date accounting/collections reports generated by Wakefield, Pannebaker and other members of the Finance team (after his oversight of Team reporting and accounting figures), acting accordingly. The failure to update accounting reports resulted in a lack of real-time information and confusion about where and what funds were collected into the L&B accounts. Layfield could not release funds without up to date information or accurate close-out reports. The allegation that Layfield "stole" client funds is not accurate – rather it was misreporting by Wakefield and directions by Wakefield and Pannebaker to transfer funds to operating accounts as well as a failure to settle, manage and collect funds that led to the shortfalls.

## CONCLUSION
The Current False Narrative Being Perpetrated by Joe Barrett, Todd Wakefield and Marty Brill

- Phil Layfield stole all the money
- Joe Barrett and Todd Wakefield had no idea of the accounting problems/challenges

- Phil Layfield hid the firm's problems from everyone and Todd & Joe are in shock over the current situation
- Everyone was innocent and Phil Layfield is a criminal
- Todd Wakefield is the bona fide owner of Maximum Legal (California), LLP and Joe Barrett Law is a d/b/a that has no culpability

## The Facts Illustrate That:

- Phil Layfield put more money into L&B then he received out of L&B.
- Joe Barrett and Todd Wakefield had full knowledge of accounting issues as early as October 2016 and continued to draw large salaries.
- L&B was profitable until September 2016.
- Todd Wakefield intentionally mislead Phil Layfield and others about the true performance of the litigation teams until it was too late.
- In his role as Director of Litigation, Todd Wakefield grossly mismanaged the litigation teams (which was his primary responsibility) and failed to perform his daily, weekly and monthly duties.
- When Jeff Pannebaker was hired in October 2016 as CFO, he grossly mismanaged the Finance Team, failed to complete the switchover from quickbooks to NetSuite ERP and failed to provide any useful reporting to management. In essence, L&B was flying blind for almost 8 months due to Jeff and Todd's failure to do even the most basic tasks
- Joe Barrett had full knowledge of the accounting issues, client complaints, but sat back and waited for an opportunity to take advantage of the demise of L&B.
- Joe Barrett has engaged in almost the same type of behavior in the past when he was sued for fraud and was forced to have a receiver appointed during the demise of the Cochran firm.
- Joe Barrett encouraged employees to quit, sue and steal cases.
- When accounting issues were discovered, an agreement was had between Joe, Todd and Phil to point the finger at Phil so any State Bar issues would be focused on Phil and so Todd and Joe could continue making money for Maximum Legal and in turn L&B
- Joe and Todd breached the pact in an attempt to gain 100% control over Maximum Legal (California), LLP and avoid paying the $8 million notes to Layfield for the purchase of their interests in Maximum Legal.

# EXHIBIT 2



# BARRETT LAW
Trial Lawyers for the People

3777 Long Beach Boulevard
3rd Floor
Long Beach, CA 90807

August 3, 2017

<u>**VIA FIRST CLASS AND ELECTRONIC MAIL**</u>

David Breitburg, Esq.
Tharpe & Howell LP
15250 Ventura Blvd., 9th Floor
Sherman Oaks, CA 91403

<u>DBREITBURG@THARPE-HOWELL.COM</u>

Re:  *Case Name: Johnson v. Sky's The Limit Limousine, Inc.*
     *County of Orange Case No.: 30-2016-00845876-CU-PA-CJC*
     *Date of Incident: 04/16/2014*

Dear Counsel:

As a former employee of the law firm of Layfield & Barrett, APC ("L&B"), which has served as counsel of record for the plaintiff in the above-referenced case, I am writing to advise you that L&B appears to have effectively ceased to function as an active law practice. Efforts are underway to provide for the orderly winding-down of its affairs and the transition of its cases to other lawyers and law firms to ensure that client interests are protected. Your patience and cooperation in this process is requested.

I have been informed that creditors of L&B have filed a petition for involuntary bankruptcy in the U.S. Bankruptcy Court for the Central District of California. This action follows the termination of all remaining lawyers and staff in June by the firm's managing partner, Philip Layfield ("Layfield"). L&B and Layfield personally also are the targets of multiple claims, lawsuits, bar complaints and client complaints alleging mishandling of client funds and other misconduct. Consequently, the Office of the Chief Trial Counsel of the State Bar of California is considering proceedings under section 6190 of the Business & Professions Code for assumption of jurisdiction over L&B by the Superior Court. Absent such action, we anticipate an ex parte motion shortly seeking a broad-based stay of proceedings in the above-referenced case and other cases in the L&B portfolio to protect clients from adverse consequences under these unfortunate circumstances.

In the interest of ensuring that clients who are effectively unrepresented in active litigation are not harmed by circumstances over which they have no control (and of which they

1



# BARRETT LAW

## Trial Lawyers for the People

may not yet even be aware), I am requesting your cooperation and civility by a request that you postpone further activity in the above-referenced case for 45 days while these issues are being sorted out and formal actions and orders are being put into place.

If you will be so kind, please sign your name below and email this back to me at joe@joebarrettfirm.com so we can assure the clients time is being afforded to straighten out this situation and protect them from harm due to the actions of their former lawyers.

Sincerely,

Joseph M. Barrett, Esq.

_____          _____
*Signed*                                              *Dated*

*Attorney for Defendant:*

_____

2

# EXHIBIT 3

*DAVID L. CLARK*
*Attorney at Law*
*10736 Jefferson Blvd., #757*
*Culver City, CA 90230*
*(310) 204-0777*
August 14, 2017

Send to
State Bar

Joseph M. Barrett
Barrett Law
3777 Long Beach Blvd., 3rd Floor
Long Beach, CA 90807                    Via certified, return receipt mail

RE: *Reyna, et al. vs. Perez, et al.*, Los Angeles Superior Court Case No. BC621050

Dear Mr. Barrett:

Your request by letter dated August 5, 2017 is denied.

Your letter of August 5 is the first I have ever heard of the circumstances you describe, and based upon research I conducted last week it appears you have omitted important considerations.

You eschew any positive assertion that you have any authority to act on behalf of the plaintiffs in the above-referenced matter. You do not assert that you have become, or intend to become, attorney of record in the matter (personally, or through "Barrett Law," or "Maximum Legal (California)," or any other entity). Indeed, you do not even assert that you have ever been in contact with the plaintiffs, or that you plan to contact them for the purpose of substituting as counsel of record.

According to filings in the two pending bankruptcy proceedings involving Layfield & Barret and Maximum Legal (California), accessible through the pacer.gov system, you and your associate, Mr. Wakefield, were well aware beforehand of the pending winding down of the affairs of your former firm and the assumption of representation of its clients by the latter-mentioned firm. Well before this summer, both of you appear to have executed several documents and exchanged emails with numerous lawyers in these firms for that purpose. While you maintain that the actual cessation of operations of your former firm was abrupt, it appears to me that you and your old firm(s) did not take sufficient steps beforehand for the effective or orderly transfer of representational responsibilities.

Indeed, I discovered this last week that someone caused to be filed a change of address and a purported association of counsel in the above-referenced matter by Maximum Legal (California), LLP, on or about June 19, 2017. However, I can not recall ever receiving the supposedly mailed service copy, I can not find it in my file, and that instrument is ineffectual for any change of the name(s) of any attorney(s) of record in so far as it contains no signed consent on behalf of the clients. (See CCP §584.) Your Aug. 5 letter makes no mention of this law firm, of which you appear to be a principal lawyer. So, of course your letter of Aug. 5 makes no mention of any purported association of this firm into the above-referenced matter.

Moreover, while in your Aug. 5 letter you maintain that your old firm of Layfield & Barrett has ceased operations, you fail to mention in your Aug. 5 letter that in bankruptcy proceedings Mr. Layfield maintains that your old firm has been operating and continues its operations. You also fail to mention that the Layfield & Barrett bankruptcy matter was at that time subject to a motion for conversion into a voluntary Chapter 11 proceeding. It has since been so converted, according to on-line records.

Indeed, both of those bankruptcy proceedings relating to the two firms make it abundantly clear that your old firm of Layfield & Barrett, Maximum Legal (California), Mr. Layfield, yourself, and others have been, and are currently, engaged in sharp disputes over not only sums of money, but also over who properly represents potentially several dozens of litigation clients who were once solely and officially represented by your old firm Layfield & Barrett. The possibility that the above-referenced is one of those disputed cases is obvious.

At least since April of this year, the plaintiffs' counsel of record in the above-referenced appears to have abandoned any interest in pursuing the case. My client offered himself for deposition several times before that, only to have plaintiffs' counsel unilaterally cancel each of the reserved and noticed deposition dates. Instead, plaintiffs' counsel only seemed interested in continuing to make demands for the payment of sums to settle the matter, even though it was unambiguous that my client intended to defend the matter at trial and not pay out any nuisance value in the case. After the last rejection by my client of a CCP 998 demand, the plaintiffs' case has languished. After more than four months, your mailed letter of August 5 is the next contact I've actually had in the case from anyone purportedly associated with the plaintiffs.

If you have, or ever do, see the Layfield & Barrett file in this case, you will see that I have briefed several binding court precedents that dictate no duty of care was owed by my client to the plaintiffs. The plaintiffs' counsel has never, ever, in about a year's time now, presented any facts to indicate, as is necessary under the law, that my client was on notice to suspect that any risk of danger existed at the residence he rented and where the alleged injuries took place. The plaintiffs' answers to discovery propounded to them on these factual points were nonresponsive, nonsensical and failed to establish any of the required facts for recovery. In the absence of such essential facts, I many months ago demanded in writing of plaintiffs' counsel that this matter be dismissed with prejudice as against my client.

I reiterate to you directly that which you will find in your old firm's file for the case, if you ever see it - namely, that the matter should be dismissed forthwith and with prejudice as against my client, that is, in so far as it is within your lawful ability to assist or effectuate such an outcome. I thank you in advance for any efforts you may expend towards that outcome.

Nothing contained herein or omitted herefrom is intended, nor shall it be construed to be a waiver, relinquishment, diminution, or impairment of any of my client's rights, claims, defenses, privileges or remedies, all of which are expressly reserved.

Sincerely,

David L. Clark
Attorney for Defendant Edgar Hurtado

CC, via certified, return receipt mail:
  Layfield & Barrett, 382 NE 191st St., #42308, Miami, FL 33179-3899
  Te'Aira Law, Maximum Legal (California), LLP, 633 West 5th Street, Suite 3300, Los Angeles, CA 90071

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
C.C.P. Sections 1013

I, the undersigned, hereby certify that I am a citizen of the United States and over the age of eighteen; I caused our attorney service to serve this document by personal service who will sign a separate proof of service upon completion. My business address is 382 NE 191st Street #42308, Miami, Florida, 33179

I am familiar with the practice of this law firm for the collection and processing of documents for mailing with the United States Postal Service, that the documents would be deposited with the United States Postal Service that same day in the ordinary course of business by using our attorney service online portal.

On October 31, 2017, I caused the requested ACE ATTORNEY SERVICE TO PERSONALLY SERVE THIS DOCUMENT:

**Response to Notice of Disciplinary Charges**

on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages with postage thereon fully prepaid, and following the ordinary business practices of this law firm, placed said envelope(s) for collection and mailing to the parties to the within action, at Los Angeles, California, addressed as follows:

**SEE ATTACHED SERVICE LIST**

☐      BY MAIL: I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon full prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐      VIA FACSIMILE TRANSMISSION [Complying with Code of Civil Procedure § 1013(e) and (f)]: from Fax number to the fax number:

☐      BY FEDERAL EXPRESS: I served such envelope or package to be delivered by FedEx Overnight service in an envelope or package designated by the FedEx carrier.

☒      BY PERSONAL SERVICE: I personally requested that ACE ATTORNEY SERVICE personally serve the documents listed above.

RESPONSE TO FIRST AMENDED NOTICE OF DISCIPLINARY CHARGES
13

1

2     ☐     BY ELECTRONIC SERVICE [Complying with Code of Civil Procedure § 1010]: I
3  caused such document(s) to be electronically filed and served through Ace Legal's
4  Electronic Filing Portal for the above-entitled case. Upon completion of transmission of
   said document(s), a filing receipt is issued to the filing party acknowledging receipt, filing
5  and service by the above-referenced system. A copy of the filing receipt page will be
   maintained with the original document(s) in our office.
6

7  Executed on October 31, 2017, at Los Angeles, CA.

8

9                                              Name of Process Server

10                                             Daniel Tang

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SERVICE LIST

State Bar of California
Office of Chief Trial Counsel
Eli D. Morganstern
Senior Trial Counsel
845 South Figueroa Street
Los Angeles, CA 90017

**EXHIBIT "B" (Layfield Declaration re Bankruptcy Case**

**(without exhibits))**

1  CURD, GALINDO & SMITH, L.L.P.
   JEFFREY B. SMITH, SBN 150095
2  301 East Ocean Boulevard, Suite 1700
   Long Beach, CA 90802
3  Telephone: (562) 624-1177
   Facsimile: (562) 624-1178
4  Email: jsmith@cgsattys.com

5  Attorneys for Debtor Layfield & Barrett, APC

6                  UNITED STATES BANKRUPTCY COURT

7                  CENTRAL DISTRICT OF CALIFORNIA

8                       LOS ANGELES DIVISION

9  In re:                          )   Case No.: 2:17-bk-19548-NB
                                    )
10 LAYFIELD & BARRETT, APC          )   Chapter 11
                                    )
11                                  )   DECLARATION OF PHILIP LAYFIELD IN
                                    )   SUPPORT OF DEBTOR'S OPPOSITION TO
12              Debtor.             )   EMERGENCY MOTION FOR
                                    )   APPOINTMENT OF INTERIM TRUSTEE
13                                  )   UNDER 11 U.S.C. SECTION 303(g)
                                    )
14                                  )   Date: August 8, 2017
                                    )   Time: 1:00p.m.
15                                  )   Place: Courtroom 1545
                                    )   255 E. Temple Street
16                                  )   Los Angeles, CA 90012
                                    )
17                                  )
                                    )   HONORABLE NEIL BASON,
18                                  )   UNITED STATES BANKRUPTCY JUDGE

19 ─────────────────────────────────

20 TO THE HONORABLE NEIL BASON, UNITED STATES BANKRUPTCY JUDGE, AND TO

21 INTERESTED PARTIES:

22   COMES NOW PHILIP LAYFIELD and submits his declaration and Exhibits in support of the

23 Opposition of Layfield & Barrett, APC to the EMERGENCY MOTION FOR APPOINTMENT

24 OF INTERIM TRUSTEE UNDER 11 U.S.C. SECTION 303(g), filed by Petitioning Creditors

25 The Dominguez Firm, Mario Lara, Nayazi Reyes and Maria Rios.

26

27

28

Curd, Galindo & Smith, L.L.P.
301 E. Ocean Boulevard, Suite 1700
Long Beach, CA 90802
Ph: (562) 624-1177
Fx: (562) 624-1178

## DECLARATION OF PHILIP LAYFIELD

I, Philip Layfield, hereby declare as follows:

1.  I am an attorney duly licensed to practice law before all courts of the State of California and I am the President and sole beneficial owner of 100% of Layfield & Barrett, APC (hereinafter L&B). I have been a practicing lawyer concentrating on personal injury and business litigation cases for over 15 years.

2.  In 2016 and early 2017 I decided to commence the winding down of L&B in favor of a new business model.  The new business model was to expand to a national firm that focused on larger cases as opposed to high volume.  We would seek out larger tort cases and where necessary team with local lawyers who needed the experience and resources of a national firm of experienced litigators.

3.  I intended to use my experience to market the larger cases for the new business, and to manage the "back office" functions of a large multi-state national practice from off site, with Information Technology, accounting and other functions under my supervision, but performed in favorable labor and overhead markets to save cost.

4.  It was my intention to ultimately remove myself from the day to day handling of cases as a trial lawyer, and to manage the marketing side of a national law practice from Costa Rica where office and labor costs are very inexpensive.

5.  The new national law firm was formed in early 2017, as detailed more below:  Maximum Legal, LLC a Delaware limited liability company ("ML").

6.  I am the CEO of MLS and sole beneficial owner of 100% of ML's membership interests.

7. ML owns four wholly-owned subsidiary law firms which are: 1. Maximum Legal (California), LLP; 2. Maximum Legal (Arizona) LLC, Maximum Legal (Utah), LLC and Maximum Legal (Florida), PLLC.

8. Some existing cases of L&B would be transferred to ML for handling by one of the ML subsidiaries. Other cases were to be resolved or culled within L&B over the next year as discussed below.

9. The law firm of Jones Waldo in Salt Lake City, Utah prepared the documentation for the winding down of of L&B, the transfer of cases and assets from L&B to ML and/or its subsidiaries, and the formation of ML and its subsidiaries along with the assistance of the former General Counsel of L&B, Todd Wakefield.

10. I am also the CEO of Maximum Legal Services, LLC (hereinafter "MLS") which is not a law firm, but provides the back office litigation support services as well as other services to law firms including ML and its subsidiaries. Through its network of affiliated entities, MLS currently employs approximately 20 individuals in 4 countries. The website is www.maximumlegalservices.com.

11. I have become aware of declarations filed in the Maximum Legal (California), LLP bankruptcy case along with certain declarations filed in this case which are false, deceptive, misleading and inflammatory.

12. I have not fled the country. I have been in constant contact with Joe Barrett, Todd Wakefield and others since my planned move to Costa Rica. My planned move has been in the works for approximately 6 months with the full knowledge of Joe Barrett, Todd Wakefield and all key employees of L&B and ML.

13. Joe Barrett and Todd Wakefield were aware at all time that L&B's Director of Intakes Kenny Palacios and a Team Coordinator John Meneses were relocated to Costa Rica at the same time in order to set up the office. They were provided weekly and sometimes daily updates of the progess being made in Costa Rica.

14. The orderly transition of certain cases, personnel and assets from L&B is outlined in detail in a Memorandum circulated by Todd Wakefield on June 5, 2017 only two months ago. Attached as Exhibit 1 is a true and correct copy of the June 5, 2017 Memorandum.

15. In addition to that Memorandum, a Master Services Agreement was signed with ML and Maximum Legal (Costa Rica) to perform substantial services to ML for multiple years. Maximum Legal (Costa Rica) is not a law firm but a subsidiary of MLS that is authorized to conduct business in Costa Rica. That Master Services Agreement was signed in April 2017. In anticipation of the performance of those services, Costa Rican office space was acquired, employees hired and families moved from California to Costa Rica to set up this substantial operation.

16. I made the L&B management team aware of my plans to step down from active litigation practice in January 2017, to effectuate the new business model. Joe Barrett and Todd Wakefield were intimately involved in those plans. In fact, Todd Wakefield requested that we have a partner meeting in Costa Rica with the intent of mixing a vacation in with the work of transitioning into the MLS business model. The idea that I have hidden myself in Costa Rica to avoid responsibility on any level is patently false and belied by dozens if not hundreds of e-mails that we exchanged about the opening of the Costa Rica operations, and ML and its subsidiaries.

17. Between February 2017 through June of 2017, myself, the lawyers at Jones Waldo and
    Todd Wakefield worked together on the formation of Maximum Legal, LLC and its
    wholly-owned subsidiaries, which included Maximum Legal (California), LLP.

18. Signing packages were created for all interested parties, including Joe Barrett and Todd
    Wakefield. All parties signed the required agreements in the Spring of 2017.

19. Part of the restructuring contemplated the transfer the high-value cases from L&B to ML
    in exchange for a twenty-five percent referral fee back to L&B in recognition of the
    substantial work and expenses already incurred by L&B on this portfolio. This
    transaction was designed to ensure that L&B would have sufficient assets to satisfy all of
    its obligations during its wind-down process, which included any client matters
    outstanding, liens and the $4 million Advocate Capital loan.

20. In April 2017, a Master Association Agreement was signed between L&B and ML which
    transferred a case portfolio worth approximately $10 million from L&B to ML.

21. For the lower value cases still residing at L&B, a "Culling-List" was created whereby
    Todd Wakefield and team of 3 attorneys and 2 paralegals would attempt to settle, refer or
    drop cases that didn't make strategic sense for ML to take over. This process was
    supposed to be completed by June 30, 2017.

22. It was anticipated that ML would initially occupy four separate locations in Los Angeles,
    Park City, Miami and Scottsdale Arizona respectively.

23. I have read the declarations in support of the motion to appoint a trustee that allege that I
    have transferred assets to myself from L&B, particularly real estate in Utah and Arizona.

24. L&B was being operated out of office buildings owned by L&B for which I was the
    personal guarantor on almost $2 million of debt.

25. Neither L&B nor ML were paying rent on the office suites in Arizona or Utah by April
2017. With over $14,000/ month due on the payments for which I was personally
responsible, I took it upon myself to find a tenant for the Utah and Arizona locations.
I've recently learned that ML has abandoned those buildings. ML has also abandoned
the Los Angeles office despite an agreement to occupy those spaces. Attached as Exhibit
2 is a true and correct copy of the lease prepared by Todd Wakefield for the Utah
location.

26. Since the plan was to wind down the affairs of L&B within twelve months, a decision
was made to separate those assets into an LLC structure. With the full knowledge of Mr.
Barrett and Mr. Wakefield, those properties were transferred at fair market value to
Layfield V, LLC, which is an entity that I have a financial interest. In fact, Mr.
Wakefield prepared the deed transfers with the assistance of his spouse who works at a
title company.

27. Those properties had very little equity since they had been acquired using 90% loan to
value SBA financing and were not rented at that time.

28. It was agreed that we would credit the 10% equity position in those properties against
monies the L&B owed to me.

29. L&B owes me substantial monies. I have unreimbursed expenses in excess of $500,000
and I am the personal guarantor of $4 million in litigation financing from Advocate
Capital.

30. I also advanced monies to L&B during 2017 in excess of $500,000. Attached as Exhibit
3 are true and correct copies of bank statements showing those transfers. Joe Barrett and
Todd Wakefield have never put one dollar into L&B.

31. Shortly after starting the Costa Rican operations, pursuant to our plans as set out in the Memorandum (Ex. 1) and the various other agreements related to ML and its subsiaries in June of 2017, Mr. Wakefield and Mr. Barrett began behaving erratically. They refused to communicate on basic issues like case status and began having secret meetings without me. They ultimately fired almost the entire staff without my knowledge and with no notice.

32. Mr. Wakefield refused to honor the Master Association Agreements with L&B and the ML agreements with MLS and took extraordinary efforts to "choke-off" all revenue to L&B.

33. Mr. Wakefield and Mr. Barrett filed a bankruptcy petition on behalf of Maximum Legal (California), LLP without the approval of its corporate parent, ML, which I controlled the majority of the vote at the time. They have intentionally misled this court about the ownership structure.

34. I recently learned that Mr. Wakefield and Mr. Barrett are attempting to avoid paying me the $8 million they owe to me as part of a plan to attack my character and L&B.

35. I have also become aware that Mr. Wakefield and Mr. Barrett have been telling people that L&B is out of business and that I have fled the country. These statements are all false. I maintain a 2nd residence in California in the same neighborhood for several years.

36. In early July of 2017, I became aware that Mr. Wakefield had abandoned the culling list and was taking the position that Maximum Legal (California), LLP was not taking over those cases. I attempted to communicate these issues with Mr. Wakefield and he has been unresponsive.

37. For the past three weeks, I have sent numerous communications to Mr. Wakefield to sort

out the cases that were still remaining at L&B in order to ascertain if my list of L&B

cases was complete and accruate. Additionally, the Chief Operating Officer at MLS has

attempted to obtain that list as late as August 3, 2017. Mr. Wakefield assured that he

would provide the list and he has failed to provide the list.

38. Myself, along with MLS' Director of Litigation Support and MLS' COO have spent the

last 10 days sorting through the cases abandoned by Mr. Wakefield and are actively

representing those clients.

39. As one example, Mr. Wakefield agreed to take the responsibility of filing a minor's

compromise for a case settled by L&B, but he has completely failed to take even the first

steps towards filing the minor's compromise motion  I learned this today by virtue of an

email from defense counsel. L&B is now going to handle this petition. A true and

correct copy of that email is attached hereto as Exhibit 4.

40. L&B is a functioning law firm with cases throughout the United States. Currently, L&B

has 133 matters in various stages from pre-litigation, active litigation, cases which have

attorney liens, cases that have been referred to other lawyers as co-counsel, and cases that

are currently being referred;

41. The value of these cases exceeds $50 million.

42. The estimated legal revenues from these cases exceeds $6 million.

43. I am more than capable of handling these matters and plan to hire addition staff to

maximize the value of the current matters.

44. L&B has pending fees and costs recoverable of approximately $2 million.

45. I am in charge of the L&B attorney client (IOLTA) accounts, and am now also in charge of all ML IOLTA accounts as a result of the recent terminations of Messrs. Wakefiled and Barrett from ML. L&B has hundreds of cases and dozens of settlements that require detailed accounting of costs, fees and client distributions. L&B suffered massive turnover in its finance department with the departure of our controller in March 2017. I have recently been able to hire two Certified Public Accountants at MLS to take over the administration of our IOLTA accounting. I will be supervising those accountants.

46. Mr. Wakefield oversaw the close-out function at L&B through June 30, 2017. He worked with the accountants and finance team. For approximately 18 months, Mr. Wakefield failed to properly account for costs, liens and other important issues. His failure to discharge his basic duties made it extremely difficult and time consuming to finalize close outs. I ultimately realized that I needed to take over this process, which I have.

47. The IOLTA accounting and transition with ML, and now disputes arising between L&B's former lawyers and me has been an admitted quagmire. But appointment of a Chapter 7 trustee will NOT make the matter better, it will make it worse. ML and L&B can and will account for all funds owed to all clients, co-counsel and liendholders through the Chapter 11 process. Chapter 11 is necessary to be able to properly administer this process without the constant attacks on L&B funds being levied improperly by Mr. Barrett, Mr. Wakefield and The Dominguez Firm. In short, they have been substantially interfering with L&B's daily operations.

48. With respect to the allegation about L&B's phone number, being disconnected, that is also intentionally misleading. During the transition from L&B to ML, it was anticipated

that ML would take over the old L&B phone number and L&B would obtain a new toll-free number. On Monday, July 31st, I learned that Maximum Legal (California), LLP was abandoning all office space and not taking any phone numbers. L&B quickly moved to reprogram its phone system. L&B's toll-free number is 855-880-8335, and is working

49. L&B's website was temporarily down while L&B rebranded to remove all old locations, employees and outdated information. That website currently has a "coming soon" page located at www.layfieldbarrett.com, but refers its viewers to our phone #

50. L&B has contracted with MLS to provide back office litigation support.

51. L&B has assets in the millions of dollars.

52. L&B has dozens of cases I am actively working to resolve.

53. L&B has numerous co-counsel relationships.

54. As a result of Mr. Wakefield and Mr. Barrett's smear campaign, L&B has suffered losses in the millions. In fact, on one case that was set to resolve on August 8, 2017, L&B was fired by the client as a direct result of their improper actions. The legal fees in that case alone were anticipated to be in the millions. If the case ultimately goes to trial, I anticipate a verdict in excess of $20 million, which legal fees of $8 million.

55. When I learned of the extent of the misconduct by Messrs. Barrett & Wakefield, I terminated them as Managers of Maximum Legal, LLC effective August 5, 2017. I also terminated Mr. Wakefield as CEO of Maximum Legal, LLC. Additionally, I redeemed their ownership in Maximum Legal, LLC. This was all done with the advice of counsel as to the proper mechanism under the Maximum Legal, LLC Operating Agreement. A true and correct copy of the Operating Agreement of Maximum Legal, LLC is attached herewith as Exhibit 5.

56. On June 30, 2017, I held a status meeting with attorneys at L&B and ML to discuss many pending matters that needed to be addressed. I documented that meeting with follow up notes. Attached as Exhibit 6 is a true and correct copy of that email.

57. Although I was hoping to spend the next year spearheading the growth of MLS, as a result of the attacks on myself personally, L&B and ML, I am going to dedicate myself to resolving all outstanding issues with L&B and assert my rights as the 100% owner of Maximum Legal, LLC.

58. I have instructed counsel to convert this involuntary Chapter 7 to a voluntary Chapter 11 reorganization. Certainly, the mismanagement of Mssrs. Wakefield & Barrett have put a massive financial strain on L&B and it is apparent that L&B will benefit from a reorganization so that it can move to complete the collection of its assets, the payment of all of its debts and the orderly transition of its files

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of August, 2017 in Tamarindo, Costa Rica.


Philip Layfield