NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MARK AVEIS (Cal. Bar No. 107881)
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4477/4849
     Facsimile: (213) 894-6269
     E-mail:   mark.aveis@usdoj.gov
              eddie.jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-124-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S **FIRST AMENDED** RESPONSE TO DEFENDANT'S APPLICATION FOR BAIL REVIEW |
| v. | |
| PHILIP JAMES LAYFIELD, aka Philip Samuel Pesin, | Hearing date: June 6, 2018 Time: 11:00 a.m. |
| Defendant. | |

The government, by and through its counsel of record, the
United States Attorney for the Central District of California,
hereby files its **first amended** response to defendant Philip
Layfield's application for bail review, Dkt. 33, hereby providing to
the Court an index of Exhibit 1 (marked and received during the
initial bail hearing) and page references to Exhibit 1.

INDEX TO EXHIBIT 1

| PAGE(S) | ITEM(S) |
|---|---|
| 1-13 | First Amended Notice of Disciplinary Charges, In Re Philip Layfield, California State Bar Court, filed September 26, 2017 |
| 14-44 | Response to First Amended Notice of Disciplinary Charges, filed by Philip Layfield, October 31, 2017 |
| 45-48 | Emails re client S.J. |
| 49-56 | Decision and Order of Involuntary Enrollment, California State Bar Court, In re Philip Layfield, filed May 18, 2018 |
| 57-76 | Amended Proof of Claim of US Claims Opco LLC (dba DRB), filed in In Re Layfield & Barrett APC, U.S. Bankruptcy Court, CDCA, 17-BK-19548-NB |
| 77-78 | Email re R.P. fee splitting and settlement |
| 81-201 | Declaration of Philip Layfield filed in In Re Layfield & Barrett APC |
| 202-212 | Motion [] to Withdraw as Counsel of Record [for Philip Layfield], filed in In Re Layfield & Barrett APC |
| 213 | Esquire Bank signature card for IOLTA account ending in 2012 |
| 214-233 | Emails and Notice of Settlement (signed by defendant Layfield) in the matter of S.J. |
| 234-235 | Email from counsel for bankruptcy trustee in In Re Layfield & Barrett APC re non-turnover of bank records by defendant Layfield |
| 236 | FBI 302 for E.E.D. re Pineda case associated counsel |
| 237-249 | IRS MOIs for witness R.M. |
| 250-252 | DHS/HSI MOI for witness R.M. |
| 253-257 | DHS/HSI MOI for witness J.M. |

3

## I.    SUMMARY

The government submits that defendant's application should be denied because there are no conditions nor is there any combination of conditions to support bail for at least the following reasons: (1) defendant remains a flight risk, and the risk of flight has increased since defendant has seen discovery that overwhelmingly proves the charges, especially evidence that shows that defendant is facing substantial prison time; (2) defendant remains an economic danger to the community because, among other things, he negotiated from Costa Rica the disposition of at least one personal injury case that was property of defendant's former firm's bankruptcy estate, and without the client's knowledge, and defendant has concealed computers and computer files by directing others to take such property from the U.S. to Costa Rica where such property was, in effect, wholly unavailable to the bankruptcy trustee for defendant's former firm; (3) defendant is a danger to others as he has intimidated at least one witness and threatened to turn that witness over to immigration authorities for deportation, thereby also potentially interfering with the government's ability to prepare for trial and to prosecute this case.

## II.   FACTS

### A.    Defendant's Plan to Relocate to Costa Rica

In a sworn statement before the bankruptcy court in the case involving his former firm, Layfield & Barrett ("L&B"), in which he was the 100% owner, defendant planned to wind-down L&B in 2016, and to then relocated to Costa Rica to "remove [him]self from the day-to-day handling of cases . . . ."  **Exhibit 1 at 82**.  It is

undisputed that, at all relevant times, defendant (and his wife) were sole signatories for L&B's "Interest on Lawyer's Trust Account" ("IOLTA") at Esquire Bank, account number ending in 2012 ("IOLTA 2012"), and into which the proceeds of dozens of L&B clients' settlement proceeds were deposited concurrently with the time that defendant had decided to relocate to Costa Rica. **Exhibit 1 at 213**. The government's accounting of the IOLTA account shows hundreds of thousands of dollars, if not well more, was transferred out of the IOLTA account and to the L&B operating account and to defendant's personal account.  At the relevant time, defendant had a substantial and rather lavish monthly cost of living, with his residence loan alone at more than $15,000, not to mention thousands of dollars in car payments and horse maintenance costs. **Exhibit 1 at 246; 253-255**.

    B.    Unpaid Clients

        1.    Client J.N.

As alleged in the indictment, and supported by substantial evidence disclosed prior to the present bail review to defendant as government's discovery, J.N. engaged L&B in March 2016 to represent her in a personal injury case.  The case was settled in August 2016 for $3.9 million, the entire amount of which was deposited at the end of August into the IOLTA 2012 account.  Save for a single "lulling payment" of $25,000 paid to J.N. in March 2017, J.N. received nothing, even though, as defendant concedes, L&B's fee was at most approximately $1.5 million.  J.N. may face a collection action by Medical for nearly $300,000, all of which defendant was supposed to ensure was paid as a lien against J.N.'s settlement

5

proceeds.

2.    Client R.P.

R.P. suffered a significant personal injury and retained counsel.  That counsel referred the matter to defendant's firm to associate into the case and split fees.  **Exhibit 1 at 77-78**. Defendant was *not* responsible for the case at L&B; it was handled by other lawyers there.  R.P.'s matter was settled for approximately $1.3 million and the settlement proceeds were deposited into the IOLTA 2012 account, of which approximately 50% was to be split between L&B and the referring firm.  The referring firm receiving nothing.  **Exhibit 1 at 78**.  R.P. received a small "lulling" payment. After relocating to Costa Rica, and when confronted by the referring firm in a recorded call dated August 25, 2017, to explain why the client's portion was simply not in the IOLTA 2012 account whose balance at the time of the call was practically zero, defendant said he would pledge new money from new cases to cover the obligation. Defendant also told the referring firm that defendant had provided L&B bank records to the L&B bankruptcy trustee (L&B had been placed in bankruptcy about three weeks earlier, a fact about which defendant well knew) when, according to the trustee's counsel, defendant had failed to turn-over anything.  **Exhibit 1 at 234**.  The L&B lawyers who worked on the case got nothing.

3.    The *Pineda* Matter and the DRB Advance

Another L&B matter involved a wrongful death case in which the decedent's minor children were co-represented by two firms and L&B. Much of the work at L&B was done by an associate who quit the firm, no less because defendant refused to pay him a bonus earned in

6

connection with the associate's work.  The *Pineda* matter was settled in late May 2017.  On or about June 2, 2017, defendant applied to borrow against *the entire* amount of legal fees due *all* of the firms, not just the amount due L&B.  **Exhibit 1 at 57-71**.  Defendant did not disclose to the other firms that defendant was seeking the loan.  By this time, by defendant's own admissions, L&B was in dire financial condition, including because it could not meet its own payroll obligations and, at defendant's direction, it had not paid its quarterly payroll taxes.  Nonetheless, defendant still had enough money to pay to ship his cars and horses to Costa Rica.  In any event, on June 8th and 9th, 2017, as a condition of and in order to induce the lender for the *Pineda* fee advance to approve the loan, defendant caused the *Pineda* plaintiffs to execute new fee agreements, retaining defendant's wholly-owned and new firm, that authorized defendant to receive *all* of the *Pineda* attorney's fees.  **Exhibit 1 at 236**.  The loan, $700,000, was approved and funded on June 9, 2017.  At the last minute, defendant directed the loan proceeds to be wired to his personal account instead of the L&B operating account.  Four days later, defendant flew and relocated with his family to Costa Rica.  The loan was never repaid and its balance has ballooned to more than $925,000.  **Exhibit 1 at 65**.

C.   State Bar Recommendation of Disbarment

In September 2017, the California State Bar charged defendant with multiple counts of comminging funds and related counts (including counts relating to J.N. and R.P., as described above).  **Exhibit 1 at 1-13**.  The State Bar had received over 50 complaints from former L&B clients, many of whom were non-English speakers, who

7

had not received any money from settlements that were clearly deposited into the IOLTA 2012 account during the time that defendant had planned to relocate to Costa Rica.  Defendant responded to the State Bar charges by claiming that he had been victimized by others at L&B to whom, in part, he entrusted passwords to L&B accounts. **Exhibit 1 at 16**.  None of the witnesses whom the government has interviewed, and none of the numerous individuals who have volunteered information that defendant was in charge of the IOLTA 2012 account, have in any way supported defendant's claim.

In January 2018, defendant failed to appear for his State Bar trial, despite his recent claim in his bail application that he has freely traveled to the U.S. from Costa Rica and could, therefore, have attended.  **Exhibit 1 at 49**.  As a result of his failure to appear, the State Bar has recommended disbarment.  **Exhibit 1 at 54, 224-230**.  Defendant failed to take action to set that order aside.

D.   S.J. Matter, Continuing Law Practice, and Illegal Use of Bankruptcy Estate Property

L&B represented S.J. in a civil matter.  On August 3, 2017, L&B was placed into an involuntary bankruptcy case by former client/plaintiffs who, as the indictment in this case has alleged in a similar manner, received virtually none of their settlement proceeds that were deposited into the IOLTA 2012 account that was solely controlled by defendant.  On August 7, 2017, defendant signed, in Costa Rica, a declaration under penalty of perjury that he caused to be filed in the L&B bankruptcy case in which he stated that *he* should be permitted to wind-down L&B and that a trustee should not be appointed.  **Exhibit 1 at 91**.  On August 21, 2017, a

8

trustee was appointed in the L&B case, in part because defendant's own counsel withdrew and stated in a sworn statement that defendant was not available to file the required bankruptcy schedules. **Exhibit 1 at 202-208**. *After* the appointment of the L&B trustee, defendant negotiated the disposition of S.J.'s case; clearly, the S.J. case was property of the L&B bankruptcy estate. No less, S.J. did not consent to the settlement. And, defendant attempted to have S.J. execute new fee agreements with defendant's recently (late 2017) formed new entity that defendant solely controlled from Costa Rica and which used a drop-box address in Florida as its principal business address. **Exhibit 1 at 45-48, 214-223**.

E. Concealment of Bankruptcy Estate Property and Destruction/Concealment of Evidence

In or about July 2017, after defendant had relocated to Costa Rica, defendant instructed two of his employees, R.M. and R.M., to take and ship to Costa Rica computer servers from L&B's offices. **Exhibit 1 at 246, 251-252**. They did so. The servers contained books, records, files, and other materials that related to the operation of L&B business and which were (and are) relevant to the L&B bankruptcy. Defendant remains in control of the servers and has not turned them over to the bankruptcy trustee.

F. Physical Threat to Witness R.M., and Threat to Deport

R.M. is a citizen of India. Defendant arranged for R.M. to work at L&B to perform IT services, and then to move to Costa Rica to work for defendant to do the same. Defendant owed R.M. substantial wages and R.M. was essentially marooned in Costa Rica with his legal residency there and in the U.S. at defendant's mercy.

9

When R.M. demanded his fair wages, defendant physically threatened R.M., **Exhibit 2 (video clip played during initial bail hearing)** and further threatened to report R.M. to immigration authorities to cause his deportation. **Exhibit 1 at 251-252**.

G.   Exposure and Notice to Defendant

In discussions with defendant's former counsel of record in this case, the government provided information regarding Guidelines loss and other sentencing factors. During a hearing in this case, defendant indicated that he had a document that included that information. The charges yield a statutory maximum sentence of more than 10 years. The Guidelines in this case, as determined by the government at this point and based on losses of more than $9 million, could exceed 97 months.

III.   ARGUMENT

The government must establish by a "clear preponderance of the evidence" that defendant is a flight risk, United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985), and by clear and convincing evidence that defendant poses a danger to the community, 767 F.2d. at 1405. The Court may consider both the nature of the charges as well as punishment. United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990). Equally important, especially at this point in this case where the government has produced substantial discovery, is that "the government's evidence [i]s enough to put the defendant[] on notice that [he is] . . . subject to a trial in which [he] could reasonably believe [he] might be convicted." Id.

The government has had minimal notice of this bail review, yet even with minimal time to respond the evidence of defendant's

offense conduct is overwhelming, indefensible, and, no less to a lawyer like defendant, apt to place him on notice that he will spend many years in prison if convicted.  There remains at this point no conclusive evidence about where millions of dollars in client funds and borrowed funds, not properly used by defendant to run his firm to enable his relocation to Costa Rica, may be.  Defendant continued to practice law in Costa Rica and, it appears, to convert clients from his prior firm and from the bankruptcy estate.  None of that activity can possibly be controlled by any type of bail.  The nature of the charges, the proffered evidence, the history and characteristics of defendant's brazen behavior and tangled business web, and the concern for witnesses and victims establish that defendant is both a flight risk and a danger to the community.

IV.  PROFFERED SURETIES

     None of the proffered pledges contains sufficient equity after costs of sale or disposition, and after reducing equity for homeowners' exemptions or similar debtor's rights, to provide any relief in the event of defendant's failure to appear or breach of bond.  None of the proffered sureties can realistically be able to assess whether any of them could actually prevent defendant from doing the things for which he ought, instead, to remain in custody to protect against repeating.  Thus, the proffered pledges and sureties are simply insufficient to ensure defendant's bond compliance, no matter how onerous the terms may be *on defendant himself*.  Furthermore, notwithstanding that a number of family members have proffered to serve as sureties, there is insufficient evidence to determine *defendant's* allegiance to them any more than

1  was defendant's allegiance to his former clients to whom he owed a

2  fiduciary responsibility to keep their money secure and to pay it

3  over to them.

4  V.   CONCLUSION

5       Among other factors under 18 U.S.C. § 3142 that the Court must

6  now consider, the nature and circumstances of the offenses charged,

7  the weight of the evidence against defendant, defendant's character

8  and record concerning appearances at court proceedings, and the

9  nature and seriousness of danger to any person or the community all

10 cut squarely against granting bail.

11      Accordingly, for the reasons stated herein, and respectfully

12 requesting an opportunity to supplement its position as may be

13 permitted, the government requests that defendant's bail review

14 application be denied.

                              Respectfully submitted,

                              NICOLA T. HANNA
                              United States Attorney
                              LAWRENCE S. MIDDLETON
                              Assistant United States Attorney
                              Chief, Criminal Division

Dated: June 14, 2018         _____/s/_____
                              MARK AVEIS
                              EDDIE A. JAUREGUI
                              Assistant United States Attorney
                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

12