1  TRACY L. WILKISON
   Acting United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   MARK AVEIS (Cal. Bar No. 107881)
4  IAN V. YANNIELLO (Cal. Bar No. 265481)
   CAROLYN S. SMALL (Cal. Bar No. 304938)
5  Assistant United States Attorneys
         1100 United States Courthouse
6        312 North Spring Street
         Los Angeles, California 90012
7        Telephone: (213) 894-4477/3667/2041
         Facsimile: (213) 894-6269
8        E-mail:    mark.aveis@usdoj.gov
                    ian.yanniello@usdoj.gov
9                   carolyn.small@usdoj.gov
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                    UNITED STATES DISTRICT COURT

12               FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,              No. CR 18-124(A)-MWF

14            Plaintiff,                  GOVERNMENT'S MOTION *IN LIMINE* NO.
                                          2, TO ADMIT EVIDENCE OF
15            v.                          DEFENDANT'S LIFESTYLE AND DEBTS AS
                                          PROOF OF MOTIVE TO DEFRAUD AND
16 PHILIP JAMES LAYFIELD,                 WILLFULNESS; MEMORANDUM OF POINTS
        aka Philip Samuel Pesin,          AND AUTHORITIES
17
              Defendant.
18                                        Hearing Date: June 8, 2021
                                          Hearing Time: 10:00 a.m.
19                                        Location:    Courtroom of the
                                                       Hon. Michael W.
20                                                     Fitzgerald

21

22        Plaintiff United States of America, by and through its counsel

23 of record, hereby files its motion *in limine* no. 2, to admit evidence

24 of defendant's lifestyle and debts as direct or inextricably

25 intertwined evidence of defendant's motive to defraud and willfulness

26 to evade taxes or, alternatively, as proof of motive under

27 Fed.R.Evid. 404(b).

28

1      This motion is based upon the attached memorandum of points and

2  authorities, the files and records in this case, and such further

3  proffer, evidence, information or argument as the Court may consider

4  in connection with its ruling.

5  Dated: May 10, 2021                Respectfully submitted,

6                                     TRACY L. WILKISON
                                      Acting United States Attorney
7
                                      BRANDON D. FOX
8                                     Assistant United States Attorney
                                      Chief, Criminal Division
9

10              _____/s/_____

11  MARK AVEIS
    IAN V. YANNIELLO
12  CAROLYN S. SMALL
    Assistant United States Attorneys

13  Attorneys for Plaintiff
    UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND..........................................2

      A.    Defendant Controlled the IOLTA..........................2

      B.    Evidence that Defendant Fraudulently Schemed to
            Sustain His Lifestyle and to Keep His Sinking Firm
            Afloat..................................................4

III.  LEGAL AUTHORITY.............................................8

      A.    Motions *In Limine* Generally...........................8

      B.    Evidence of Defendant's Debts and that Defendant Was
            Living Beyond His Means Is Directly Relevant to the
            Charged Fraud Scheme....................................8

      C.    Defendant's Debts and "Lifestyle" Evidence Is
            Inextricably Intertwined With the Charged Fraud Scheme...10

      D.    Evidence of Defendant's "Lifestyle" and Personal
            Expenses Is Also Admissible As Direct Proof of
            Willfulness, An Element of Tax Evasion.................12

      E.    Alternatively, Evidence of Defendant's Debts and
            Financial Condition Is Admissible to Prove Defendant's
            Motive to Defraud under Fed.R.Evid. 404(b)..............15

IV.   CONCLUSION.................................................17

# **TABLE OF AUTHORITIES**

Cases

*Sansone v. United States*,
  380 U.S. 343, 351 (1965) ........................................ 14

*United States v. Abodeely*,
  801 F.2d 1020 (8th Cir. 1986) .................................. 13

*United States v. Bailie*,
  99 F.3d 1147, 1996 WL 580350 (9th Cir. 1996) .................. 11

*United States v. Beasley,*
  2 F.3d 1158 (9th Cir. 1993) .................................... 17

*United States v. Beckman*,
  298 F.3d 788 (9th Cir. 2002) .................................. 11

*United States v. Bensimon*,
  172 F.3d 1121 (9th Cir. 1999) ................................... 9

*United States v. Bergstein*,
  788 Fed.Appx. 742 (2nd Cir. 2019) ............................. 13

*United States v. Conley*,
  826 F.2d 551 (7th Cir. 1987) .................................. 14

*United States v. Crespo de Llano*,
  838 F.2d 1006 (9th Cir. 1987) ................................. 17

*United States v. Falley*,
  489 F.2d 33, 40 (2d Cir. 1973) ................................ 10

*United States v. Feldman*,
  788 F.2d 544 (9th Cir. 1986) .................................. 15

*United States v. Fernandez*,
  497 F.2d 730 (9th Cir. 1974) ................................... 9

*United States v. Fowler*,
  927 F.2d 611 (9th Cir. 1991) ................................... 9

*United States v. Griffin*,
  524 F.3d 71, 82 (2d Cir. 2008) ................................ 13

*United States v. Heller*,
  551 F.3d 1108 (9th Cir. 2009) .................................. 8

*United States v. Holden*,
   625 F. App'x 316 (9th Cir. 2014) ................................. 12

*United States v. Jackson-Randolph*,
   282 F.3d 369 (6th Cir. 2002) ............................... 14, 17

*United States v. Kuzlik*,
   468 F.3d 972 (7th Cir. 2006) ................................... 16

*United States v. Lewis,*
   2009 WL 1307458 (W.D.Pa May 8, 2009) .......................... 16

*United States v. Morant*,
   98 F. App'x 560 (7th Cir. 2004) ............................... 16

*United States v. Pittman*,
   82 F.3d 152 (7th Cir. 1996) ................................... 15

*United States v. Ray*,
   2015 WL 5038108 (N.D. Ind. Aug. 25, 2015) ..................... 12

*United States v. Reyes*,
   660 F.3d 454 (9th Cir. 2011) .................................. 11

*United States v. Ringwalt*,
   213 F.Supp.2d 499 (E.D. Pa. 2002) ............................ 15

*United States v. Saniti*,
   604 F.2d 603 (9th Cir. 1979) ................................... 9

*United States v. Taylor,*
   832 F.2d 1187 (10th Cir. 1987) ................................ 10

*United States v. Weygandt*,
   681 F. App'x 630 (9th Cir. 2017) .............................. 12

*United States v. Wirsing*,
   719 F.2d 859 (6th Cir. 1983) .................................. 14


**Statutes**

26 U.S.C. § 7201 ................................................ 15

26 U.S.C. § 7206(1) ............................................. 16

Fed.R.Evid. 403 ............................................ Passim

Fed.R.Evid. 404(b)............................................. Passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Philip Layfield ("defendant") has been charged with scheming to defraud his former personal injury clients, referral counsel, and creditors.  The government intends to prove that defendant carried out his fraudulent scheme, in part, by holding himself out as an empathetic lawyer who, for example, advertised in a local lawyer's magazine that

> "our typical client was a person who was catastrophically injured in a violent event that lasted maybe one second but changed their life forever, or someone who has been wronged by a corporation, government or insurance company for a unique reason.  Our niche is trying to bring economic justice and positive change to such people, who trust and rely upon our firm."

Defendant's business model was also based on aggressively courting case referrals from other lawyers.  Defendant solicited case referrals through his firm's Facebook page and defendant routinely offered to fully finance litigation costs for referred cases.

Against proof of defendant's full court press to generate business, the government will prove that defendant did not intend to conduct himself as he advertised.  Instead, the evidence will show that defendant schemed to control cases and their settlement proceeds to create a slush fund for defendant's extravagant lifestyle and to keep his firm alive to generate more cases whose proceeds he could misappropriate on whim.

All the while, defendant evaded his income tax obligations by using his firm's client trust account as his personal piggy bank to transfer millions of dollars to himself and to cover his personal debts to the detriment of many of his clients who, by the time that

1  defendant moved to Costa Rica, got substantially nothing despite the
2  millions of dollars paid in settlement of their cases.

3      By this motion, the government seeks permission to simply show
4  the jury where the money went, and why.  Courts routinely admit
5  evidence of wealth and debts as direct or inextricably intertwined
6  proof of a defendant's motive to commit crimes involving financial
7  gain, including tax evasion.  The present case is exemplary as the
8  evidence proffered below is relevant and admissible as direct or
9  inextricably intertwined evidence of the fraud and tax charges.

10      Alternatively, such evidence is admissible under Fed.R.Evid.
11  404(b) and 403 as more probative than prejudicial proof of
12  defendant's motive.

13  **II.    FACTUAL BACKGROUND[1]**

14      **A.    Defendant Controlled the IOLTA**

15      The government will call at trial numerous former employees of
16  defendant's law firm as well as former clients, lawyers who referred
17  cases to defendant in exchange for a percentage of case recoveries,
18  and creditors who lent money to defendant's firm.  The testimony and
19  related evidence, none of which can be reasonably open to debate, was
20  that defendant and his firm almost exclusively practiced plaintiff's
21  personal injury law.  As a result, substantially all of the firm's
22  revenue was earned through contingency fee agreements entitling the
23  firm on average to approximately 40% of the gross settlement proceeds
24  from any given case.

25

26

_____

27      [1] This recitation of facts reflects the anticipated testimony
    and related exhibits the government expects to elicit in its case-in-
28  chief as relevant to this Motion.

2

Against that undisputed proof, the government will establish through bank records, the testimony of bank witnesses, and through defendant's admissions that defendant was at all relevant times the sole signatory for the firm's primary client trust account or "interest-on-lawyer's-trust-account" ("IOLTA").[2]  Through the testimony of defendant's firm's former employees, the government expects to show that defendant directed those employees to follow, and they in fact followed, a protocol for handling and giving defendant immediate notice of the firm's receipt of client settlement checks.  Defendant's directions included that employees were to scan each settlement check immediately upon its receipt (usually by mail from an insurance company); immediately email that scanned check to defendant; and deposit that check into the IOLTA.

The government also intends to prove through bank and payor records, e.g., insurance company or opposing counsels' records and testimony, the details of each settlement check including the client and case to which each check related; the amount of each check; and the date each check was deposited into the IOLTA.

Finally, ex-employees of defendant's firm are expected to testify that defendant had the final say about whether and when to disburse net settlement proceeds to clients.  Former employees will testify that defendant at times refused to approve such payments and, in some cases, stated that he would not authorize net settlement payouts unless a client first threatened to complain to the State Bar.  As to one such case, the government will call a former client, F.H., and his counsel to testify that defendant did not authorize

---

[2]  The firm also had a small number of other IOLTA accounts that are not relevant here and will not be relevant at trial.

payment to F.H. until after F.H.'s counsel demanded payment under threat of reporting defendant to the State Bar.[3]  Bank records will establish that defendant did pay that client, but not with the settlement funds that had been deposited into the IOLTA on behalf of F.H.; defendant had long since embezzled those funds.  The funds paid to F.H. instead came from the months-later settlement of an unrelated case.

**B.    Evidence that Defendant Fraudulently Schemed to Sustain His Lifestyle and to Keep His Sinking Firm Afloat**

The government will prove the amount of attorney's fees to which defendant's firm was entitled for each case.  Such proof will include retainer agreements and case "closing" or settlement statements generated by defendant's firm as well as former employee and client testimony.

Bank records will show that, for example, in 2016, defendant misappropriated a substantial amount of his clients' net settlement proceeds in order to pay defendant's substantial and progressively mounting lifestyle and business obligations and to keep his creditors at bay until defendant moved to Costa Rica.

For example, public and bank records, defendant's own statements, and the testimony of a government summary witness who will authenticate summary charts will show that, in early March 2016, defendant purchased a $4.5 million house on Trigo Trail in the exclusive Orange County community of Coto de Caza ("Trigo Trail"); Trigo Trail's monthly carrying costs, including mortgages, property taxes, homeowner's association dues, and grounds and swimming pool

---

[3]  F.H. is the subject of Counts 14 and 15 (wire fraud) of the FSI.

maintenance were more than $24,000; and that defendant also owed several thousand dollars in monthly payments for high-end cars, horses, and other lifestyle expenses.

Additionally, bank and business records will show that defendant's firm had substantial monthly operating expenses, including payroll that at times reached more than $150,000 and tens of thousands of dollars in office rent.

Furthermore, business and bank records will establish that defendant had personally guaranteed a credit line that allowed defendant's firm to obtain loans to finance case costs.  Among other things, defendant promised the creditor, Advocate Capital, that three million of the four million dollars in advances would be earmarked for use for specific cases whose settlement proceeds would secure, and out of which defendant would repay, such loans.  As of early March 2016, when defendant closed escrow on Trigo Trial, defendant's firm owed Advocate Capital, and defendant had personally guaranteed repayment of, approximately $3.8 million that had mounted over several years and whose repayment probability was, at best, dubious given the firm's certain mounting debt but speculative revenue prospects.

Thus, based upon the foregoing and other related evidence, the government will prove that, from at least the time that defendant bought the Trigo Trail house, and continuing until defendant moved to Costa Rica on June 13, 2017, there were insufficient *legitimately* available funds to cover defendant's and his firm's obligations.

No less, defendant increased the weight of the anvil of debt hanging over his head by, in at least one case, using later-received

client settlement funds to pay a client whose earlier-received

settlement funds defendant had misappropriated to pay his and his

firm's bills.

Specifically, for example, the government will prove that client

T.B. (identified in Count 10 of the FSI) had retained defendant's

firm to represent T.B. in a medical malpractice case.  In June 2016,

defendant settled T.B.'s case for gross settlement proceeds of

$1,068,100.85.  Those funds were deposited into the IOLTA.  The

balance in the IOLTA just before that deposit was approximately

$47,975.  The balance in the firm's general operating account was

approximately -$17,454.  The "closing statement" for T.B.'s case -

prepared by defendant's firm – stated that the attorney's fees for

T.B.'s case were just under $200,000 and that T.B. was owed net

settlement proceeds of approximately $538,000.

However, bank records for the IOLTA show that in short order

defendant withdrew substantially all of T.B.'s gross settlement

proceeds, in violation of not only defendant's firm's own retainer

agreement but in violation of California law and defendant's

fiduciary duty to T.B.[4]  Thus, by August 1, 2016, and even with

several intervening deposits into the IOLTA of settlement proceeds

from other clients' cases, the IOLTA balance was down to $4,915.

There were equally insufficient funds available in the firm's general

operating account to pay anywhere close to the amount due T.B.

T.B. is expected to testify that he was wholly unaware that

defendant had misappropriated T.B.'s settlement funds.  T.B. knew,

[4]  As alleged at FSI, ¶ 12, then applicable California Rule of
Professional Conduct 4-100 required that defendant promptly withdraw
from the IOLTA defendant's attorney's fees so as not to illegally
commingle his fees and the client's net settlement proceeds.

6

though, that his case had settled in June 2016.  T.B. complained to

defendant several times thereafter about not receiving his net

settlement proceeds.  On September 7, 2016, in response to one of

T.B.'s several inquiries, defendant lulled T.B. that he would be

fully paid:

> T[.B.]:
>
> We are getting your close-out handled. Don't worry. I don't see
> us having to pay anything to Medi-Care.  If all works out as
> planned, I may give you a little discount on your fee. You've
> been a great client of ours.  We had an operational setback
> during our transition of case management systems over the last
> 30 days which caused a delay from accounting, etc.
> I see no reason why everything can't be resolved by Aug 31 and a
> full disbursement in your hand, assuming we don't have an
> earthquake[.]

Ultimately, T.B. was fully paid.  But, it was at the expense of

yet another of defendant's clients.  Client M.M. had sustained a

brain injury in an auto accident.  M.M.'s case settled in early

August 2016 and his gross settlement proceeds of nearly $1 million

were deposited into the IOLTA.  Bank records and those of a bill

paying service that defendant routinely used to pay firm and personal

bills will show that defendant used $275,000 of M.M.'s settlement

proceeds to pay client T.B. overdue net settlement proceeds for

T.B.'s case.

As to where defendant's misappropriated funds went, the

government will establish through bank records that defendant

transferred hundreds of thousands of dollars directly from the IOLTA

to his personal bank account as well as to the mortgagee on one of

defendant's houses and to cover defendant's firm's operating

expenses.  T.B., M.M., and defendant's other client/victims will

testify that they did not consent to defendant's to defendant's use

of their funds, nor did they even know that defendant had manipulated and misappropriated the IOLTA for his personal benefit.

## III.  LEGAL AUTHORITY

### A.   Motions *In Limine* Generally

The Court may issue pretrial rulings in jury trials as to the admissibility of evidence at trial.  *See, e.g., United States v. Heller*, 551 F.3d 1108, 1111-12 (9th Cir. 2009), where the Court stated:

> The term "in limine" means "at the outset."  Black's Law Dictionary 803 (8th ed.2004).  A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area.  See id. at 1038-39.  In the case of a jury trial, a court's ruling "at the outset" gives counsel advance notice of the scope of certain evidence so that admissibility is settled before attempted use of the evidence before the jury.

A motion *in limine* may seek to admit evidence as well as to exclude it.  *See, e.g., United States v. Bensimon*, 172 F.3d 1121, 1124 (9th Cir. 1999) (government moved *in limine* to admit as impeachment evidence defendant's prior conviction for mail fraud).

### B.   Evidence of Defendant's Debts and that Defendant Was Living Beyond His Means Is Directly Relevant to the Charged Fraud Scheme

"The trial court is vested with discretion in admitting or denying motive evidence, [citation omitted], and evidence, though relevant, may be excluded at the discretion of the court if its probative value is substantially outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  *United States v. Fernandez*, 497 F.2d 730, 735-36 (9th Cir. 1974).  The admissibility of motive evidence based on financial difficulty does not appear to be limited to admissibility under Rule

404(b).  Thus, "[i]t is well-settled in the Ninth Circuit that
financial difficulty is relevant to a defendant's motive to
participate in a crime which results in financial gain." *United
States v. Fowler*, 927 F.2d 611 (9th Cir. 1991) (unpublished); *United
States v. Saniti*, 604 F.2d 603, 604 (9th Cir. 1979) ("Evidence that
tends to show that a defendant is living beyond his means is of
probative value in a case involving a crime resulting in financial
gain.").

Proof of financial difficulty to establish motive appears to
have evolved from tax evasion cases during the Al Capone era where
the government essentially could only prove tax evasion from evidence
that a defendant's net worth could only have come from illegal
sources.  The Second Circuit then observed that such limitations did
not apply in fraud cases:

> This distinction between the treatment of the general net worth
> tax fraud cases and those cases, like the one at bar, where only
> a crime of financial gain is involved, results from the fact
> that in the former, the government generally relies for its
> conviction exclusively on the inference to be drawn from the
> financial evidence.  Indeed, the entire theory was originally
> developed as a last resort, where no other evidence was
> admissible.  In the typical case where a crime of financial gain
> is involved, however, the evidence presented by the prosecution
> will not be limited to a demonstration of financial discrepancy.
> Under ordinary circumstances, such a showing, standing alone,
> does not even make out a prima facie case.  Therefore, although
> the same difficulty of refutation is inherent in both types of
> cases there is no danger in this case that a failure in
> refutation would be completely conclusive on the merits.  There
> is, then, no need to surround the introduction of this financial
> evidence with the exceptional safeguards found in the net worth
> tax fraud cases.  The admission of this proof was proper.

*United States v. Falley*, 489 F.2d 33, 40 (2d Cir. 1973).

Similarly, in *United States v. Boone*, 951 F.2d 1526, 1537-38
(9th Cir. 1991), the Ninth circuit affirmed defendants' convictions
for securities fraud where defendants had solicited funds for a

9

purported mining investment and then commingled the investment
proceeds with their personal funds.  The defendants' control of the
account into which their victims' funds were deposited was the same
as in the present case.  Thus, in *Boone*, "[t]he Boones spent
substantial amounts of investor funds on their two mortgages,
furniture payments and other personal expenses.  In light of this
evidence, a reasonable jury could conclude that by accepting the
investors' money and spending it for his own account, Albert Boone
intended to defraud those who bought interest in the mining claims he
sold."  *Id.  See also United States v. Taylor,* 832 F.2d 1187, 1194
(10th Cir. 1987) (use of business funds for personal benefit is
directly probative of fraudulent intent).

     And, the Ninth Circuit has approved of the introduction of
motive evidence in a matter very similar to the government's proffer
here: to finance an extravagant lifestyle and to keep a business
alive.  In *United States v. Bailie*, 99 F.3d 1147, 1996 WL 580350,
(9th Cir. Oct. 8, 1996) (unpublished), the Ninth Circuit affirmed the
district court's admission of evidence of defendant's lifestyle,
including homes, condos, expensive cars and a chauffeured limousine
as probative of the Bailies' motive in committing the crimes charged.
The district court also properly admitted such evidence to
demonstrate the Bailies' motive to keep the broadcasting school alive
to support their affluent lifestyle.  *Id.*

**C.  Defendant's Debts and "Lifestyle" Evidence Is Inextricably
     Intertwined With the Charged Fraud Scheme**

     At trial, the government will submit evidence showing that
defendant improperly used client settlement money to pay himself and

to finance his firm's business operations.  Thus, that defendant
spent client money to pay personal debts is, at minimum, inextricably
intertwined with the charged fraud scheme.  The evidence shows that
defendant -- not others at his firm -- was stealing client money and
controlling firm finances.

"Evidence of 'other acts' is not subject to Rule 404(b) analysis
if it is inextricably intertwined with the charged offense." *United
States v. Beckman*, 298 F.3d 788, 793 (9th Cir. 2002) (internal
quotation marks omitted.  Evidence is inextricably intertwined with
the charged offense when "(1) particular acts of the defendant are
part of a single criminal transaction, or when (2) 'other act'
evidence is necessary to admit in order to permit the prosecutor to
offer a coherent and comprehensible story regarding the commission of
the crime." *Id.* (internal quotation marks and alterations omitted);
*see also United States v. Reyes*, 660 F.3d 454, 463-64 (9th Cir. 2011)
(government "allowed to introduce evidence about [defendant's]
motivation for his involvement in the backdating scheme, his
scienter, even if such evidence is generally not sufficient, standing
alone, to prove intent to defraud." (citation omitted)); *United
States v. Holden*, 625 F. App'x 316, 318 (9th Cir. 2014) (evidence of
wealth admissible where "the district court allowed the evidence as
relevant to motive); *United States v. Weygandt*, 681 F. App'x 630, 633
(9th Cir. 2017) (same).

Evidence related to defendant's debts and how he misused client
money to pay for personal expenses is necessary to present a
"coherent and comprehensible story regarding the commission" of the
charged crimes.  *Beckman*, 298 F.3d at 793.  Without such evidence,

11

the government would be prevented from explaining how defendant executed the fraud scheme, as well as why he did it.  Ultimately, "[l]ack of proof of prior impecunity is a matter of weight and not a matter of admissibility."  *United States v. Falley*, 489 F.2d at 39-40 (collecting cases).

      D.    **Evidence of Defendant's "Lifestyle" and Personal Expenses Is Also Admissible As Direct Proof of Willfulness, An Element of Tax Evasion**

Furthermore, evidence of defendant's substantial personal monthly expenses, firm operating expenses, crushing obligations to creditors like litigation advance lenders, and defendant's "robbing from Peter to Paul," namely, using settlement funds due a later client to repay an earlier client whose settlement funds defendant had misappropriated, is admissible as direct evidence of tax evasion.

The analysis here is similar to that followed by the Court in *United States v. Ray*, No. 3-14-CR-078 JD, 2015 WL 5038108 (N.D. Ind. Aug. 25, 2015), and the appellate cases on which it was based.  In *Ray*, defendant was charged with embezzling county property, in violation of 18 U.S.C. § 666(a)(1)(A), and with underreporting her taxable income generated from her embezzlement.  Defendant was also charged with wire fraud for mismanaging and stealing money from her father-in-law's bank accounts.  Defendant moved under Rules 404(b) and 403 to exclude evidence of defendant's use of embezzled funds "for her and her husband's gambling, gambling expenditures, and gambling debts as well as to pay for other personal expenses of the defendant and her husband." Id., at *1.  The Court denied the motion, holding that "the evidence in question is direct evidence of underreporting taxable income, as it was proof of the source of funds

1    that "she had to have received [] somehow." *Id.*, citing *United*
2    *States v. Shrum*, 655 F.3d 782, 786 (8th Cir. 2011)(evidence of a
3    defendant's gambling was relevant to the falsity of the income
4    reported on the tax returns); *United States v. Griffin*, 524 F.3d 71,
5    82 (2d Cir. 2008) ("testimony regarding [the defendant's] spending
6    habits was highly probative as to whether [the defendant's] tax
7    returns ... were false"); *United States v. Abodeely*, 801 F.2d 1020,
8    1025 (8th Cir. 1986) (evidence of gambling activities was relevant
9    because it "indicates a substantial unreported income source
10   necessary to satisfy the losses").

11        The *Ray* court also held that evidence of defendant's actual
12   gambling debts was direct proof of the amount of defendant's gambling
13   debts that defendant had claimed as part of defendant's scheme to
14   defraud.  The Court stated that "evidence of Ms. Ray's actual
15   gambling activities and debts will be necessary to compare against
16   Ms. Ray's statements on those subjects in order to determine if those
17   statements were fraudulent." *Id.  See also, United States v.*
18   *Bergstein*, 788 Fed.Appx. 742 (2nd Cir. 2019) (evidence of defendant's
19   gambling debts was admitted as direct evidence of defendant's
20   fraudulent scheme where defendant fraudulently transferred funds from
21   his trust accounts to pay his casino debts and to transfer money to
22   himself).

23        In particular, evidence of defendant's lifestyle, shown through
24   his use of cash that was otherwise available to pay his federal
25   income taxes, is relevant and admissible to prove willfulness, an

26
27
28
                                   13

element of tax evasion as charged in count 26 of the FSI.[5]   In *United States v. Conley*, 826 F.2d 551 (7th Cir. 1987), the Court upheld the admission at trial of photos of Conley's home and a chart showing how Conley spent money available to pay his taxes on a variety of lavish items (including his home).  In describing Conley as "a self-employed personal injury lawyer [who] did well, but [] was less than enthusiastic about sharing his money with the government[,]" the Court stated that such evidence of Conley's "brokerage accounts, his trips around the United States and to Europe, his purchase of a riding mower, and the fact that he owned a Cadillac"  . . . tended to show that the defendant had the means to pay his taxes, indicating that his failure to pay was for other reasons."  *Id.*, at 559. *See also*, *United States v. Wirsing*, 719 F.2d 859, 861 n. 4 (6th Cir. 1983) (in tax evasion cases, the government is often permitted to introduce evidence of purchases, expenditures, and cash on hand to prove that defendant received unreported income); *United States v. Jackson-Randolph*, 282 F.3d 369, 376-79 (6th Cir. 2002) (affirming district court's decision to admit, over a Rule 403 objection, evidence that a defendant charged with fraud and money laundering had purchased expensive jewelry, clothing, and several fur coats, taken trips to Aruba, the Bahamas, Las Vegas, and Atlantic City, and given expensive gifts such as jewelry, clothing, and trips because it tended to show that her expenditures exceeded her legitimate sources of income); *United States v. Peters*, 153 F.3d 445, 461 (7th Cir.

---

[5]   Tax evasion under 26 U.S.C. § 7201, as charged in count 26 of the FSI, requires proof of three elements: (1) willfulness, (2) existence of a tax deficiency, and (3) an affirmative act constituting an attempt to evade or defeat payment of the tax. *Sansone v. United States*, 380 U.S. 343, 351 (1965).

1998) ("defendant's consistent pattern of diverting corporate funds
into her personal accounts and making corporate expenditures for her
personal benefit was sufficient evidence to support conclusion that
defendant filed tax returns which she did not 'believe to be true and
correct as to every material matter,' " quoting 26 U.S.C. § 7206(1));
*United States v. Pittman*, 82 F.3d 152, 155 (7th Cir. 1996) (holding,
in a false subscription and tax evasion prosecution, that "an
inference of knowledge might be drawn from [defendants'] diversion of
income to a private bank account"); *United States v. Ringwalt*, 213
F.Supp.2d 499, 504 (E.D. Pa. 2002) (noting that the government can
show willfulness in a § 7201 prosecution by showing, inter alia, the
defendant "concealed assets or covered up sources of income").

### E. Alternatively, Evidence of Defendant's Debts and Financial Condition Is Admissible to Prove Defendant's Motive to Defraud under Fed.R.Evid. 404(b)

Beyond evidence of a defendant's debts or financial condition is
admissible as direct or inextricably intertwined proof, such evidence
is admissible under Rule 404(b) to prove motive. *See, e.g., United
States v. Feldman*, 788 F.2d 544, 556-57 (9th Cir. 1986)(upholding
admissibility of evidence, via a bank custodian, that defendant's
bank account was overdrawn as proof of motive under Rule 404(b)).

*United States v. Bergstein*, *supra*, 788 Fed.Appx. 742, is
instructive as very close to the present case.  Bergstein, a lawyer,
was charged with scheming to misappropriate clients' funds that he
had held in trust.  At trial, the government introduced evidence that
Bergstein had used those trust funds to pay Bergstein's casino debts;
debts that were plainly not associated with the reason that Bergstein
held those funds.  Ruling that evidence of Bergstein's casino debt

15

was admissible under Rule 404(b) to prove motive, the Court stated that "[t]he evidence of Bergstein's casino debts plainly reflects his motive to misuse [a client's] money to [repay other clients] after misusing their investments to satisfy those debts." *See also United States v. Kuzlik*, 468 F.3d 972 (7th Cir. 2006)(evidence of defendant's "debts, debt defaults, and his bank account overdrafts during the relevant period was admissible [under Rule 404(b)] because it showed his motive for engaging in the fraudulent scheme[]" to embezzle money from a client of defendant's bookkeeping and tax service business); *United States v. Lewis,* 2009 WL 1307458, *10 (W.D.Pa May 8, 2009)(In case charging conversion of funds and tax evasion, "[t]hat defendant incurred substantial debts is clearly probative of motive[.]"); *United States v. Morant*, 98 F. App'x 560, 564 (7th Cir. 2004)(evidence of defendant's gambling losses satisfied the four-prong test for admissibility under Rule 404(b) to prove motive to commit bank robbery).

Similarly, the Court should admit evidence of defendant's lifestyle expenses as proof of motive because the government expects to show that defendant had no other source of funds to pay his bills other than from misappropriating client funds.  The evidence is therefore similar to that which is routinely admitted in drug trafficking cases, where the jury can reasonably infer that a defendant's lifestyle or personal wealth can be explained only by ill-gotten gain.  *See, e.g., United States v. Beasley,* 2 F.3d 1158, *4 (9th Cir. 1993) (unpublished)("It is well settled "that evidence of . . . unexplained wealth is admissible in drug conspiracy trials if it creates a reasonable inference that the unexplained wealth came

16

1  from the drug conspiracy[,]" citing *United States v. Miguel*, 952 F.2d

2  285, 289 (9th Cir. 1991); *see also United States v. Crespo de Llano*,

3  838 F.2d 1006, 1018 (9th Cir. 1987); *United States v. Patterson*, 819

4  F.2d 1495, 1501 (9th Cir. 1987).

5          Finally, the probative value of the proffered evidence far

6  outweighs any prejudice.  The evidence of defendant's statutory and

7  contract obligations to his clients, the amounts and source of funds

8  that he misappropriated, and the use of those funds is credible and

9  based almost exclusively on direct evidence.  Next, the money that

10 defendant spent on himself and his business debts was simply not

11 available from any source other than that of his clients' settlement

12 funds.  Finally, the time frame during which defendant

13 misappropriated his clients' funds and was the same as that during

14 which he not only used those funds but which he was required to

15 report and pay his income taxes.  *See, e.g., United States v.*

16 *Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002)(analyzing Rule

17 403 in light of three-part test of quality of evidence, possibility

18 of other cash sources, and temporal proximity of misconduct); *United*

19 *States v. Beasley*, supra, 2 F.3d 1158 at *4 (Rule 403 did not

20 preclude admission of unexplained wealth evidence).

21 **IV.   CONCLUSION**

22         For the reasons stated herein, the government requests that MIL

23 No. 2 be granted.

24

25

26

27

28
                                                            17