1 | TRACY L. WILKISON
United States Attorney
2 | SCOTT M. GARRINGER
Assistant United States Attorney
3 | Chief, Criminal Division
MARK AVEIS (Cal. Bar No. 107881)
4 | IAN V. YANNIELLO (Cal. Bar No. 265481)
CAROLYN S. SMALL (Cal. Bar No. 304938)
5 | Assistant United States Attorneys
1100 United States Courthouse
6 | 312 North Spring Street
Los Angeles, California 90012
7 | Telephone: (213) 894-4477/3667/2041
Facsimile: (213) 894-6269
8 | E-mail:    mark.aveis@usdoj.gov
ian.yanniello@usdoj.gov
9 | carolyn.small@usdoj.gov

10 | Attorneys for Plaintiff
UNITED STATES OF AMERICA

11 |

12 |                    UNITED STATES DISTRICT COURT

13 |                FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 | UNITED STATES OF AMERICA,          No. CR 18-124(A)-MWF

15 |          Plaintiff,               GOVERNMENT'S SENTENCING POSITION
                                       AND RESPONSE TO PRESENTENCE REPORT
16 |          v.                       FOR DEFENDANT PHILIP JAMES
                                       LAYFIELD; MEMORANDUM OF POINTS AND
17 | PHILIP JAMES LAYFIELD,            AUTHORITIES; DECLARATION OF SAM
          aka Philip Samuel Pesin,    CHAN; EXHIBITS
18 |
             Defendant.               [Concurrently filed with
19 |                                   separately lodged, under seal,
                                       supporting documents]
20 |
                                       Date: February 17, 2022
21 |                                   Time: 1:00 p.m.

22 |

23 |      The government, by and through its counsel of record, the United

24 | States Attorney for the Central District of California and Assistant

25 | U.S. Attorneys Mark Aveis, Ian V. Yanniello, and Carolyn S. Small,

26 | hereby files its sentencing position and response to the Revised

27 | Presentence Report disclosed on January 21, 2022 (Dkt. 346)("PSR")

28 | for defendant Philip James Layfield.

1        The government's sentencing position is based upon the attached

2    memorandum of points and authorities; the supporting declaration of

3    Sam Chan and attached exhibits; the concurrently lodged (under seal)

4    declaration of Matthew Zawol, document excerpts, and supporting

5    letters; and such further information and argument as the Court may

6    permit at the sentencing hearing.

7    Dated: February 3, 2022        Respectfully submitted,

8                                       TRACY L. WILKISON
                                   United States Attorney

9

10                                      SCOTT M. GARRINGER
                                   Assistant United States Attorney
                                   Chief, Criminal Division

11

12                                           /s/
                                   MARK AVEIS

13                                      IAN V. YANNIELLO
                                   CAROLYN S. SMALL

14                                      Assistant United States Attorneys

15                                      Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR....3

      A.    Factual Findings......................................3

      B.    Summary of Guidelines Calculation, Objection to PSR,
            Total Offense Level, and Sentencing Recommendation.......3

      C.    Objection to PSR......................................4

      D.    Base Offense Level....................................7

      E.    An 18-Level Enhancement Applies Because the Total
            Intended Loss is Between $3.5 Million and $9.5 Million....8

            1.    The Intended Loss Was $7,563,431.45.................8

            2.    Defendant Should Not Receive Any Credit for
                  Payments to Clients Out of Other Victims'
                  Settlements.........................................9

            3.    Defendant Should Not Receive Any Credit for
                  Payments Made from the State Bar's Client
                  Security Fund or from Other Third Parties..........11

      F.    A Two-Level Enhancement Applies for 10 or More Victims...13

      G.    A Two-Level Enhancement Applies for Evading Law
            Enforcement/Scheme Offshore............................14

      H.    A Two-Level Adjustment Applies for Abuse of Position
            of Trust/Use of Special Skill..........................16

      I.    The Tax Offenses Do Not Change the Guidelines'
            Calculation............................................16

      J.    Defendant is Not Entitled to Any Credit for Acceptance
            of Responsibility......................................17

III.  A SENTENCE OF 168 MONTHS IS REASONABLE AND APPROPRIATE
      UNDER THE 3553(A) FACTORS...................................18

      A.    Nature and Seriousness of the Offense, § 3553(a)(1)......18

      B.    History and Characteristics of Defendant, § 3553(a)(1)...19

      C.    Need for Deterrence, to Promote Respect for the Law,
            and for Just Punishment, § 3553(a)(2)...................23

i

## **TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                PAGE

    D.   Policy Statements and Need to Avoid Unwarranted
       Sentencing Disparities, § 3553(a)(6).......................25

IV.  FINE ..............................................................26

V.   RESTITUTION.......................................................26

VI.  CONCLUSION........................................................26

DECLARATION OF SAM CHAN AND EXHIBITS

# TABLE OF AUTHORITIES

DESCRIPTION                                                          PAGE

**Federal Cases**

Gall v. United States,
    552 U.S. 38 (2007) ........................................... 25

In re Kassas,
    631 B.R. 469 (Bankr. C.D. Cal. 2021) ........................ 12

United States v. Blitz,
    151 F.3d 1002 (9th Cir. 1998) ............................... 9

United States v. Callaway,
    762 F.3d 754 (8th Cir. 2014) ................................ 9

United States v. Ochoa,
    265 F.3d 837 (9th Cir. 2001) ................................ 17

United States v. Stoddard,
    150 F.3d 1140 (9th Cir. 1998) ............................... 9-10

**Federal Statutes**

18 U.S.C. § 3553 .......................................... passim

18 U.S.C. § 3663 .......................................... 26

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1 .......................................... passim

U.S.S.G. § 3A1.1 .......................................... 4

U.S.S.G. § 3B1.3 .......................................... 16

U.S.S.G. § 3E1.1 .......................................... 17

**Other Authorities**

Cal. Bus. & Prof. Code § 6140.5 ............................... 11

Brookman v. State Bar,
    46 Cal. 3d 1004 (1988) .................................. 12

iii

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.   INTRODUCTION**

Defendant Philip Layfield is due to be sentenced following a trial in which a federal jury convicted him of 19 counts of wire fraud and one count each of mail fraud, tax evasion, failure to collect and pay over payroll tax, and willful failure to file a tax return.

Defendant, now a disbarred lawyer, aggressively marketed himself as a champion of the severely injured.  He actively solicited case referrals from other lawyers by representing that he would invest what it took to yield high outcomes that he would share with fellow members of the Bar.

It was all a sham.  The evidence introduced during a nearly three-week trial established beyond a reasonable doubt that defendant carefully curated an image of empathy for clients and respect for fellow lawyers to perpetrate and conceal a scheme to steal millions of dollars in case settlements to fund his lifestyle and boost his ego.

The evidence, including defendant's own testimony, showed that defendant repeatedly stole money from his trust account that he should have paid to his clients who had suffered horrible personal injuries.  They had hired defendant to bring them closure and some sense of relief.  Their faith in the legal system shaken, defendant compounded his clients' stress and anxiety by forcing them to hire other counsel to try to recover money from defendant, only to find little or nothing.

Defendant not only misused his clients' and referral counsels' money, but he enjoyed the added benefit of not paying income taxes on the millions he had stolen.

Defendant's scheme did not end with stealing money from his clients or referral counsel.  He also stole from and exploited his own employees.  He misused money due their retirement accounts.  He withheld information from them about the dire financial condition of the firm.  He used them to lie to their clients who, unlike defendant, they sincerely cared about.

As defendant's house of cards was collapsing, defendant cowardly abandoned his clients and relocated with his cars and horses to Costa Rica, leaving others who had trusted him to deal with the financial and emotional ruin defendant had caused.

Even after defendant was charged, he moved on to a new scheme to misappropriate money entrusted to him, placing his wife in harm's way to answer to defendant's latest victims, much like defendant had done to his former employees.

And, even as defendant stands convicted and awaiting sentencing, he continues to scheme to defraud, this time to fool the Court into believing that defendant is sincerely contrite.

The nature and seriousness of defendant's heartless offense conduct, defendant's contemptible history and characteristics, and the need to promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant are just some of the factors on which the government recommends that the Court impose a sentence at the top of the anticipated Guidelines range, 168 months.

## II. GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR[1]

### A. Factual Findings

The government generally concurs in the PSR's factual findings except as discussed below regarding the Guidelines calculation and applicable sentencing factors under 18 U.S.C. § 3553(a).

### B. Summary of Guidelines Calculation, Objection to PSR, Total Offense Level, and Sentencing Recommendation

The government concurs with the PSR's Guidelines calculation, except that the government objects to the PSR for not applying a two-level vulnerable victim adjustment. As more fully argued below, the overwhelming evidence shows that defendant knew that his clients were vulnerable. He actively sought out clients whose vulnerability from grave injuries defendant could exploit when they most needed loyal and empathetic counsel. He used those same vulnerabilities to get the very settlements that he later embezzled.

Thus, with a vulnerable victim adjustment of two levels, the government believes that the total offense level should be 33, not 31 as determined by the PSR. The corresponding sentencing range is 135-168 months, and the government recommends that defendant should be sentenced at the high end of that range.

The parties exchanged their draft Guidelines briefs, and then conferred, in an effort to eliminate or hone areas of dispute. The government's analysis and detailed response to the PSR's Guidelines calculation also reflects the parties' discussions and defendant's

---

[1] The parties agreed and advised the probation officer that the initial Presentence Report (Dkt. 334) erroneously calculated tax loss and a multiple count adjustment. The probation officer then issued a Revised Presentence Report. (Dkt. 346.) All references herein to the "PSR" are to the revised report.

3

anticipated arguments.

**C.   Objection to PSR**

The PSR did not apply a vulnerable victim adjustment on the ground of insufficient evidence.  (PSR, ¶ 66.)  The government objects and believes that the evidence overwhelmingly supports a two-level vulnerable victim adjustment.

A vulnerable victim adjustment applies if defendant "knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  A "vulnerable victim" is defined as "a person (A) who is a victim of the offense of conviction" or any relevant conduct, and "(B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct."  *Id.*, comment, note 2.  The adjustment should be applied if supported by a preponderance of the evidence.  (PSR, ¶ 66.)

The evidence at trial established beyond a preponderance of the evidence (if not beyond a reasonable doubt) that defendant "knew or should have known that a victim of the offense was a vulnerable victim" for several reasons.  First, he targeted a uniquely vulnerable population through extensive print and Internet advertising.  In defendant's own words

> Our typical client is a person who was catastrophically injured in a violent event that lasted maybe one second but changed their life forever . . . ."  Our niche is trying to bring economic justice and positive change to such people, who trust and rely upon our firm.

(Government's Trial Ex. 21, attached hereto to declaration of Sam Chan.)  The foregoing quote was excellent evidence of defendant's state of mind that informed his business plan.  As more fully stated below, defendant was an experienced business operator who knew who to

4

target in order to maximize revenue.  While defendant's firm

certainly took cases involving less serious accidents, clearly

defendant focused on courting big-ticket cases from both clients and

referral counsel to whom defendant promised handsome returns.  There

can be no argument that, based on defendant's own testimony as to his

experience, he was as a threshold matter well aware that money was

best made by getting cases involving the most serious of injuries or

death.

And, as the victims' trial testimony and many of the

concurrently filed supporting letters make clear, defendant's

marketing strategy worked.  The people who sought defendant's legal

services had been struck by cars or a train (*see, e.g.*, letters from

J.N., J.Y., F.H., R.P., and M.M.); they had been the victims of

serious medical malpractice (*see, e.g.*, letter from T.B.); or they

had lost a spouse or a parent to a defective product (*see, e.g.*,

letter from D.S.).  They were suffering from broken bones and spinal

and brain injuries; they were dealing with chronic pain; they were

undergoing numerous medical procedures and facing mounting medical

expenses.  Given their ages and/or their physical and mental

conditions stemming from, as defendant put it, "catastrophic[]"

injuries, defendant's clients were particularly vulnerable and

susceptible to exploitation.

Next, and to be clear, defendant knew or had reason to know

specific clients' conditions and vulnerability *before* he recovered

any money on their behalf.  Defendant had access to his clients'

accident reports.  The reports included extensive details about and

gruesome photographs of their injuries and consequences.  Defendant

used that same information, photos and all, in mediation briefs.  For

1   example, in December 2016 defendant pitched his firm to P.C. and her

2   referral counsel (J.L., who testified at trial).  As J.L. testified,

3   defendant stated that he would hire experts and spend hundreds of

4   thousands of dollars to press P.C.'s case.[2]  P.C. had suffered

5   permanent disfigurement and faced a lifetime of special needs

6   following impalement by parts from the exploding undercarriage of her

7   car.  Defendant used accident reports and medical records for his

8   mediation brief for P.C.'s case.  He wrote all about P.C.'s injuries

9   and their consequences, adding vivid accident and surgical photos.

10  Defendant wrote that

> [P.C.] also has suffered (and continues to suffer) from severe
> emotional distress.  Her injuries required her to wear a
> colostomy bag for four (4) years, . . .  As a result, she
> avoided family and friends.  Her injuries . . . result[ed in
> the couple's separation.  These burdens have fundamentally
> altered [P.C.]'s sense of self-worth and have left her with
> profound and overwhelming feelings of sadness, anxiety, and
> worthlessness.

(Chan Decl., ¶ 3.)

17      Defendant thus demanded a settlement of $2,000,000 given P.C.'s

18  "severe and debilitating physical, emotional, and psychological"

19  damages.  Defendant also stated that P.C.'s medical expenses totaled

20  $283,292.47" and that P.C. "also has lost earnings of at least

21  $113,028.08."  (Chan Decl., ¶ 3.)

22      Within approximately 30 days of pitching to get P.C.'s case,

23  defendant settled the case for $600,000.  He did not invest the

---

[2]    The timing of getting P.C.'s case was critical.  By December
2016, defendant had embezzled the entirety of J.N.'s settlement (more
than $2 million due J.N.) as well as several million from other
clients.  And, based on the testimony of defendant's firm's
controller, Jeff Pannebaker, defendant could not make payroll.  In
short, defendant badly needed P.C.'s case and had to turn it into
quick cash.

hundreds of thousands of dollars that he had promised.  Defendant did, however, promptly embezzle P.C.'s settlement.  Within a month of receiving P.C.'s settlement, defendant had spent down the IOLTA to $5,216 even with millions in settlements received but unpaid by that time.  (Chan Decl,, ¶ 4.)  P.C. and referral counsel J.L., as J.L. testified at trial, got nothing from the settlement.

Finally, defendant made his clients even more vulnerable.  For example, as client J.N. continued to convalesce and rebuild her life following an auto accident in which she was hoisted, head-first, through windshield of an oncoming car, defendant repeatedly misled J.N. into believing that her settlement funds were safe and sound. Within but a few months after depositing and spending down nearly all of J.N.'s settlement funds without a word to her, defendant then trumped even his own manipulative depravity.  He increased J.N.'s vulnerability and anxiety by convincing J.N. to put J.N.'s non-existent settlement funds in a trust to protect her money from her family.  The last thing that J.N. needed at that time was defendant driving a wedge between her and her loved ones.

In the end, defendant's own words were a window into his soul. He well knew or had reason to know that the very individuals he sought out were vulnerable on account of their "age, physical or mental condition" or were "particularly susceptible to criminal conduct."  A two-level vulnerable victim adjustment should apply.

### D.   Base Offense Level

The government concurs with the advisory Guidelines calculations in the PSR for the base offense level.  The base offense level for the fraud counts is seven because defendant was convicted of multiple counts of wire fraud and one count of mail

1    fraud.  Each of those counts carries a statutory maximum sentence of

2    20 years imprisonment.  (U.S.S.G. § 2B1.1(a)(1); PSR, ¶ 53.)[3]

3         **E.   An 18-Level Enhancement Applies Because the Total Intended
              Loss is Between $3.5 Million and $9.5 Million**

4

5         The government agrees with the PSR that an 18-level loss

6    enhancement applies because the total intended loss is between $3.5

7    million and $9.5 million.  (PSR, ¶¶ 54-55); U.S.S.G.

8    § 2B1.1(b)(1)(J).)  The government further agrees with the PSR that

9    defendant's loss should not be reduced by payments to clients from

10   sources other than their own settlement funds, including from third

11   party sources like the State Bar's Client Security Fund.  However,

12   even if the Court were to credit defendant with payments to clients

13   from unrelated sources, the Court need not determine the propriety of

14   those payments.  The total Guidelines loss would still be well above

15   the $3.5 million threshold for application of an 18-level

16   enhancement.

17             1.   The Intended Loss Was $7,563,431.45

18        The evidence at trial showed that defendant embezzled nearly $7

19   million of his clients' settlement money, on top of which he

20   defrauded a litigation advance lender out of $700,000.  Accordingly,

21   the total intended loss from defendant's embezzlement scheme was

22   $7,563,431.45[4].  (Chan Decl., ¶ 5, and Ex. A attached thereto.)

23   ───────────────

24        [3]  As more fully discussed below regarding the grouping analysis
        of the fraud and tax counts, and as noted in the PSR, the base
25   offense level for the tax counts does not affect the base offense
        level calculation. (PSR, ¶¶ 73-83.)

26        [4]  The loss figure differs slightly from the loss figure in the
        PSR that was based on information that the government initially
27   provided to the USPO. (*See* PSR, ¶ 38.)  The reasons for the
        discrepancy are that: (1) unpaid medical liens have now been removed
28   for certain victims; and (2) certain victims (F.Z., B.J., and C.C.)
                                    *(footnote cont'd on next page)*

                                       8

1   Counts one through 19 (wire fraud) and Count 23 (mail fraud) are

2   all related to defendant's embezzlement scheme and are grouped for

3   Guideline calculation purposes to reflect an aggregate loss amount.

4   (PSR, ¶ 50.)

5       2.   <u>Defendant Should Not Receive Any Credit for Payments</u>
    <u>to Clients Out of Other Victims' Settlements</u>

6

7   Defendant is not entitled to any credit against Guideline loss

8   for payments made to one victim from funds from another victim's

9   settlement because defendant made such payments to continue and

10  conceal his fraudulent scheme.

11  While, generally, loss shall be reduced by money the defendant

12  returned to the victim *before* the offense was detected, U.S.S.G.

13  § 2B1.1, comment. (n.3(E)(i)), a defendant is not entitled to any

14  such credit when the defendant's repayment serves merely to

15  perpetuate ongoing fraud. *See, e.g., United States v. Blitz*, 151

16  F.3d 1002, 1012 (9th Cir. 1998)(no offset for refunds "done for the

17  sole purposes of deflecting serious disruption of [the defendants']

18  schemes and making the operation look legitimate"); *United states v.*

19  *Callaway*, 762 F.3d 754, 759 (8th Cir. 2014)(no credit for payments

20  where the defendant "paid only when repeatedly confronted with [the

21  victim's] desperate medical needs or threats of legal action by

22  third parties, either of which could have foreseeably led to

23  discovery of the scheme"); *see also United States v. Stoddard*, 150

24  F.3d 1140, 1146 (9th Cir. 1998)(holding that "[r]epayments before

25  detection show an untainted intent to reduce any loss," whereas

26

27  _____

    were removed from the loss calculation because the government
    received incomplete information about amounts owed from their
28  settlements.  In any event, their loss amounts do not change the +18
    loss enhancement.

1  "[r]epayments after detection may show no more than an effort to

2  reduce accountability.").

3       Here, defendant should not receive any credit for repaying one

4  client-victim with funds from another client-victim's settlement.

5  Defendant's own retainer agreements and applicable California law

6  required that defendant hold client settlement funds in trust and

7  only make client-specific disbursements.  The government proved at

8  trial, including through IOLTA records and Special Agent Chan's

9  testimony, that defendant regularly used later-received settlement

10 funds to repay money to clients whose earlier settlement funds

11 defendant had embezzled, and commonly to those clients who threatened

12 to report defendant to the State Bar and/or to sue him.  (*See, e.g.*,

13 Trial Ex. 50, attached to Chan Declaration.)

14      Moreover, defendant admitted during his own direct examination

15 that he had, for years, misused client trust funds to pay unrelated

16 obligations.  The jury did not buy defendant's attempt to minimize

17 his invading the IOLTA.  It was plain that the government's evidence,

18 corroborated by defendant's admissions, proved that defendant made

19 Ponzi-type payments to stave off client complaints to law enforcement

20 and to regulatory agencies which, in turn, allowed defendant to

21 continue his scheme undetected.  Thus, just as the Ninth Circuit

22 stated in *Stoddard, supra,* defendant did not make repayments to show

23 an "untainted intent to reduce loss."  He should not, therefore, get

24 the benefit of reducing his Guideline loss exposure for misusing

25 money to facilitate new thefts and to conceal his offense conduct.[5]

26

27      [5] Because the case law is clear that the "Credits Against Loss"
   provision in § 2B1.1, Application Note 3(E) does not apply to any
28 money returned for the purpose of perpetuating the fraudulent scheme,

*(footnote cont'd on next page)*

1    In any event, even if the Court were to credit defendant with

2    payments he made to earlier victims from later victims' settlements,

3    it would not change the Guidelines loss calculation.  The actual

4    loss remaining would still easily exceed the $3.5 million threshold

5    by approximately $2 million.  (*See* Chan Decl., ¶ 6 and Ex. B

6    attached thereto (actual Guideline loss at least approximately

7    $5,551,756.64.)

8         3.   <u>Defendant Should Not Receive Any Credit for Payments</u>
          <u>Made from the State Bar's Client Security Fund or from</u>
9         <u>Other Third Parties</u>

10   The Guidelines loss also should not be reduced by payments made

11   to victim-clients from the California State Bar's victim fund (the

12   "Client Security Fund" or the "Fund").

13   The Fund exists to "relieve or mitigate pecuniary losses caused

14   by the dishonest conduct" of lawyers.  (Zawol Decl., ¶ 3 (quoting

15   Cal. Bus. & Prof. Code § 6140.5(a).)  The Fund paid 89 of

16   defendant's former clients a total of approximately $2,796,057.58,

17   exclusive of costs or interest. [6]  (Zawol Decl., ¶ 4 and page 4 of

18   attached spreadsheet.)  These payments "were made to help alleviate

19   losses resulting from [defendant]'s dishonest conduct."  (*Id.*, ¶ 7.)

20   The dishonest lawyer is responsible for reimbursing the Fund for

21   those payments.  (*Id.*)

22

23   _____

24   the Court need not address the applicability of the special rule
     prohibiting credit for payments made during a Ponzi or other
     investment scheme.  *See* U.S.S.G. § 2B1.1, comment. (n.3(F)(iv)).

25       [6] The government only recently obtained at defendant's
     counsel's request the information provided by the Fund.  The Fund
26   identified 89 clients, of which approximately 19 were identified at
     trial or in the discovery.  Thus, for the purpose of determining
27   Guideline loss, the government has included as victims only those
     former clients who were identified either in the government's
28   evidence presented at trial, or in discovery previously produced to
     the defense.

Additionally, a Fund payment to an aggrieved client "is a fine payable to a governmental unit that is not compensation for actual pecuniary loss." *In re Kassas,* 631 B.R. 469, 470-74 (Bankr. C.D. Cal. 2021)("The debt owed by Kassas to the Client Security Fund is a penalty imposed in furtherance of the State's interest in punishing and rehabilitating errant attorneys, rather than compensation for actual pecuniary loss."); *Brookman v. State Bar*, 46 Cal. 3d 1004, 1008 (1988)(attorney's obligation to repay amounts paid by CSF to clients is "imposed in order to protect the public and to help rehabilitate the State Bar member.").

Consistent with the purpose and character of money paid by the Fund, Guidelines loss shall be reduced by "[t]he money returned . . . by the defendant or other persons acting jointly with the defendant." U.S.S.G. § 2B1.1, comment. (n.3(E)(i)) (emphasis added). And, no reimbursements from the Fund "should be construed as having been made on [defendant]'s behalf." (Zawol Decl., ¶ 7.)

Applying the foregoing, it is clear that Fund payments to clients were not "returned" by defendant nor made on his behalf. Fund payments were made to clients because defendant had stolen their money. The fact that the Guidelines do not provide for a credit for a third-party's payments to a defendant's victims makes sense: there is nothing mitigating about a third party stepping in to provide victims some remedy for a defendant's harms. At most, such payments merely change to whom restitution is owed and in what amounts.

1

**F.    A Two-Level Enhancement Applies for 10 or More Victims[7]**

The PSR also correctly applied a two-level enhancement because defendant's offense conduct involved 10 or more victims.  (*See* PSR, ¶¶ 59-60; *see also* Chan Decl., Exs. A, B.)

The term "victim" includes "any person who sustained any part of the actual loss."  U.S.S.G. § 2B1.1, comment. (n.1).  The word "person" includes corporations, companies, or associations.  *Id.*

To the extent that defendant argues that some victims should not be counted because they were purportedly made whole by payments from the Fund or other third parties, the argument should be rejected.  As argued above with respect to determining Guideline loss, there is no basis in the Guidelines for crediting defendant in this way for payments made by third parties.  No less, the fact that a client received some compensation from a fund <u>designed to repay clients harmed by a lawyer's dishonesty</u> does not make that client any less a victim of defendant's scheme.

Similarly meritless would be an argument that defendant alluded to during trial that litigation advance lender US Claims Opco is not a victim because it somehow failed to perfect its lien against defendant's receivables.  There is no requirement in the Guidelines that victims affirmatively act in a certain way to pursue their civil remedies against a defrauding defendant or else risk losing their status as a victim.  The Guidelines thus follow the law that negligence would not be a defense to the very fraud of which defendant was convicted.  Any such requirement would unduly burden

---

[7] For the reasons set forth in footnote six, the government does not intend to seek a greater enhancement for multiple victims based upon the recently received Client Security Fund information.

13

victims and would result in an unwarranted windfall to defendants.

**G.   A Two-Level Enhancement Applies for Evading Law Enforcement/Scheme Offshore**

The PSR correctly applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(10) because defendant relocated to Costa Rica to evade law enforcement and that, with his operations in India as well as his conduct in Costa Rica, defendant conducted a substantial portion of the scheme from outside the United States.  (PSR, ¶¶ 61-63.)

The evidence at trial established that defendant owned and controlled his law firm.  His ownership and control included his financial and "back-office support" operations in India.  Defendant testified that the India operations were well underway in summer 2016 and, in defendant's view, the offshore "mutiny" there interfered with his ability to pay his clients.

Defendant's self-serving attempt at blaming his India-based employees was rejected by the jury, but his own testimony about the India operations and activity in summer of 2016 proved that he conducted a substantial part of the charged scheme offshore.  The jury heard that defendant had just purchased a $4.5 million house that he clearly could not afford and that he had, between mid-March 2016 and the beginning of August, embezzled at least approximately $2.5 million from clients to where defendant had a whopping $4,900 in the IOLTA.  (Chan Decl., ¶ 7.)  As perceptively noted by a former employee in his letter to the Court, defendant used the India-based operations as a "scapegoat" and a way to obfuscate and conceal defendant's repeated theft.  (A.L. letter at 2, lodged concurrently under seal.)

14

Once in Costa Rica, defendant took numerous steps to avail himself of his offshore sanctuary to evade law enforcement, his growing list of victims and creditors, and to continue his fraudulent scheme.  Among other things, defendant

- Refused to communicate with clients or creditors by email, but freely communicated with individuals of his choice (like his trial witnesses who testified that they had no problem communicating with defendant in Costa Rica).

- Disconnected his firm-related email account.

- Used a mail drop in Florida that had no connection whatsoever to any legitimate firm business.

- Directed his Costa Rica employees to not to use phone equipment from his failed firm because, as defendant wrote, "[w]e can't have people getting old L&B client calls and saying shit like, 'I'm in Costa Rica.'"

- Directed a Costa Rica employee to travel to the United States to seize the firm's servers and to ship them to Costa Rica.

- Created a new law name, called "Atlas Legal," and directed his Costa Rica employees to cold-call former Layfield & Barrett clients to hire defendant *after* Layfield & Barrett was in bankruptcy and under the control of a trustee.

- And, as to at least one former Layfield & Barrett client, S.J., defendant attempted to settle S.J.'s case without S.J.'s knowledge or consent, going so far as to signing under penalty of perjury and filing with a court a "Notice of Settlement."

1  (*See* Chan Decl., ¶¶ 8,15.)[8]

2       In short, there is ample evidence that defendant relocated his

3  fraudulent scheme to Costa Rica to evade law enforcement, and that a

4  substantial part of his scheme was committed in India and Costa

5  Rica.

6       **H.   A Two-Level Adjustment Applies for Abuse of Position of**
        **Trust/Use of Special Skill**

7

8       The PSR also correctly applied a two-level enhancement under

9  U.S.S.G. § 3B1.3 because, as the overwhelming trial evidence showed,

10  defendant abused a position of trust and used a specialized skill to

11  repeatedly defraud his clients.  (PSR, ¶¶ 68-71.)  "This adjustment

12  . . . applies in the case of an embezzlement of a client's funds by

13  an attorney serving as a guardian."  U.S.S.G. § 3B1.3, comment.

14  (n.1); *see id.* at n.4 (noting the use of specialized skills by

15  lawyers).

16       **I.   The Tax Offenses Do Not Change the Guidelines' Calculation**

17       The PSR correctly determined that the base offense level for

18  defendant's tax offenses is 20 because the tax loss was more than

19  $550,000 but not more than $1,500,000.  (PSR, ¶ 74; Chan Decl., ¶ 14,

20  Ex. C (calculating a total tax loss of $1,211,796.74.)  The PSR

21  further correctly determined that a two-level enhancement applies

22  because defendant failed to report that well over $10,000 of his

23  gross income had been derived from embezzlement.  (PSR, ¶¶ 75-76.)

24

25

---

26       [8]  S.J. was the victim identified in counts 21, 22, 24 and 25 of
    the First Superseding Indictment.  After the Court dismissed the
27  aggravated identity theft counts (24 and 25), the government did not
    pursue counts 21 and 22 at trial.  Defendant's attempt to defraud
28  S.J., however, is relevant and should be considered by the Court at
    sentencing.

As noted in the PSR, however, the tax offenses do not result in any increase in offense level.  (PSR, ¶¶ 81-83.)

### J.   Defendant is Not Entitled to Any Credit for Acceptance of Responsibility

Defendant is expected to claim that he is entitled to a two-level reduction for acceptance of responsibility.  His claim is meritless.

It is defendant's burden to establish eligibility for acceptance of responsibility credit where defendant is convicted at trial. *United States v. Ochoa,* 265 F.3d 837, 843 (9th Cir. 2001).  The Guidelines provide that a defendant may receive credit for acceptance of responsibility, post-trial

> [i]n *rare* situations . . . for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).  *In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.*

USSG § 3E1.1, App. Note 2 (italics added).

This case is not that "rare" situation.  Defendant has no legal challenges, just factual ones.  The jury heard substantial incriminating evidence of defendant's "pretrial statements and conduct" regarding, among other things, defendant dodging and misleading client inquiries about where their money was and bank records showing illegal transfers of client funds that defendant made from accounts he solely controlled.  The jury rejected defendant's self-serving version of the facts that he was victimized by the incompetence of others and only intended a "short term misappropriation" as he told the Probation Officer.  (PSR, ¶ 47.)

Additionally, on cross examination, defendant continued to deny responsibility by denying the most basic facts.  For example, defendant suggested, without any evidence, that the money he had stolen from clients was possibly present and properly accounted for in *other* IOLTA accounts.[9]

In short, defendant cannot demonstrate that he has accepted responsibility as that phrase is defined in the Guidelines.

## III. A SENTENCE OF 168 MONTHS IS REASONABLE AND APPROPRIATE UNDER THE 3553(A) FACTORS

Based on the numerous aggravating circumstances present here, a high-end sentence of 168 months is appropriate, just, and not greater than necessary to achieve the goals of sentencing.

### A.    Nature and Seriousness of the Offense, § 3553(a)(1)

Defendant occupied a very significant role in the lives of his clients and referral lawyers whose money he stole.  Defendant held himself out as a champion of the injured and vulnerable, and then he ruthlessly stole millions from them.  As J.N. explained in her letter,

> "[w]hile I was worried about my piling medical bills, lack of work, and possible economic ruin, Layfield was using my settlement as his personal piggy bank to fund a lavish lifestyle of Maybachs, private jets, horses, [and] luxury homes."

Defendant specifically targeted vulnerable clients like J.N. Defendant pretended to be a caring, ethical lawyer so he could gain his clients' trust, all the while intending to breach their trust

---

[9]  Government counsel promptly debunked defendant's obstructive testimony by publishing bank statements that proved without any doubt that the very funds at issue during that line of questioning were deposited into, and manipulated by defendant from, the one and only IOLTA into which defendant had deposited <u>all</u> of the victims' funds in this case.

18

and steal from them.  Defendant's clients had turned to defendant in their darkest hours, expecting to find an advocate and protector; instead, they were at the mercy of a thief who cared only about himself.

Defendant stole more than money from his victims.  He robbed them of their ability to get necessary and potentially life-changing medical treatment; to afford housing and food; and to obtain mental health services.  He robbed them of their faith in lawyers and the legal system, and of their ability to gain closure after devastating accidents.  Already suffering from life-altering injuries, defendant compounded his victims' stress and anxiety by forcing them to focus on attempting to claw their money from defendant's grip when they should have been focusing on their recovery.

The injuries that defendant caused to referral counsel is serious too.  Defendant not only solicited their cases then stole the very referral fees he promised to pay, but he put referral counsel in the impossible position of trying to answer clients' questions about where the money went.  Defendant placed referral counsel in the line of fire with their own clients who trusted that bringing defendant aboard would help their cases.  It did the opposite, and defendant abandoned referral counsel to fend for themselves, facing litigation and more in the wake.

In short, defendant's crimes were exceedingly serious and caused widespread harm.  Such significant misconduct warrants a correspondingly significant term of imprisonment.

**B.   History and Characteristics of Defendant, § 3553(a)(1)**

Defendant's history and characteristics present further aggravating factors that justify a high-end sentence of 168 months.

1      Defendant's education and work history show that he had every

2  opportunity to run a legitimate business and lead a law-abiding

3  life.  Defendant was well-educated and possessed credentials that

4  exceeded those of most lawyers.  He had an advanced law degree in

5  taxation from a top program in the country.  He was a certified

6  public accountant who worked for several years at some of the

7  largest accounting firms.  He knew about business, and he clearly

8  understood accounting.  He could have --- and should have --- used

9  his background to help his clients; instead, he used it to steal

10  from them.

11      Defendant showed no respect for others, including his own

12  employees.  He operated his firm as an abusive tyrant.  He regularly

13  and profanely berated and embarrassed his employees in front of

14  others.  His former employees describe him as a "bully" who

15  "constantly berated" his employees and was "verbally abusive" and

16  "disrespectful."  (*See, e.g.*, A.L. Letter at 1; T.W. Letter.)  As

17  the jury heard at trial through the testimony of Todd Wakefield,

18  defendant thought little of his clients, referring to them at times

19  as "pieces of shit" who didn't deserve to be paid, or words to that

20  effect.  Among other contemptible features, these characteristics

21  served to ensure that no one would question how defendant ran his

22  firm which, of course, allowed defendant to carry out and conceal

23  his scheme.

24      Defendant also routinely sacrificed his own employees'

25  reputations and future job prospects to protect himself from the

26  clients he had victimized.  Defendant had very little, if any, day-

27  to-day contact with most of his victim clients.  Instead, those

28  clients dealt with associates and support staff who were in the dark

that defendant had drained the IOLTA.  As the Court and jury saw, defendant wrote misleading emails to throw clients and his own staff off the scent that something was wrong, at times stating that defendant would "handle it" or that defendant was wrangling some unicorn in the form of a mythical "accounting" of the IOLTA -- a task defendant claimed would be completed, conveniently, days after his move to Costa Rica.  Defendant deliberately left his employees to tell clients the unsatisfying truth that only defendant knew where the money was.  Defendant left his employees to face lawsuits and State Bar complaints and spend years rebuilding their careers. (*See, e.g.,* G.S. Letter; A.L. Letter.)

Defendant also caused the State Bar to pay out millions of dollars to defendant's victims, money that defendant will most likely never repay and shouldering law-abiding lawyers with the responsibility to cover through Bar dues.

Another factor in aggravation is defendant's core desire to take chances, albeit with other people's money.  While in custody following the verdicts in this case, defendant explained to a former business colleague that he has an outsized appetite for risk, which leads him to make bad decisions.  Defendant wrote

> "I only feel alive when I'm in some sort of challenge with risk involved.  I can think of so many bad decisions where I could have played it safe and chose not to.  I see these people at soccer games with kids living these boring lives and feel like that should be enough, but it never was for me."

(Chan Decl., ¶ 10.)

In his own words, defendant made a conscious choice to gamble. Fiduciaries, like defendant, deserve hefty prison sentences for choosing to chase their own desires that breach the trust that others place in them.

There are no significant mitigating factors to weigh against the many aggravating factors.  Defendant's lack of criminal history points is not mitigating because, by defendant's own account at trial, defendant had been misappropriating client funds and treating the client-trust account as his personal piggybank for years before he was charged in this case.  Defendant's lack of criminal history thus reflects only that defendant was able to evade detection by law enforcement for many years, not that defendant's charged misconduct was aberrant.

Defendant was married and has a child, but his wife left him shortly after the verdicts and both his wife and child have refused to communicate with him.  (PSR, ¶ 111.)  There is no evidence that defendant devoted time or money to religious, charitable, or volunteer causes.  Whatever supporting letters defendant may introduce are likely to be those of family members or friends who, like defendant's clients and employees, had no visibility into defendant's criminal activities.

Furthermore, defendant has never shown remorse for his crimes or a shred of compassion for his many victims.  As noted above, he continues to this day to minimize his egregious misconduct, referring to it as a "short-term misappropriation" and a mere "ethical violation."  (PSR, ¶ 47.)  Defendant also continues to promote the false narrative that he "was always trying to pay the money back." (PSR, ¶ 45).  The overwhelming evidence was to the contrary.  For example, he could have used all or a substantial part of the $700,000 loan proceeds from US Claims Opco (that he, no less, represented in writing he would for business purposes) to repay clients.  Instead, he used it to buy yet another horse, ship a

horse, payoff a car he had shipped, and gave tens of thousands to his wife.  (Chan Decl., ¶ 11.)

### C.   Need for Deterrence, to Promote Respect for the Law, and for Just Punishment, § 3553(a)(2)

The need for both general and specific deterrence, to promote respect for the law, and to provide just punishment further justify a high-end sentence of 168 months.

Defendant engaged in a compassionless scheme to enrich himself by preying on the vulnerable.  The need to deter defendant and others from committing similar crimes is great.  As A.L. wrote in his letter to the court, defendant's "shameful, despicable conduct reflects poorly on all of us as attorneys, and erodes the public's confidence in the legal system."  (*See also* C.D. Letter ("The California Bar does not seem to have the resources and/or inclination to police all its members ... I know that the plaintiff's bar in California is closely watching this case and what the consequences will be for such an audacious breach of public trust.").)

The recommended sentence is also justified because, as noted above, defendant has never -- including leading up to this sentence -- shown any respect for the law.  For example, during a December 2021 jailhouse phone call with a relative,[10] defendant indicated that he intended to feign remorse at sentencing.  Defendant stated that

> You know, I'm trying to work on, you know, we're supposed to make this, like, make a statement at the sentencing, so I'm like working on, like, what I'm gonna supposedly say to the judge in light of everything.  You know, I have to balance it and try to be remorseful and reasonable, but what I really want to say is "you made a bunch of bad rulings and totally screwed

---

[10]  The government will separately lodge with the Court the recording of this call.

1    me over and I hope the Ninth Circuit turns it over and throws
     it in your face." That's what I really want to say. . . .
2    But, you can't say that, you can't say the truth, you have to
     dance this dance. . . . The [C]ommittee has come up with these
3    [G]uidelines from these idiot law professors.

4          Defendant has also demonstrated his disregard for this Court

5    and the law at least two other times. While defendant was in

6    pretrial custody, defendant practiced law --- while suspended from

7    practice by the State Bar --- by purporting to provide legal advice

8    to fellow inmates who were already represented by competent,

9    experienced counsel. Never mind that defendant, who admittedly had

10   no federal criminal law experience, may have interfered with those

11   inmates' relationships with their lawyers. That did not deter

12   defendant from billing thousands of dollars and actually collecting

13   at least $6,000 before he was exposed by an inmate's wife. (Chan

14   Decl., ¶ 12.)

15         Next, the government has information that defendant engaged in

16   yet another embezzlement scam during trial. The Court permitted

17   defendant's pretrial release on the condition that defendant "not

18   engage in any employment where he acts or is called upon to act as a

19   fiduciary for the funds of another person or entity . . . ." (Dkt.

20   65).

21         Just prior to and during trial, the government received

22   numerous complaints that defendant had fleeced truckers out of their

23   fees. They claimed that they had agreed to move freight for a

24   trucking business under defendant's wife's name and that the company

25   had embezzled their fees paid to the company by customers who hired

26   the company to ship freight. While defendant sat at his counsel

27   table *during the trial in this case*, he sent an email to one of

28   several truckers who together claimed that defendant had embezzled

more than \$100,000 in trucking fees due those owner-operators.
Defendant's "wife's trucking business" has since closed down,
leaving those truckers out that money.  It was plain, from
defendant's own email, that defendant was shilling his wife to run
the trucking company because defendant knew that the Court had
barred him from holding other people's money.  (Chan Decl., ¶ 13.)[11]

The government's recommended sentence specifically targets the
unique misconduct of this defendant and promotes respect for the
law.  A significant sentence is appropriate to promote specific
deterrence in light of defendant's repeated failures to comply with
the law, even in the face of significant punishment.

### D.   Policy Statements and Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6)

Because the government's recommended sentence is within the
Guidelines range, it will not cause unwarranted sentencing
disparities with other defendants in similar circumstances.  *See*
*Gall v. United States*, 552 U.S. 38, 54 (2007) ("[A]voidance of
unwarranted disparities was clearly considered by the Sentencing
Commission when setting the Guidelines ranges.")

### IV.   FINE

The government defers to the Court regarding whether to impose a
fine.

---

[11]  Defendant cleverly created the trucking business in his wife's name and put all accounts under her name as well.  All that defendant and his wife previously knew about the trucking business came from defendant's discussions with his pretrial cellmate, a trucker busted for smuggling drugs in a truck, and by defendant's work as a trucker while on pretrial release.  (*See* Dkt. 155.)

**V.    RESTITUTION**

The parties agree that restitution is not fully ascertainable at this time because the parties are awaiting additional information from the State Bar's Client Security Fund.  The parties have met and conferred and believe that they may be able to reach a stipulation as to restitution.

Accordingly, with the agreement of defendant's counsel and pursuant to 18 U.S.C. § 3663(d)(5), the government requests that the Court set a date for a final determination of restitution not later than 90 days after sentencing.

**VI.   CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 168 months in prison on each of the fraud counts, to run concurrently; the maximum statutory terms of imprisonment on each of the tax counts, to run concurrently with each other and the fraud counts; a three-year period of supervised release; a fine, if any, as determined by the Court; a mandatory special assessment of $2,300; and such other and further terms and conditions as the Court deems appropriate.