1                        DECLARATION OF SAM CHAN

2           I, Sam Chan, declare as follows:

3           1.   I am a special agent with IRS, Criminal Investigation.  I

4    make this declaration in support of the government's sentencing

5    position for defendant Philip James Layfield ("defendant").  I have

6    personal knowledge of the facts set forth herein, unless otherwise

7    stated, and could and would testify to those facts fully and

8    truthfully if called and sworn as a witness.  Because I am making

9    this declaration for the limited purpose of addressing issues related

10   to defendant's sentencing, I have not included every fact known to me

11   concerning this investigation.

12          2.   I testified as a witness at defendant's trial.  During my

13   trial testimony, which I incorporate herein by reference, I explained

14   my background and involvement in this case, and I summarized the

15   voluminous records I reviewed in connection with this matter,

16   including financial records showing defendant's receipt and

17   expenditure of client settlement money.

18          3.   The government's concurrently submitted under seal filing

19   includes excerpts of a mediation brief signed by defendant on behalf

20   of client P.C.  That brief was provided by the State Bar from its

21   proceeding against defendant and then provided by the government as

22   discovery in this case.  I believe these excerpts submitted under

23   seal are true and accurate.

24          4.   I know from my review of the IOLTA records (Esquire Bank

25   account ending in 2012, the "IOLTA"), about which I testified at

26   trial in this case, that P.C.'s total settlement proceeds of $600,000

27   were deposited into the IOLTA on or about February 22, 2017 and that,

28   by on or about March 23, 2017, the IOLTA balance was approximately

$5,216 even after the deposit of millions of dollars in settlements that were unpaid by that time.

5.    Attached hereto as Exhibit A is a document setting forth what I believe to be the intended loss caused by defendant for 26 different individuals (former law firm clients and referral attorneys) plus one lender.

a.    For client-victims, the amount listed in the "Amount Owed from Settlement" column is the settlement amount less an approximation of attorneys' fees and costs.  To the extent there is evidence that the client-victim's medical liens were not paid, the amount of the outstanding medical bills are included in the total amount of settlement money owed to the client.  For referral counsel, the amount listed in the "Amount Owed from Settlement" column is the referral fee owed from a client's settlement.  For the lender, the amount listed is the amount of an advance that was to be repaid upon receipt of a client's settlement.

b.    The column titled "Supporting Records" identifies the evidence I reviewed when determining the approximate amount of money owed to the listed victims.

c.    I know from reviewing financial records, including the IOLTA, that defendant spent the entirety of the settlement money owed to the listed client-victims before any of the listed victims received what they were owed from the respective settlements.  I was able to make this determination by reviewing records from the IOLTA and other financial accounts and tracking the drawdown of settlement money that was deposited.  Interviewing every victim was not necessary to determine that defendant had embezzled the victim's settlement money.

1           d.   When tracing the expenditure of settlement money and

2  identifying victims of defendant's scheme through an analysis of the

3  relevant financial records, I took a conservative approach and did

4  not include clients in Exhibit A if there was a possibility that case

5  costs could have been equal to or exceeded the settlement amount such

6  that no money would have been owed to the client.  Based on my review

7  of the IOLTA and the drawdown of funds deposited on behalf of dozens

8  of other individuals who appeared to be clients like those identified

9  at trial, it is possible --- and indeed likely --- that there are

10  many more victims of defendant's embezzlement scheme.

11       6.   I know from reviewing financial records and internal law

12  firm documents, that defendant authorized partial payments to certain

13  clients, usually when the client threatened to file a State Bar

14  complaint or take other legal action.  Attached hereto as Exhibit B

15  is a document that shows intended loss, or loss before reduction of

16  any payment that a client may have received from defendant, and

17  actual loss, or the amount a client was still owed after receiving a

18  partial payment from defendant.  Exhibit B also includes those

19  clients who received no partial payment.  However, I know from

20  reviewing relevant financial records that these repayments were not

21  from the victims' own settlements; rather, they were made from

22  settlements from other client-victims.

23       7.   Based upon my review of the IOLTA, retainer agreements, and

24  trial testimony, I believe that defendant had embezzled a total of at

25  least approximately $2.5 million during the brief period of mid-March

26  2016 through August 1, 2016.  The embezzled funds came from clients

27  M.L. (whose settlement proceeds of approximately $750,000 were

28  deposited into the IOLTA in March 2016); J.Y. (whose settlement

proceeds of approximately $699,000 were deposited into the IOLTA in May 2016); and T.B. (whose settlement proceeds of approximately $1 million were deposited in the IOLTA in June 2016).  The foregoing evidence, and more, showed that none of these clients or their referral attorneys who were owed several hundred thousand dollars received any funds during the foregoing four-month period.  Moreover, the IOLTA balance was approximately $4,915 on August 1, 2016.

8.   During the course of this investigation, I learned that defendant had started a new law firm in Costa Rica under the name, "Atlas Legal."  I interviewed witness K.P.  K.P told me that he had worked for Layfield & Barrett in the U.S. and that defendant had hired him to move to Costa Rica to work for defendant.  K.P. stated that he relocated to Costa Rica and did work there for defendant who told him (K.P.) to solicit former Layfield & Barrett clients to retain defendant's new firm, Atlas Legal.  I know from reviewing interview reports for a former Layfield & Barrett client, S.J., that an individual named "[K.]" called S.J. to retain Atlas Legal and that S.J. stated that he did not hire Atlas Legal or authorize defendant to settle S.J.'s case.

9.   Attached hereto as Exhibit C is a document showing the loss to the IRS that resulted from defendant's tax offenses.  The column titled "Source of Loss and Supporting Records" identifies the type of tax defendant failed to pay that resulted in the loss, and it also identifies the records I reviewed in determining the amount of loss.

10.   I reviewed letters that defendant sent while in custody following the verdicts in this case.  I also listened to recordings of non-privileged telephone calls that defendant placed while in custody during the same time period.  The letters and recordings were

4

1    provided, unaltered, by the jail facility to my co-case agent, Mark

2    Speidel.  The excerpts of defendant's letters and the transcript of

3    the recording that were described in the government's sentencing

4    position accurately reflect the letters that I read and the recording

5    that I listened to.

6         11.  As I testified during trial, I traced the use of the

7    proceeds of the approximately $700,000 loan advanced to defendant by

8    US Claims Opco that were deposited into defendant's personal account

9    at USAA, ending in 1924, on or about June 12, 2017, the day before he

10   flew to Costa Rica.  From my review of bank records for that account,

11   and from other related documents, I determined that defendant used a

12   substantial amount of those loan proceeds for what appeared to be

13   personal use, including approximately $20,000 to buy a horse named

14   "Chinaco;" to ship his personal goods to Costa Rica; approximately

15   $37,000 to pay off a truck he had shipped from the U.S. to Costa

16   Rica; and a $50,000 transfer to his wife.  I did not see any use of

17   the proceeds of that $700,000 loan to pay any of the clients whose

18   cases, as I have testified, settled and for which they received

19   nothing despite being entitled to, in total, several million dollars.

20   Please see attachment B for a detailed description of those clients

21   and their unpaid settlement entitlements.

22        12.  Between about March and late July, 2018, the parties in

23   this case litigated over defendant's pretrial release from MDC where

24   defendant was housed with other inmates including an individual named

25   M.G.  I received from Agent Speidel documents indicating that

26   defendant had billed M.G. for legal services that defendant purported

27   to provide to M.G. while both were in custody and, according to the

28   docket in M.G.'s case, M.G. was represented by counsel.  I

                                    5

incorporate by reference the government's motion to revoke defendant's pretrial release (Dkt. 155).  In in essence, M.G.'s wife refused to pay defendant's bill although another inmate's family did, in fact, pay defendant $6,000 for his "legal services."

13.  Just before and during trial in this case, co-case agent Ryan Heaton of the FBI provided emails to me from a group of individuals who stated that defendant's wife's company, Maximum Global Transportation, owed them over $100,000 in unpaid freight transport costs.  One such email was from defendant, attached hereto, that was apparently emailed by defendant while he sat at the counsel table during the trial in this case.

14.  Attached hereto as Exhibit D is a compilation of documents obtained during the investigation of this case that I understand, including based on the "Bates" number on each such document, were produced by the government to the defense as part of discovery.

15.  I interviewed R.M. as part of the investigation of this case.  R.M. told me, among other things, that defendant, for whom she had worked at Layfield & Barrett, offered her a job with him in Costa Rica.  R.M. further stated that she relocated to Costa Rica to work for defendant and that, while there, defendant directed her to travel to the U.S. to retrieve and send back to Costa Rica computer servers that had been used by the Layfield & Barrett firm.  R.M. stated that she followed defendant's direction and obtained and sent the servers to Costa Rica.

///
///
///
///

1        I declare under penalty of perjury under the laws of the United

2  States of America that the foregoing is true and correct and that

3  this declaration is executed at Santa Ana, California, on February 3,

4  2022.

5

6                                  SAM CHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# U.S. v. PHILIP LAYFIELD, CR 18-124(A)-MWF

## Intended Loss

| | VICTIM | AMOUNT OWED FROM SETTLEMENT (INCLUDING AMOUNT OWED FOR MEDICAL LIENS) | SUPPORTING RECORDS |
|---|---|---|---|
| 1 | A.L. | $7,002.85 | May 5, 2017 email from Wakefield to Layfield, CA State Bar Complaint, Bill.com records |
| 2 | Bl. S. | $30,390.14 | Actually paid via Bill.com on Jan 26, 2017 |
| 3 | Bo. S. (Referral Counsel for Client J.Y.) | $179,098.20 | Pay order |
| 4 | C.D. (Referral Counsel for Client J.Y.) | $58,750.27 | Pay order |
| 5 | C.S. | $30,390.14 | Settlement letter dated Sep 2, 2016 |
| 6 | Da. S. (Referral Counsel for Client R.P.) | $243,000.00 | Closing Statement (in Excel file) |
| 7 | De. S. | $60,780.28 | Settlement letter dated Sep 2, 2016 |
| 8 | F.H. | $295,686.66 | Settlement letter dated Apr 20, 2017 along with Closing Statement |
| 9 | Ir. C. | $19,640.73 | May 5, 2017 email from Wakefield to Layfield |
| 10 | J.L. (Referral Counsel for Client P.C.) | $83,300.00 | Closing Statement & Trial testimony |
| 11 | J.N. | $2,260,893.41 | Retainer agreement dated Feb 24, 2016 (60%), $25,000 Case advance check / letter dated Feb 15, 2017, pre-closure email & spreadsheet provided by Almeida on Feb 3, 2017 (case fee $59,283.59 / medical liens $27,723), email from Layfield to Wakefield with payables / creditor list of $1.8 million and attached excel file as of July 15, 2017 ($7,900 not paid), Medi-Cal Lien dated May 9, 2017 |
| 12 | J.S. | $127,239.22 | Amount paid via Bill.com from other client's settlement on Sep 29, 2016 |
| 13 | J.Y. | $250,000.00 | Pay order |
| 14 | M.B. (Referral Counsel for Client M.M.) | $126,467.00 | Closing Statement |
| 15 | M.H. | $52,141.77 | May 5, 2017 email from Wakefield to Layfield, Bill.com records |
| 16 | M.L. | $307,054.00 | Closing Statement & Trial testimony |
| 17 | M.M. | $442,502.16 | Settlement letter dated Sep 19, 2016 along with Closing Statement |
| 18 | M.W. (Referral Counsel for Client M.M.) | $235,549.36 | Closing Statement |
| 19 | P.A. (on behalf of The Dominguez Firm) (Referral Counsel for Client M.L.) | $150,000.00 | Closing Statement & Trial testimony |
| 20 | P.C. | $317,560.08 | Closing Statement & Medi-cal Lien dated Jun 26, 2017 |

EXHIBIT A-1

| | | | |
|---|---|---|---|
| 21 | P.M. (Referral Counsel for Client T.B.) | $24,382.37 | Closing Statement |
| 22 | R.P. | $560,105.44 | Retainer agreement dated Sep 22, 2014, Bill.com records, closing statement (excel file) |
| 23 | Se. A. | $382,028.01 | Closing Statement |
| 24 | Si. A. | $14,025.33 | Bill.com record |
| 25 | T.B. | $581,061.66 | Closing Statement ($538,187.41) & Letter dated April 8, 2017 ($42,874.25) |
| 26 | W.M. (Referral Counsel for Client T.B.) | $24,382.37 | Closing Statement |
| | | **AMOUNT OWED TO LENDER** | |
| 27 | US Claims Opco LLC (Lender) | $700,000.00 | BK Case #17-BK-19548-NB Claim of Proof, US Claims Oppo production, USAA #1924 records / wire |
| | | | |
| | **TOTAL** | **$7,563,431.45** | |

EXHIBIT A-2

# U.S. v. PHILIP LAYFIELD, CR 18-124(A)-MWF

## Intended and Actual Loss (selected victims)

|    | **VICTIM** | **INTENDED LOSS** | **ACTUAL LOSS** |
|----|------------|-------------------|-----------------|
| 1  | A.L. | $7,002.85 | $7,002.85 |
| 2  | Da. S. (Referral Counsel for Client R.P.) | $243,000.00 | $243,000.00 |
| 3  | F.H. | $295,686.66 | $115,247.54 |
| 4  | Ir. C. | $19,640.73 | $19,640.73 |
| 5  | J.L. (Referral Counsel for Client P.C.) | $83,300.00 | $83,300.00 |
| 6  | J.N. | $2,260,893.41 | $2,235,893.41 |
| 7  | M.H. | $52,141.77 | $52,141.77 |
| 8  | M.L. | $307,054.00 | $287,054.00 |
| 9  | M.M. | $442,502.16 | $442,502.16 |
| 10 | P.A. (on behalf of The Dominguez Firm) (Referral Counsel for Client M.L.) | $150,000.00 | $150,000.00 |
| 11 | P.C. | $317,560.08 | $317,560.08 |
| 12 | P.M. (Referral Counsel for Client T.B.) | $24,382.37 | $24,382.37 |
| 13 | R.P. | $560,105.44 | $560,105.44 |
| 14 | Se. A. | $382,028.01 | $182,028.01 |
| 15 | T.B. | $581,061.66 | $42,874.25 |
| 16 | W.M. (Referral Counsel for Client T.B.) | $24,382.37 | $24,382.37 |
| 17 | US Claims Oppo LLC (Lender) | $700,000.00 | $700,000.00 |
|    | **TOTAL** | **$6,450,741.51** | **$5,551,756.64** |

EXHIBIT B

# U.S. v. PHILIP LAYFIELD, CR 18-124(A)-MWF

## Loss to IRS

| | Victim | Loss | Source of Loss and Supporting Records |
|---|---|---|---|
| 1 | Internal Revenue Service | $128,763.74 | Payroll Taxes (via Namely data) |
| | | $1,083,033.00 | Personal Income Tax (via Revenue Agent Report) |
| | **TOTAL LOSS TO IRS** | **$1,211,796.74** | |

EXHIBIT C

TRIAL EXHIBITS

# TRIAL LAWYERS
## *for the People,*
## *in Pursuit of Justice*

**Layfield & Barrett Trial Attorneys Refuse to Back Down, Insist on Remaining at the Forefront of Technology, Training, and Education, and Refuse to Settle for Anything Less Than Their Injured Clients Deserve**

by Jennifer Hadley

"We are trial lawyers for the people—a full-service law firm, vibrant and hard-working, filled with a passion to bring justice to people on a contingency fee arising from accidents, defective products, business disputes, wrongly handled insurance claims, employment and workers' rights cases, police misconduct and more," says Founder and Managing Partner of Layfield & Barrett Trial Attorneys, APC (Layfield & Barrett).

As a firm with more than 95 staff members and 24 attorneys, Layfield & Barrett serves victims of catastrophic injuries from across the nation, with offices in Los Angeles; Park City, UT; San Diego; San Francisco; Washington, D.C.; and Scottsdale, AZ. However, their largest office is the firm's Irvine office, where Layfield has been based for the last 3 years. Under his direction and vision, the firm has grown a whopping 500% over the last 3 years, in terms of attorneys, staff, cases and revenue. Most recently, in January 2016 the firm officially became Layfield Barrett Trial Attorneys, APC, when Joe Barrett, one of California's most respected trial attorneys, who was formerly with The Cochran Firm, joined forces with Layfield and his team of aggressive, creative, and highly skilled trial lawyers.

"Our typical client is a person who was catastrophically injured in a violent event that lasted maybe one second but changed their life forever, or someone who has been wronged by a corporation, government or insurance company for a unique reason. Our niche is trying to bring economic justice and positive change to such people, who trust and rely upon our firm," says Layfield.

## FIGHTING FOR THE PEOPLE

"Only by being a Trial Lawyer for the People can I truly obtain the blessing of both doing good and doing well, as the late Johnnie L. Cochran, Jr. said. I can care for those I serve, provide great career opportunities for the people I work with, and bring justice to the folks we serve. Nothing is more rewarding," says L&B partner Joe Barrett. He isn't just blowing smoke, either. His firm routinely takes cases that even some of the largest plaintiff's firms reject, and turns them into economic justice for victims. Such was the case last year when one of the firm's partners settled a case for a teenager who fell out of her third-floor bedroom window one night, resulting in a tragic and life-changing accident. "Through tenacious legal work, we changed



EXHIBIT 21
Page 2 of 6

CLIENT: M.L.

DEPOSIT : $750,000 on 3/18/16

SETTLEMENT GONE / SUBSTANTIALLY GONE : 5/3/16



## Transfers to Philip James Layfield (2016)

United States vs. Philip James Layfield

### $405,000 Transfers from Esquire Bank Acct #2012 (IOLTA) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 2/16/16 | $50,000.00 |
| 2/17/16 | $50,000.00 |
| 2/18/16 | $50,000.00 |
| 2/22/16 | $30,000.00 |
| 7/1/16 | $50,000.00 |
| 8/15/16 | $25,000.00 |
| 10/25/16 | $15,000.00 |
| 10/31/16 | $35,000.00 |
| 12/15/16 | $15,000.00 |
| 12/16/16 | $25,000.00 |
| 12/30/16 | $60,000.00 |

### $189,265 Transfers from the operating account (via Bill.com) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 1/5/16 | $10,000.00 |
| 1/5/16 | $10,000.00 |
| 1/5/16 | $30,000.00 |
| 1/21/16 | $4,264.92 |
| 1/21/16 | $10,000.00 |
| 1/26/16 | $10,000.00 |
| 1/29/16 | $10,000.00 |
| 1/29/16 | $15,000.00 |
| 2/1/16 | $5,000.00 |
| 2/1/16 | $10,000.00 |
| 2/12/16 | $50,000.00 |
| 4/7/16 | $25,000.00 |

### $150,000 Transfer from the operating account to Jim Tracy for LAYFIELD's home loan

| Date | Amount |
|---|---|
| 8/30/16 | $100,000.00 |
| 9/15/16 | $50,000.00 |

### $1,357,500 Transfers from Esquire Bank Acct #2004 (operating account) into LAYFIELD's personal account (USAA #1924)

| Date | Amount | Date | Amount |
|---|---|---|---|
| 4/4/16 | $30,000.00 | 8/30/16 | $50,000.00 |
| 4/7/16 | $50,000.00 | 8/30/16 | $20,000.00 |
| 4/19/16 | $50,000.00 | 8/31/16 | $50,000.00 |
| 4/25/16 | $25,000.00 | 9/1/16 | $50,000.00 |
| 4/29/16 | $35,000.00 | 9/2/16 | $50,000.00 |
| 5/6/16 | $30,000.00 | 9/6/16 | $50,000.00 |
| 5/13/16 | $40,000.00 | 9/7/16 | $50,000.00 |
| 5/18/16 | $35,000.00 | 9/12/16 | $40,000.00 |
| 5/23/16 | $50,000.00 | 9/16/16 | $50,000.00 |
| 5/24/16 | $35,000.00 | 9/26/16 | $48,000.00 |
| 6/3/16 | $50,000.00 | 10/3/16 | $50,000.00 |
| 6/13/16 | $15,000.00 | 10/07/2016 | $50,000.00 |
| 6/23/16 | $50,000.00 | 10/11/2016 | $25,000.00 |
| 6/30/16 | $50,000.00 | 10/19/2016 | $25,000.00 |
| 7/12/16 | $35,000.00 | 10/24/2016 | $30,000.00 |
| 7/15/16 | $25,000.00 | 10/27/2016 | $30,000.00 |
| 7/28/16 | $25,000.00 | 10/31/2016 | $25,000.00 |
| 7/29/16 | $7,500.00 | 12/06/2016 | $25,000.00 |
| 8/9/16 | $20,000.00 | 12/12/2016 | $25,000.00 |
| 8/18/16 | $20,000.00 | | |

TOTAL : $205,000

EXHIBIT 49
Page 1 of 6



CLIENT : Se. A.

DEPOSIT : $ 1,250,000 ON 4/1/16

SETTLEMENT GONE / SUBSTANTIALLY GONE : 5/3/16

## Transfers to Philip James Layfield (2016)

United States vs. Philip James Layfield

**$405,000** Transfers from Esquire Bank Acct #2012 (IOLTA) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|------|--------|
| 2/16/16 | $50,000.00 |
| 2/17/16 | $50,000.00 |
| 2/18/16 | $50,000.00 |
| 2/22/16 | $30,000.00 |
| 7/1/16 | $50,000.00 |
| 9/15/16 | $25,000.00 |
| 10/25/16 | $15,000.00 |
| 10/31/16 | $35,000.00 |
| 12/15/16 | $15,000.00 |
| 12/16/16 | $25,000.00 |
| 12/30/16 | $50,000.00 |

**$189,265** Transfers from the operating account (via Bill.com) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|------|--------|
| 1/5/16 | $10,000.00 |
| 1/5/16 | $10,000.00 |
| 1/8/16 | $30,000.00 |
| 1/21/16 | $4,264.82 |
| 1/21/16 | $10,000.00 |
| 1/26/16 | $10,000.00 |
| 1/28/16 | $10,000.00 |
| 1/28/16 | $15,000.00 |
| 2/1/16 | $5,000.00 |
| 2/1/16 | $10,000.00 |
| 2/12/16 | $50,000.00 |
| 4/7/16 | $25,000.00 |

**$150,000** Transfer from the operating account to Jim Tracy for LAYFIELD's home loan

| Date | Amount |
|------|--------|
| 8/30/16 | $100,000.00 |
| 9/15/16 | $50,000.00 |

**$1,357,500** Transfers from Esquire Bank Acct #2004 (operating account) into LAYFIELD's personal account (USAA #1924)

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 4/4/16 | $30,000.00 | 8/30/16 | $50,000.00 |
| 4/7/16 | $50,000.00 | 8/30/16 | $20,000.00 |
| 4/19/16 | $50,000.00 | 8/31/16 | $50,000.00 |
| 4/25/16 | $25,000.00 | 9/1/16 | $50,000.00 |
| 4/28/16 | $25,000.00 | 9/2/16 | $50,000.00 |
| 5/6/16 | $30,000.00 | 9/6/16 | $50,000.00 |
| 5/13/16 | $40,000.00 | 9/7/16 | $50,000.00 |
| 5/18/16 | $50,000.00 | 9/12/16 | $40,000.00 |
| 5/23/16 | $50,000.00 | 9/16/16 | $50,000.00 |
| 5/24/16 | $35,000.00 | 9/26/16 | $45,000.00 |
| 6/3/16 | $50,000.00 | 10/3/16 | $50,000.00 |
| 6/13/16 | $15,000.00 | 10/07/2016 | $50,000.00 |
| 6/23/16 | $50,000.00 | 10/11/2016 | $25,000.00 |
| 6/30/16 | $25,000.00 | 10/19/2016 | $25,000.00 |
| 7/12/16 | $35,000.00 | 10/24/2016 | $20,000.00 |
| 7/15/16 | $25,000.00 | 10/27/2016 | $30,000.00 |
| 7/26/16 | $25,000.00 | 10/31/2016 | $25,000.00 |
| 7/29/16 | $7,500.00 | 12/06/2016 | $25,000.00 |
| 8/9/16 | $20,000.00 | 12/12/2016 | $50,000.00 |
| 8/18/16 | $20,000.00 | | |

TOTAL : $ 205,000

EXHIBIT 49
Page 2 of 6



CLIENT: **J.Y.**

DEPOSIT: $ 699,000 ON 5/18/16

SETTLEMENT GONE / SUBSTANTIALLY GONE : 6/13/16

TOTAL : $ 165,000

United States vs. Philip James Layfield

## Transfers to Philip James Layfield (2016)

**$405,000** Transfers from Esquire Bank Acct #2012 (IOLTA) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 2/16/16 | $50,000.00 |
| 2/17/16 | $50,000.00 |
| 2/18/16 | $50,000.00 |
| 2/22/16 | $30,000.00 |
| 7/1/16 | $50,000.00 |
| 8/15/16 | $25,000.00 |
| 10/26/16 | $15,000.00 |
| 10/31/16 | $35,000.00 |
| 12/15/16 | $15,000.00 |
| 12/16/16 | $25,000.00 |
| 12/30/16 | $60,000.00 |

**$189,265** Transfers from the operating account (via Bill.com) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 1/5/16 | $10,000.00 |
| 1/5/16 | $10,000.00 |
| 1/8/16 | $30,000.00 |
| 1/21/16 | $4,264.82 |
| 1/21/16 | $10,000.00 |
| 1/26/16 | $10,000.00 |
| 1/29/16 | $10,000.00 |
| 1/29/16 | $15,000.00 |
| 2/1/16 | $5,000.00 |
| 2/1/16 | $10,000.00 |
| 2/12/16 | $50,000.00 |
| 4/7/16 | $25,000.00 |

**$150,000** Transfer from the operating account to Jim Tracy for LAYFIELD's home loan

| Date | Amount |
|---|---|
| 8/30/16 | $100,000.00 |
| 9/15/16 | $50,000.00 |

**$1,357,500** Transfers from Esquire Bank Acct #2004 (operating account) into LAYFIELD's personal account (USAA #1924)

| Date | Amount | Date | Amount |
|---|---|---|---|
| 4/4/16 | $30,000.00 | 8/30/16 | $50,000.00 |
| 4/7/16 | $50,000.00 | 8/30/16 | $20,000.00 |
| 4/19/16 | $50,000.00 | 8/31/16 | $50,000.00 |
| 4/25/16 | $25,000.00 | 9/1/16 | $50,000.00 |
| 4/28/16 | $25,000.00 | 9/2/16 | $50,000.00 |
| 5/6/16 | $30,000.00 | 9/6/16 | $50,000.00 |
| 5/13/16 | $40,000.00 | 9/7/16 | $50,000.00 |
| 5/18/16 | $35,000.00 | 9/12/16 | $40,000.00 |
| 5/23/16 | $50,000.00 | 9/16/16 | $50,000.00 |
| 5/24/16 | $35,000.00 | 9/26/16 | $45,000.00 |
| 6/3/16 | $30,000.00 | 10/3/16 | $50,000.00 |
| 6/13/16 | $15,000.00 | 10/07/2016 | $25,000.00 |
| 6/23/16 | $50,000.00 | 10/11/2016 | $25,000.00 |
| 6/30/16 | $25,000.00 | 10/19/2016 | $25,000.00 |
| 7/12/16 | $35,000.00 | 10/24/2016 | $30,000.00 |
| 7/15/16 | $25,000.00 | 10/27/2016 | $30,000.00 |
| 7/28/16 | $25,000.00 | 10/31/2016 | $25,000.00 |
| 7/29/16 | $7,500.00 | 12/06/2016 | $25,000.00 |
| 8/9/16 | $20,000.00 | 12/12/2016 | $30,000.00 |
| 8/18/16 | $20,000.00 | | |

EXHIBIT 49
Page 3 of 6



CLIENT : **T.B.**

DEPOSIT : $ 1,068,100.85 ON 6/28/16

SETTLEMENT GONE / SUBSTANTIALLY GONE : 7/29/16

## Transfers to Philip James Layfield (2016)

United States vs. Philip James Layfield

**$405,000** Transfers from Esquire Bank Acct #2012 (IOLTA) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 2/16/16 | $50,000.00 |
| 2/17/16 | $50,000.00 |
| 2/18/16 | $50,000.00 |
| 2/22/16 | $30,000.00 |
| 7/1/16 | $50,000.00 |
| 8/15/16 | $25,000.00 |
| 10/26/16 | $15,000.00 |
| 10/31/16 | $35,000.00 |
| 12/15/16 | $15,000.00 |
| 12/16/16 | $25,000.00 |
| 12/30/16 | $60,000.00 |

**$189,265** Transfers from the operating account (via Bill.com) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 1/5/16 | $10,000.00 |
| 1/5/16 | $10,000.00 |
| 1/8/16 | $30,000.00 |
| 1/21/16 | $4,284.82 |
| 1/21/16 | $10,000.00 |
| 1/26/16 | $10,000.00 |
| 1/29/16 | $15,000.00 |
| 2/1/16 | $6,000.00 |
| 2/1/16 | $10,000.00 |
| 2/12/16 | $50,000.00 |
| 4/7/16 | $25,000.00 |

**$150,000** Transfer from the operating account to Jim Tracy for LAYFIELD's home loan

| Date | Amount |
|---|---|
| 8/30/16 | $100,000.00 |
| 9/15/16 | $50,000.00 |

**$1,357,500** Transfers from Esquire Bank Acct #2004 (operating account) into LAYFIELD's personal account (USAA #1924)

| Date | Amount | Date | Amount |
|---|---|---|---|
| 4/4/16 | $30,000.00 | 8/30/16 | $50,000.00 |
| 4/7/16 | $50,000.00 | 8/30/16 | $30,000.00 |
| 4/19/16 | $50,000.00 | 8/31/16 | $50,000.00 |
| 4/25/16 | $25,000.00 | 9/1/16 | $50,000.00 |
| 4/28/16 | $25,000.00 | 9/2/16 | $50,000.00 |
| 5/6/16 | $30,000.00 | 9/6/16 | $50,000.00 |
| 5/31/16 | $40,000.00 | 9/7/16 | $50,000.00 |
| 5/18/16 | $35,000.00 | 9/12/16 | $40,000.00 |
| 5/23/16 | $50,000.00 | 9/16/16 | $50,000.00 |
| 5/24/16 | $35,000.00 | 9/26/16 | $45,000.00 |
| 6/3/16 | $30,000.00 | 10/3/16 | $50,000.00 |
| 6/13/16 | $15,000.00 | 10/07/2016 | $50,000.00 |
| 6/29/16 | $50,000.00 | 10/11/2016 | $25,000.00 |
| 6/30/16 | $25,000.00 | 10/19/2016 | $25,000.00 |
| 7/12/16 | $35,000.00 | 10/24/2016 | $30,000.00 |
| 7/15/16 | $25,000.00 | 10/27/2016 | $30,000.00 |
| 7/28/16 | $25,000.00 | 10/31/2016 | $25,000.00 |
| 7/29/16 | $7,500.00 | 12/09/2016 | $25,000.00 |
| 8/4/16 | $20,000.00 | 12/12/2016 | $30,000.00 |
| 8/18/16 | $20,000.00 | | |

TOTAL : $ 217,000

**EXHIBIT 49**
Page 4 of 6





CLIENT : J.N.

DEPOSIT : $500,000 ON 8/26/16 ; $3,400,000 ON 8/29/16

SETTLEMENT GONE / SUBSTANTIALLY GONE : 10/19/16

TOTAL : $755,000

EXHIBIT 49
Page 6 of 6

# Ex. 50 - Summary of Client Settlement Payments

## M.L. (Deposited into IOLTA on 3/18/16)

| | | |
|---|---|---|
| Settlement Amount | $750,000.00 | |
| M.L. s Entitled Amt from Settlement | $307,054.00 | Per closing statement / letter from Pannebaker on Jan 13, 2017 (Exs. 232, 233) |
| | | |
| Payments made to client | | |
| 10/24/2016 | $5,000.00 | Paid from other client settlements |
| 11/7/2016 | $5,000.00 | Paid from other client settlements |
| 12/5/2016 | $5,000.00 | Paid from other client settlements |
| 12/5/2016 | $5,000.00 | Paid from other client settlements |
| | $20,000.00 | |
| | | |
| **Amount Not Paid:** | $ 287,054.00 | |

## Se. A. (Deposited into IOLTA on 4/1/16)

| | | |
|---|---|---|
| Settlement Amount | $1,250,000.00 | |
| Se. A. s Entitled Amt from Settlement | $382,028.01 | Per closing statement (Ex. 237) |
| | | |
| Payments made to client | | |
| 8/23/2016 | $5,000.00 | Paid from M.M. 's portion of settlement |
| 9/15/2016 | $5,000.00 | Paid from J.N. 's portion of settlement |
| 10/24/2016 | $5,000.00 | Paid from other client settlements |
| 11/7/2016 | $5,000.00 | Paid from other client settlements |
| 11/18/2016 | $5,000.00 | Paid from other client settlements |
| 1/11/2017 | $25,000.00 | Potentially paid w/ F.H. 's portion of settlement |
| 2/10/2017 | $25,000.00 | Paid from other client settlements |
| 3/1/2017 | $75,000.00 | Potentially paid from R.P. & P.C. portion of settlement |
| 4/27/2017 | $10,000.00 | Paid from other client settlements (via WFB #3706) |
| 4/27/2017 | $15,000.00 | Paid from other client settlements (via WFB #3706) |
| 6/19/2017 | $25,000.00 | Paid from other client settlements |
| | $200,000.00 | |
| | | |
| **Amount Not Paid:** | **$182,028.01** | |

EXHIBIT 50
Page 1 of 3

## T.B. (Deposited into IOLTA on 6/28/16)

| | | |
|---|---|---|
| Settlement Amount | $1,068,100.85 | |
| T.B.'s Entitled Amt from Settlement | $42,874.25 | Per closeout statement and adjustment email from TW on Apr 18, 2017 (Exs. 262A, 265) |
| Payments made to client | | |
| 8/19/2016 | $275,000.00 | Paid from M.M.'s portion of settlement |
| 9/19/2016 | $213,187.41 | Paid from J.N.'s portion of settlement |
| 9/30/2016 | $50,000.00 | Paid from J.N.'s portion of settlement |
| | $538,187.41 | |
| *Amount Not Paid:* | *$42,874.25* | |

## M.M. (Deposited into IOLTA on 8/16/16)

| | | |
|---|---|---|
| Settlement Amount | $991,249.01 | |
| M.M.'s Entitled Amt from Settlement | $442,502.07 | Per closeout statement and accompaning letter (Ex. 273) |
| *Amount Not Paid:* | *$442,502.07* | |
| *Payment made to referral counsel - M.B. | | |
| *Payment made to referral counsel - M.W. | | |
| 9/19/2016 | $99,124.90 | Paid from J.N.'s portion of settlement |
| 9/19/2016 | $198,249.80 | Paid from J.N.'s portion of settlement |

EXHIBIT 50
Page 2 of 3

**J.N.** (Deposited into IOLTA on 8/26/16 & 8/29/16)

| | | |
|---|---|---|
| Settlement Amount | $3,900,000.00 | Per Philip Layfield attaching cost break-down spreadsheet on Feb 3, 2017 (Exs. 286, 286A, 286B) |
| **J.N.**'s Entitled Amt from Settlement | $2,053,164.73 | |
| Payment made to client — 3/9/2017 | $25,000.00 | Paid from other client settlements |
| **Amount Not Paid:** | **$2,028,164.73** | (Does not include $199,828 in Medi-Cal liens) |

**P.C.** (Deposited into IOLTA on 2/22/17)

| | | |
|---|---|---|
| Settlement Amount | $595,001.00 | |
| **P.C.**'s Entitled Amt from Settlement | $270,014.86 | Per closing statement (Ex. 324) |
| **Amount Not Paid:** | **$270,014.86** | |

**R.P.** (Deposited into IOLTA on 2/24/17)

| | | |
|---|---|---|
| Settlement Amount | $1,350,000.00 | |
| **R.P.**'s Entitled Amt from Settlement | $183,984.97 | Manually calculated per pre-closure statement (Ex. 343) |
| **Amount Not Paid:** | **$183,984.97** | (Does not include over $376,120 unpaid liens) |

**EXHIBIT 50**
**Page 3 of 3**

**From:** Philip Layfield [mailto:p@maximumlegalservices.com]
**Sent:** Friday, June 30, 2017 10:57 AM

# REDACTED

**Importance:** High

Ok.  That's great news.  Here are some of my observations:

1.  L&B needs a dedicated phone number to receive phone calls.  One line, one number that provides a recorded message that says:

Thank you for calling L&B, nobody is available to take your call right now.  If you need to communicate with someone regarding your case, your file, or any other matter, please address any issues in writing to XXXXX (florida address.)  This number needs to be given to the ML staff to pass on.  We are not going to take emails any longer to

2.  ML needs to have its own separate phone system separate from MLS.  That means that nobody in India should be on the ML phone system.  Only the MLS system.  ML needs its own voice recordings and their should be NO L&B voice recordings for anything other than #1 above.

3.  MLS needs to have its own voice recordings.  Rita, Rohit, Kenny, Phil, John, and others need to have proper phone numbers.  Right now, I believe mine is all screwed up.  I see my phone with a 7243 extension with messages and I don't even know what my new phone number is and I don't know what my password is.  We can't allow ANYBODY FOR MLS TO BE ON THE OLD L&B SYSTEM.

4.  We need to check caller IDs and make sure everything is properly reflected;

5.  I see phones downstairs with message lights?  How is that possible if we are on an MLS system?  I suspect you guys have brought old L&B extensions.  We can't have people getting old L&B client calls and saying shit like, "I'm in Costa Rica".

6.  We need phones for the marketing team and accounting team in San Jose.  We need phones for India with Florida numbers, not Irvine numbers.  I need to see an inventory of what we

USAO_37193

EXHIBIT 153
Page 1 of 3

have.


This is not an option, we need to have all of this resolved no later than July 10th.



USAO_37194

**EXHIBIT 153**
**Page 2 of 3**

REDACTED

USAO_37195

EXHIBIT 153
Page 3 of 3

**Michael Artinian**

| | |
|---|---|
| **From:** | info <info@layfieldbarrett.com> |
| **Sent:** | Tuesday, June 27, 2017 6:26 PM |
| **To:** | Michael Artinian |
| **Subject:** | Automatic reply: J.N. |

Please be advised that Layfield & Barrett does not accept email communications on any business matters at this time.  If you have any questions or correspondence, please send to our mailing address of:

L&B, APC
382 NE 191st St. #42308
Miami, Florida 33179-3899

1

USAO CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER  002509
**EXHIBIT 293**
**Page 1 of 1**

EMAIL SENT DURING TRIAL

----- Forwarded Message -----
**From:** "Philip Layfield"
**To:** "A        S        "
**Cc:** "Christine Layfield"                              "C          L

**Sent:** Wed, Aug 18, 2021 at 9:52 AM
**Subject:** Re: A        S
Hi Adrian:

I sincerely apologize that the company has not been able to pay you in full.  Unfortunately, the
company ran into some unanticipated financial difficulties, that have caused delays in making
payments to Owner Operators.  We have been trying to work out payment arrangements with
several of our OOs.  One solution that we have with some of our OO's is that we simply have
committed to paying them $1,000 per day as long as they are moving freight.  This will keep cash
flow in your pocket and allow you to continue to earn while we get your past balance paid down.
  At this time, we just can't pay you the full balance, but if you are willing to get your truck out of

the shop and commit to a load and keep running, then we can keep money flowing to you.  The problem is that many owner operators like you have all put their trucks in the shop for repairs and nobody is generating any money.  We need to reverse this situation so the company has funds to pay its bills.  Please give chris a call today and see if you can work out an arrangement to get your truck out of the shop and so we can get you loads booked and start paying you money each day.

Thank you.

On Aug 17, 2021, at 2:24 PM, A          S                               wrote:

Can I please get paid this week? What is the problem that I have to wait weeks to get paid for the work I've done? Plus why is it that you offer to pay in increments instead of my whole check? I am owed $6,890.84. Once again, the contract that was signed by both of us said that you had up to 6 days to pay me after the invoice was sent. I don't want to pursue legal action but I may have to. I don't work for free. All I ask is communication & I haven't been getting that at all. Please respond via email or better yet call me.

This message is confidential. It may also be privileged or otherwise protected by the work product doctrine or other legal rules. If you have received it by mistake, please let us know by e-mail reply, and delete it from your system. You may not copy this message or disclose its contents to anyone.The integrity and security of this message cannot be guaranteed on the Internet.