Anthony M. Solis, SBN 198580
A Professional Law Corporation
23679 Calabasas Road, Suite 412
Calabasas, CA 91302-1502
213-489-5880 - Phone
213-489-5923 - Fax
anthonysolislaw@gmail.com

Steven A. Brody, SBN 271616
Law Office of Steven A. Brody
155 S. Lake Ave., Suite 800
Pasadena, CA 91101
213-290-5294
stevebrodylaw@gmail.com

Attorneys for Defendant
Philip Layfield

United States District Court

Central District of California

Western Division

| | |
|---|---|
| United States of America, | Case No: 18-cr-124(A)-MWF |
| Plaintiff, | |
| | Defendant Philip Layfield's Sentencing Memorandum |
| v. | |
| Philip Layfield, | |
| Defendant. | Date: February 17, 2022<br>Time: 1:00 p.m.<br>Hon. Michael W. Fitzgerald |

Defendant Philip Layfield, by and through counsel of record, Anthony M. Solis and Steven Brody, submits his senentencing memorandum to the Court.

Dated: February 3, 2022

Anthony M. Solis
A Professional Law Corp.

*Anthony M. Solis /s/*
By: Anthony M. Solis,
Attorney for Defendant
Philip Layfield

---

Defendant Layfield's Sentencing Memorandum

**Memorandum of Points and Authorities**

**Introduction**

Philip Layfield comes before the Court for sentencing having been convicted, following a jury trial, of wire fraud, mail fraud and tax charges. As set forth below, the goals of sentencing are all met with a sentence that is comprised of 57 months of custody, followed by a period of supervised release.

**A. The Offense Conduct.**

The Court is well aware of the conduct in this matter, having presided over the jury trial. In essence, Mr. Layfield was an attorney at law who helmed a personal injury law firm. Over a period of time, Mr. Layfield misappropriated client funds to cover firm and personal expenses in the hopes that the firm's future revenues, which were expected to be substantial, would be sufficient to satisfy any outstanding obligation the firm had to any individual client, referring attorney or creditor.[1] Unfortunately for Mr. Layfield, the firm was overextended and could not promptly generate sufficient revenue to cover its obligations to creditors in sufficient to prevent the firm's collapse.

**B. Mr. Layfield's History and Characteristics.**

**1. Mr. Layfield's Early Life**

As described in the PSR, Mr. Layfield had a difficult childhood. His parents divorced when he was young and his mother remarried and moved away from his biological father. His mother actively prevented Layfield from seeing or having a relationship with his father. As one might expect, Mr. Layfield is now estranged from his mother and maintains a close relationship with his biological father, James Layfield (who was a surety for Mr. Layfield's bond in this matter). His relationship with his mother was fraught–and particularly strained when she moved the family

---

[1]The evidence at trial confirmed this expectation. Mr. Layfield testified that the firm's revenue projections led him to believe that all the firm's creditors would be paid.

from New Jersey to Arizona. In Arizona, he had to make new friends and the possibility of re-connecting with his father grew more remote.

Mr. Layfield had a difficult time in high school as well, as his relationship with his mother deteriorated. After being kicked out of her home, Mr. Layfield went to work and supported himself, but was not able to graduate from high school. He had to obtain a GED. He later put himself through college at the University of Arizona and later obtained law degrees at the University of San Diego and Georgetown University.

**2. Mr. Layfield's Law Practice**

As the PSR details, after several positions with different accounting firms, Mr. Layfield began a law firm. It grew to be successful and later, after several changes, became Layfield & Barrett, which Mr. Layfield hoped to grow into a major firm. As has been detailed throughout the proceedings, Mr. Layfield attempted to grow his firm too large, too quickly and got overextended. His misappropriations were a function of many things: ego, greed, impatience, etc. Mr. Layfield clearly believed that the misappropriations were not a permanent fixture of his firm, but a temporary fix to a problem of his own creation. The government has persistently characterized Mr. Layfield as having set out to defraud his clients and spirit away with the money. The facts of the case suggest something else: that Mr. Layfield over-extended, used client money to bail himself out and got stuck, and wasn't able to dig out of the mess. This is not to minimize his conduct or the harm it caused to others. It is merely a more accurate rendering of the "scheme" than a mere cash grab and flight to a tropical isle.

In addition, during the time that he was building his law practice, Mr. Layfield became involved in a number of charitable organizations, within the legal community and outside the law. He has donated thousands of dollars to the Juvenile Diabetes Foundation and participated annually in their walk to raise money. Mr. Layfield donated an average of $10,000 per year to this organization. Between 2012 and 2016, Layfield was a member of the Board of Governors, Board of Directors and Officer

of the Los Angeles Trial Lawyers Charity. This organization raised several million dollars each year to fund programs that improved the quality of life for the underserved of the LA Community. The charity funds outreach program, battered women's shelters and sports equipment for economically disadvantaged youth. Mr. Layfield was also an exectutive member of the Casino Night committee responsible for an annual event that helped raise approximately $1m. Mr. Layfield was set to become the President of the organization, however, this was about the time that the offense conduct was going on. He resigned his position before he assumed the presidency. However, he did routinely donate large sums to the organization–well before the offense conduct occurred.

Mr. Layfield also was a board member of the Calvary Christian Church in Pacific Palisades, where his daughter attended school. Through the church, Mr. Layfield volunteered at the LA Mission, assisting in locating transitional housing for the homeless. Layfield was also a member of the Board of Directors of the Consumer Attorney's Association of California and received the President's Award for Service to the Community in 2015. Mr. Layfield also received the Wiley W. Manuel Award from the California State Bar in recognition of his pro bono work representing indigent applicants in need of disability benefits. Finally, as a member of the American Association of Justice, he was a member of the President's Circle for donations to access for justice causes.

**3. Mr. Layfield's post offense life.**

As detailed in the PSR, and throughout the proceedings, it is clear that Mr. Layfield badly miscalculated. He underestimated his firm's ability to weather his rapid expansion plan and profligate expenditures. He underestimated the desire of his employees to continue to work for his firm amid the chaos and his demanding and often difficult personality. The "scheme" as it were, harmed many people emotionally, financially and in ways not easy to characterize. But Mr. Layfield's actions also decimated his own life. By all accounts, Mr. Layfield's life as he ever

knew it, is over. He's lost every personal possession and asset.[2] He has lost every business asset he has ever had, including any reputation, personal or professional, he previously had. He's lost his license to practice law. His wife and child have left him and cut off all communication. By his own definition, he is "a completely broken man." The firm, and whatever hopes he may have had for it, has completely crushed him and ended his former life. Going forward, Mr. Layfield will have to start life from nearly zero. This characterization is not meant to evoke any sympathy or empathy for Mr. Layfield, but merely to help the Court understand that Mr. Layfield does not believe that his choice to misappropriate client funds was a wise one. Anyone viewing Mr. Layfield's actions, and their consequences, would not deem the outcome to be a desirable one.

### 4. Substance abuse.

As the PSR details, Mr. Layfield has had a history of alcohol abuse. This began during high school after he experienced the death of one of his best friends. Following this event, "[Layfield] would get drunk and use drugs to cope and would eventually stop attending school." Rec. Letter p. 9, ¶ 106. What began in high school turned out to be a persistent problem in his life. Mr. Layfield reported that, in the past, he drank alcohol heavily during very stressful periods of his life. PSR ¶ 124. He was, however, able to stop drinking when his life became less stressful. *Id.*.

The Diagnostic and Statistical Manual of Mental Disorder, fifth edition (DSM-V, a treatise of the American Psychiatric Assn.) deems an individual as having an alcohol use disorder (AUD) if they (a) drink more or longer than they intended; (b) more than once wishing to cut down or stop drinking, but not being able to; (c) experiencing cravings for alcohol; (d) feeling that you need to drink in a greater

---

[2] In contrast to the government's initial projection, an unfortunately for everyone, there is no money stashed in foreign accounts. There are no stores of cash anywhere. Any speculation that Mr. Layfield will profit from his misdeeds is misplaced.

amount to feel the same level of relaxation or intoxication. The list of criteria is actually eleven items long, however, if an individual experiences four to five of the eleven symptoms, they are considered a moderate case of alcohol use disorder (with mild being on the low end, moderate being in the middle and severe on the high end.) The foregoing criteria apply to Mr. Layfield and the DSM-V would deem him to have a moderate AUD. The PSR should be ordered to be updated and made clearer about Mr. Layfield's substance abuse issues so that he can get the proper treatment and care within the Bureau of Prisons and on supervised release thereafter.

### 5. Medical Issues.

The PSR at ¶ 122 reveals that Mr. Layfield has been diagnosed with diabetes for which he is prescribed an oral medication to be taken twice a day. The CDC deems diabetes (type 1 or type 2) to be a risk factor for severe illness due to contracting Covid-19. *See* cdc.gov/coronavirus2019-ncov/need-extra-precautions/people-with-medical-conditions.

### 6. Other Mitigating Factors.

As the Court is aware, the conditions of Mr. Layfield's confinement at Santa Ana Jail during the pandemic, and particularly during the last two surges (Delta, Omicron) have been been particularly spartan, with 22 hour lockdowns per day and severely restricted movements, very limited visitations and recurring quarantines due to possible exposures. This Court has regularly found that conditions of confinement during the pandemic have been a source of sentence mitigation.[3]

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense.**

The defendant believes that a sentence of 57 months–or the low end of the guidelines as calculated by the defense is a sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing. It is clear that the government –and

---

[3] *See, e.g. U.S. v. He*, 20-cr-00070-MWF (defendant held in pretrial confinement for over four months due to Covid restrictions).

likely the victims– deem a greater period of incarceration as the only sufficient punishment for his offense conduct. The government is expected to advocate for a 168 month sentence. Probation has recommended a 108 month sentence. *See* Rec. Letter p. 3

However, a sentence of nearly five years in custody is sufficient to reflect the seriousness of the offense, promote respect for the law and provide for just punishment for the offense. Such a sentence communicates that the offense conduct is serious, and is not tolerated from a member of the bar whose actions caused harm to a large number of individuals and very significant harm to a smaller subset of individuals. An extremely long sentence, as advocated by the government, is merely punitive without taking into consideration numerous other goals of sentencing. Such a sentence would also leave Mr. Layfield to begin supervised release as nearly a senior citizen with little earning capacity to support himself or generate funds to repay his victims. He would be closer to collecting Social Security than embarking on a new career of employment to support himself.

At some point, the government's high-end of the guidelines lengthy sentence is a reflection of the disdain the government has for Mr. Layfield personally and professionally. Some of the letters submitted by the government reflect a visceral dislike for Mr. Layfield personally, such as T.W., whose armchair psychology deems Mr. Layfield within some "Dark Triad" of personality traits. Without excusing Mr. Layfield's offense conduct, Mr. Layfield's sentence should reflect a seriousness of the offense and respect for the law, but should dispense with delving deeply as to whether Mr. Layfield was a "good" or "bad" person. Addressing the offense conduct–which is abhorrent– is sufficient.

**D. To Afford Adequate Deterrence to Criminal Conduct**

There is scarcely a rational actor who would deem Mr. Layfield's criminal conduct as attractive or successful. Any observer would clearly see that Mr. Layfield erred and blew up his life. His misfortunes are clearly all of his own doing and not

because he was a bad boss or a "narcissist" or mean person. All of his calamity can clearly be traced to his decision to misappropriate client funds and try to conceal that from others in hopes the accounts would even up when new cases were settled, bringing in sufficient revenue. Had he not made that fateful decision, his business might have suffered due to poor management or leadership, but he would not be before the Court for sentencing. In that regard, it is the misappropriation conduct that the Court should seek to deter. In that light, a 57-month sentence is sufficient, particularly because Mr. Layfield has already suffered every other life consequence due to his actions. His conduct and its consequences are not something anyone would conclude was successful or profitable for Mr. Layfield by any measure.

This rings true both for Mr. Layfield personally and any fiduciary, including lawyers, generally. While federal sentencing routinely deals in substantial numbers of years, even decades or lifetimes, a 57-month sentence, followed by a period of supervision, after over three years of supervision on pretrial release, is a significant portion of his life to remain within the criminal justice system. It is a sufficient deterrent to criminal conduct.

**E. To Protect the Public from further Crimes of the Defendant.**

Mr. Layfield has been dealing with the aftermath of his poor decisionmaking from 2016/2017 for several years now. He'd been on pretrial release since 2018 until after his trial in August of last year.[4] His offense has caused him to lose everything and nearly everyone in his life. After a lengthy prison term and a period of supervised release, the public has little to fear from Mr. Layfield. He will have no law license. He will be a convicted felon with a substantial restitution judgment, amid numerous other judgments and financial obligations. A 57-month sentence is sufficient to

---

[4] The Court will recall that bond in this case was a hotly contested matter. However, after he was released on bond, Mr. Layfield adhered strictly to the terms of his bond and all times and appeared for every required court appearance, including trial, even after adverse pretrial rulings. Mr. Layfield has never tried to avoid facing the consequences of his actions in this matter following his release.

incapacitate Mr. Layfield for the foreseeable future. His supervised release will keep him under supervision for years following. While the government clearly differs, Mr. Layfield does not need a 14-year sentence in order to protect the public from his crimes.[5]

### F. To Provide the Defendant Needed Educational or Vocational Training.

Mr. Layfield does not need educational training, however, it is clear that he will have some period of time following incarceration that he will need to be gainfully employed and will need to support himself and pay restitution, among his other financial obligations. A more mitigated sentence than that suggested by the government or probation will permit a lengthy period of incarceration, but will also allow Mr. Layfield sufficient time before he is too old to join the workforce in order to obtain gainful employment, support himself and begin to pay his obligations. A fourteen (14) year sentence puts Mr. Layfield into his sixties before he starts from zero to rebuild his life.

### G. The Need to Avoid Unwarranted Sentencing Disparities.

White collar crimes and financial crimes in general are not a model of uniformity–and for good reason. Each crime is different as to the manner it is conducted and the harms it causes. In this sense, the guidelines are a rough measure of where sentences should wind up.

For example, in *United States v. Avenatti*, (19-cr-00373-PGG SDNY) the New York case in which an attorney was alleged to have extorted a defendant for $25m and attempted to defraud his own client, the Court sentenced the defendant to only

---

[5]The government has suggested that the trucking business with which Mr. Layfield was associated is a different version of the same scheme as the offense conduct. None of that is true. The trucking business was run by Layfield and his wife but collapsed when Mr. Layfield was discovered to be involved with this case. After he started trial and was remanded, he could barely help operate the company and it failed. This is not the same conduct as misappropriating client funds.

30 month sentence, despite a large intended loss.

In *United States v. Feliz and Ravelo* 15-cr-421-KM (D-NJ), a husband and wife set out to defraud the wife's law firm's clients with a loss amount of $7.8M. The money was used to buy frivolous luxury goods. The pair were sentenced to 60 and 48 months, respectively.

In *United States v. Olshen*, 14-cr-00476-DAK (D-UT) the defendant caused a $7m loss to numerous individuals, but was only sentenced to 42 months.

To be sure, every case has its differences and one can always distinguish one case from another. However, the foregoing cases suggest that strict adherence to the the guidelines using a strict financial calculation does not always mete out the appropriate punishment. A sentence at or near the defendant's proposed sentence of 57-months can be rendered while still avoiding unwarranted sentencing disparities.

**H. The Need to Provide Restitution to any Victims of the Offense.**

It is clear that a substantial restitution order will result from this case. Several individual victims have unrecompensed losses that will require restitution. An extremely lengthy custodial sentence which satisfies certain punitive goals will leave victims without any mechanism to obtain restitution from a defendant who arguably can have a significant earning capacity upon release from custody. A more mitigated sentence will fulfill the goals of sentencing while still permitting Mr. Layfield to become employed and begin the process of repaying restitution to the victims of his offense.

**Conclusion**

The defense recommends a 57-month period of incarceration followed by a three (3) year period of supervised release.

The defense recommends that the Court order the PSR to be updated to more accurately reflect Mr. Layfield's substance abuse history. It is respectfully requested that the Court recommend that the Bureau of Prisons place Mr. Layfield in the 500-hour Residential Drug Treatment Program (RDAP) and add as a condition of his

release terms that he be evaluated for his susceptibility to alcohol abuse and, if necessary, place him in a treatment program.

The defense further requests that the Court request that Mr. Layfield be designated to the facility in Pensacola, Florida or, in the alterative, the facility at Cumberland, Maryland, so he can be close to his family that lives in Delaware.

Finally, the defendant will waive his appearance at a subsequent restitution hearing. It is anticipated that the parties will ultimately reach a stipulation as to the restitution amount.

Dated: February 3, 2022

Anthony M. Solis
A Professional Law Corp.

*Anthony M. Solis /s/*
By: Anthony M. Solis,
Attorney for Defendant
Philip Layfield

Law Offices of Steven Brody

*Steven Brody /s/*
By: Steven Brody
Attorney for Defendant
Philip Layfield

Defendant Layfield's Sentencing Memorandum
11