TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MARK AVEIS (Cal. Bar No. 107881)
IAN V. YANNIELLO (Cal. Bar No. 265481)
CAROLYN S. SMALL (Cal. Bar No. 304938)
Assistant United States Attorneys
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4477/3667/2041
     Facsimile: (213) 894-6269
     E-mail:    mark.aveis@usdoj.gov
                ian.yanniello@usdoj.gov
                carolyn.small@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-124(A)-MWF |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION IN SUPPORT OF RESTITUTION; SUPPORTING DECLARATION OF SAM CHAN AND EXHIBIT |
| v. | |
| PHILIP JAMES LAYFIELD, aka Philip Samuel Pesin, | Hearing date: May 12, 2022 Time: 3:00 p.m. |
| Defendant. | |

The government, by and through its attorneys of record, hereby submits its position in support of restitution to be ordered against defendant Philip James Layfield.  The government submits that defendant should be ordered to pay restitution in this case in the total amount of $10,715,428.43.

The government's restitution submission is based upon the evidence received at trial, the Court's statements on the record during the sentencing hearing on February 17, 2022, the information provided below, the attached supporting declaration of Sam Chan and

exhibit, the concurrently lodged, under seal, spreadsheet from the California State Bar Client Security Fund, and upon such other and further information or evidence as the Court may consider.

Dated: April 22, 2022          Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
MARK AVEIS
IAN V. YANNIELLO
CAROLYN S. SMALL
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    SUMMARY AND APPLICABLE LAW....................................1

      A.    Procedural Posture......................................1

      B.    The Restitution Victims.................................1

            1.    Clients, Referral Counsel, and Litigation Lender.....1

            2.    Internal Revenue Service.........................2

            3.    State Bar Client Security Fund...................4

      C.    Chart of Restitution....................................5

II.   UNDISPUTED RESTITUTION.......................................6

III.  DISPUTED RESTITUTION.........................................6

      A.    S.A. - $182,028.01......................................6

      B.    P.C. - $213,810.83......................................7

      C.    T.D.F. - $150,000.00, M.L.- $187,054.00.................8

      D.    F.H. - $15,247.54.......................................9

      E.    M.M. - $242,502.16......................................9

      F.    W.M. and Estate of P.M. - $24,382.37 each..............10

      G.    U.S. Claims/Opco - $1,785,872.00.......................10

      H.    IRS - $1,497,479.60 (total)............................11

            1.    Income Tax - $1,340,019.44.......................11

            2.    Payroll Tax - $157,460.16........................13

      I.    California State Bar Client Security Fund -
            $3,427,496.45..........................................13

IV.   OTHER TERMS AND CONDITIONS OF RESTITUTION....................13

DECLARATION OF SPECIAL AGENT SAM CHAN............................16

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**Cases**

Brookman v. State Bar,
  46 Cal. 3d 1004 (1988) ......................................... 5

James v. United States,
  366 U.S. 213 (1961) ........................................... 3

McMillan v. Pennsylvania,
  477 U.S. 79 (1986) ............................................ 4

McNally v. United States,
  483 U.S. 350 (1987) ........................................... 2

Pasquantino v. United States,
  544 U.S. 349 (2005) ........................................... 3

State Bar of California v. Statile,
  168 Cal. App.4th 650 (2008) ................................... 5

United States v. Batson,
  608 F.3d 630 (9th Cir. 2010) ............................... 2, 3

United States v. Chalupnik,
  514 F.3d 748 (8th Cir. 2008) .................................. 4

United States v. Green,
  722 F.3d 1146 (9th Cir. 2013) ................................ 12

United States v. Hassebrock,
  663 F.3d 906 (7th Cir. 2011) .................................. 3

United States v. Perry,
  714 F.3d 570 (8th Cir. 2013) .................................. 4

**Federal Statutes**

18 U.S.C. § 3563 .................................................. 2

18 U.S.C. § 3583 .................................................. 2

18 U.S.C. § 3612 ............................................. 14, 15

18 U.S.C. § 3663 .............................................. 1, 2

18 U.S.C. § 3664 .............................................. 4, 14

26 U.S.C. § 6601 ................................................. 13

26 U.S.C. § 7201 .................................................. 2

26 U.S.C. § 7202 .................................................. 2

26 U.S.C. § 7203 .................................................. 2

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                PAGE

**United States Sentencing Guidelines**

U.S.S.G. § 5E1.1 ................................................... 2

**Other Authorities**

Cal. Bus. & Prof. Code § 6140.5 ................................... 5

I.   **SUMMARY AND APPLICABLE LAW**

    **A.   Procedural Posture**

    The initial sentencing hearing in this case was held on February 17, 2022.  Prior to the sentencing hearing, the parties advised the Court that they had met and conferred and would need additional time to attempt to determine restitution without a hearing.  Thus, at the parties' joint request, the Court deferred its determination of restitution in this case to May 12, 2022.

    The parties have further met and conferred and agreed in part to restitution for certain victims.  This brief is intended to reflect the undisputed restitution based on the parties' agreement as well as to set forth the government's position for restitution in dispute.

    **B.   The Restitution Victims**

    The government believes that there are three groups of victims to whom restitution should be paid.

    1.   Clients, Referral Counsel, and Litigation Lender

    First, restitution must be paid to individuals or entities directly and proximately harmed by defendant's offense conduct, pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A *et seq* ("MVRA").  This group consists of defendant's former clients and referral counsel who were owed portions of the settlement proceeds that defendant embezzled from his trust account.  It also includes litigation lender U.S. Claims/Opco, whom defendant defrauded into advancing him money on the eve of defendant's relocation to Costa Rica.

    Clients, referral counsel, and U.S. Claims/Opco are "victims" to whom restitution is owed pursuant to the MVRA.  "[T]he term 'victim' means a person directly and proximately harmed as a result of the

commission of an offense for which restitution may be ordered
including, in the case of an offense that involves as an element a
scheme, conspiracy, or pattern of criminal activity, any person
directly harmed by the defendant's conduct in the course of the
scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2). The MVRA
makes restitution mandatory, as a separate term of the sentence, for
title 18 offenses against property (including any offense committed
by fraud or deceit). 18 U.S.C. § 3663A(c). *See also, McNally v.
United States*, 483 U.S. 350, 358 (1987)("the words 'to defraud'
commonly refer 'to wronging one in his property rights by dishonest
methods or schemes,' and 'usually signify the deprivation of
something of value by trick, deceit, chicane or overreaching.'")

### 2. Internal Revenue Service

Second, restitution should be paid to the Internal Revenue
Service based on defendant's unpaid income and payroll taxes. For
the tax convictions, First Superseding Indictment, counts 26 and 28
(26 U.S.C. § 7201 and 7203), and failure to pay over payroll taxes,
count 27 (26 U.S.C. § 7202), restitution is discretionary and
awardable as a condition of supervised release. 18 U.S.C. § 3583(d);
U.S.S.G. § 5E1.1; *United States v. Batson*, 608 F.3d 630, 636 (9th
Cir. 2010)("[W]e hold that 18 U.S.C. § 3563(b)(2), which grants
federal courts broad discretion to order restitution as a condition
of probation, and 18 U.S.C. § 3583(d), which extends that grant to
supervised release, authorizes federal courts to order restitution as
a condition of supervised release for any criminal offense, including
those set forth in Title 26, for which supervised release is properly
imposed."). An award of restitution as a condition of supervised
release is subject to the same causation limitations as an award

2

under the MVRA.  *United States v. Batson*, 608 F.3d at 637 ("[A]n award of restitution ordered as a condition of supervised release can compensate []only for the loss caused by the specific conduct that is the basis of the offense of conviction (citation omitted)[.]").  Restitution for tax-related offense conduct that is awarded as a condition of supervised release does not include relevant conduct under the Sentencing Guidelines.  *Id.*  Accordingly, defendant cannot be required to pay restitution ordered as a result of his tax-related convictions until his period of supervised release begins.  *United States v. Hassebrock*, 663 F.3d 906, 924 (7th Cir. 2011).

The measure of restitution awardable for defendant's tax-related convictions is the money actually due the government had defendant timely and properly paid the taxes due and owing.  *See, generally, Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005)(unpaid tax constituted property under the wire fraud statute).  In a case involving both embezzlement and tax evasion, such as this case, defendant is not entitled to a tax credit for the amounts he embezzled.  The Court will recall the substantial litigation over tax-related jury instructions in which the Court instructed the jury that defendant may be liable for tax evasion for embezzling money from his clients to whom he, of course, owes restitution.  As the Supreme Court stated,

> When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.  (Citation omitted.)

*James v. United States*, 366 U.S. 213, 219 (1961).

3

1    Furthermore, the Court may impose pre-judgment interest, but not

2    penalties, as part of the tax-related restitution award in this case.

3    *United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013)(affirming

4    inclusion of interest in restitution to IRS because the full loss to

5    the victim included the time value of money); *United States v.*

6    *Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008)("[W]hile the

7    availability of a civil remedy is relevant in determining who is

8    [restitution] victim, the amount of restitution that may be awarded

9    is limited to the victim's provable actual loss, even if more

10   punitive remedies would be available in a civil action.").

11   Finally, the government bears the burden of showing the amount

12   of tax loss for restitution by a preponderance of the evidence.  18

13   U.S.C. § 3664(e); *McMillan v. Pennsylvania*, 477 U.S. 79, 97-92

14   (1986).

15                    3.   State Bar Client Security Fund

16   Third, restitution should be paid to the California State Bar's

17   Client Security Fund (the "Fund").  The Fund paid approximately $2.8

18   million to compensate 89 of defendant's former clients on account of

19   defendant's fraud.[1]  While Fund payments made to those former clients

20   identified herein reduce the amount of restitution due such clients,

21   defendant is nonetheless not entitled to what would essentially be a

22   double-credit; he is still required to pay the Fund as the subrogee

23   of the clients.  *See* 18 U.S.C. § 3664(f)(1)(A),(B)("In each order of

24   restitution, the court shall order restitution to each victim in the

25   full amount of each victim's losses as determined by the court [and

26   ---

27          [1]  *See* government's concurrently lodged, under seal, chart
     provided by Fund attorney Matthew Zawol.  This chart is identical to
     the chart that the government submitted in support of its sentencing

28   position (Dkt. 349-1), except that interest has been calculated to
     the date of the restitution hearing.

                                    4

i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."); *Brookman v. State Bar*, 46 Cal. 3d 1004, 1008 (1988)(attorney's obligation to repay amounts paid by the Fund to clients is "imposed in order to protect the public and to help rehabilitate the State Bar member."). The Fund has full rights of subrogation against defendant to recover those amounts and defendant is estopped to claim that Fund payouts were improper. California Business & Professions Code § 6140.5(c)("Upon making a payment to a person who has applied to the fund for payment to relieve or mitigate pecuniary losses caused by the dishonest conduct of an active member of the State Bar, the State Bar is subrogated, to the extent of that payment, to the rights of the applicant against any person or persons who, or entity that, caused the pecuniary loss. The State Bar may bring an action to enforce those rights within three years from the date of payment to the applicant."); *State Bar of California v. Statile*, 168 Cal.App.4th 650, 662 (2008).

**C.   Chart of Restitution**

The following chart identifies the payees and amounts for whom the government seeks restitution:

| | |
|---|---|
| T.B. (client) | $42,874.25 |
| J.L. (referral counsel) | $83,300.00 |
| J.N. (client) | $2,135,893.41 |
| R.P. (client) | $460,105.44 |
| Da. S. (referral counsel) | $243,000.00 |
| S.A. (client) | $182,028.01 |
| P.C. (client) | $213,810.83 |

| | |
|---|---|
| T.D.F. (referral counsel) | $150,000.00 |
| M.L. (client) | $187,054.00 |
| F.H. (client) | $15,247.54 |
| M.M. (client) | $242,502.16 |
| W.M. (referral counsel) | $24,382.37 |
| P.M. (referral counsel) | $24,382.37 |
| U.S. Claims/Opco | $1,785,872.00 |
| IRS | $1,497,479.60 |
| CSB Fund | $3,427,496.45 |
| Total | $10,715,428.43 |

## II.  UNDISPUTED RESTITUTION

The parties agree that restitution should be paid to the following individuals in the following amounts:

| | |
|---|---|
| T.B. (client) | $42,874.25 |
| J.L. (referral counsel) | $83,300.00 |
| J.N. (client) | $2,135,893.41 |
| R.P. (client) | $460,105.44 |
| Da. S. (referral counsel) | $243,000.00 |
| Total | $2,965,173.10 |

## III. DISPUTED RESTITUTION

The government submits that restitution should also be paid to the following payees in the following amounts, based upon applicable law, the evidence received at trial, the declaration of SA Chan, and other information, as summarized below.

### A.   S.A. – $182,028.01

At trial, the jury saw client "closing" statements prepared by defendant's former firm that showed total settlement proceeds received on behalf of certain clients as well as how the proceeds of

6

that settlement were to be disbursed, including to the client. Testimony by IRS CI Special Agent ("SA") Chan linked those statements to bank records, especially the firm's Interest-on-Lawyer's-Trust Account ("IOLTA") at Esquire Bank (account ending in 2012).

As to client S.A., SA Chan testified that he: (1) examined IOLTA records (all of which were received at trial) showing gross case settlement proceeds of $1,250,000 deposited on behalf of S.A. on April 1, 2016; (2) determined from those records that the full amount of that deposit was spent-down within approximately two months of the deposit with no payments to S.A.; (3) examined the Layfield & Barrett-issued closing statement for S.A.'s case that earmarked over $500,000 in net settlement proceeds due S.A.; (4) determined that S.A. was due $182,028.01 in net settlement proceeds after L&B payments to S.A. out of other clients' settlement proceeds; and (5) examined Fund data[2] and ruled out that S.A. received any such compensation.

## B.    P.C. - $213,810.83

At trial, SA Chan testified that he: (1) examined IOLTA records showing gross settlement proceeds of $600,000 deposited on behalf of client P.C. on February 22, 2017; (2) determined from those records that the full amount of that deposit was spent-down within less than two months of the deposit with no payments to P.C.; (3) examined the

---

[2]    At sentencing, the government introduced information from the Fund. (Dkt. 352). The information identified approximately $2.7 million in payments made by the Fund to 89 of defendant's former clients. The information, by client name and payment amount, was authenticated by the declaration of Fund supervising attorney Matthew Zawol. (Dkt. 352). The government notes that, not only did defendant did not object to any of that information at sentencing, but defendant relied on the same information in support his own sentencing position. (*See, e.g.,* Dkt. 354 at 8:17). The government hereby incorporates by reference the entirety of the Fund information submitted for sentencing.

Layfield & Barrett-issued closing statement for client P.C.'s case that earmarked $317,560 in net settlement proceeds due P.C.; (4) and determined that P.C. was due $213,810.83 in net settlement proceeds after a reduction/payment of $103,749.25 to P.C. from the Fund.

At trial, P.C.'s referral counsel, J.L., also testified that neither P.C. nor J.L. received any money from the settlement of P.C.'s case. As indicated in section II, above, defendant does not dispute that defendant should pay restitution to J.L.

### C. T.D.F. – $150,000.00, M.L.– $187,054.00

At trial, witness P.A. testified that she was employed by T.D.F., a law firm, and that client M.L. had retained T.D.F. to represent M.L. in a personal injury case. P.A. further testified that T.D.F. referred M.L.'s case to defendant's firm in exchange for a referral fee to be paid upon the settlement of M.L.'s case.

SA Chan testified that he: (1) examined IOLTA records showing gross settlement proceeds of $750,000 deposited on behalf of client M.L. on March 18, 2016; (2) determined from those records that the full amount of that deposit was spent-down within a matter of a few months of the deposit with no payments to M.L.; (3) examined the Layfield & Barrett-issued closing statement for client M.L.'s case that earmarked $150,000 in net settlement proceeds due T.D.F. as its percentage of the attorney's fee due from the case settlement; (4) determined that no payments were made to T.D.F. from either the proceeds of the settlement of M.L.'s case or from any other source; (5) determined that M.L. received $100,000 from the Fund; and (6) determined that M.L. did receive $20,000 from other L&B clients several months after M.L.'s own settlement proceeds had been drawn-down, leaving a net $187,054 due M.L.

1

**D.    F.H. – $15,247.54**

Client F.H. testified at trial that he retained defendant's firm
for compensation following a pedestrian-vehicle accident.  F.H.
further testified that he had numerous exchanges with defendant's
firm's employees, most notably D.K., seeking his part of the
settlement of his case.  D.K. testified about one of the more
egregious examples of defendant's fraud where defendant had directed
D.K. and other employees to tell curious clients that they would be
paid following completion of a phantom "accounting" that defendant
would purportedly complete two days after he settled in Costa Rica.
F.H. testified that he had to hire yet another lawyer to secure his
settlement proceeds.  F.H.'s new lawyer, D.C., testified that
defendant paid some of the money owed F.H. only after he threatened
State Bar action against defendant.

The IOLTA records received in evidence showed that F.H.'s
approximately $300,000 in settlement proceeds were deposited on
December 28, 2016, and spent to zero within approximately 30 days,
with no funds paid to F.H.  The records further showed that F.H. did
receive approximately $182,000.  Fund records show that F.H. received
another $100,000 in January 2020.  SA Chan reviewed the IOLTA and
Fund records as well as the closing statement that witness D.K. sent
to F.H. and determined a net due and owing F.H. of $15,247.54.

**E.    M.M. – $242,502.16**

M.M. testified at trial that he retained counsel to recover
compensation for a vehicle accident on the Vincent-Thomas bridge for
which M.M. suffered brain damage.  His counsel then referred the case
to L&B firm in exchange for a referral fee.  The L&B-prepared closing
statement was received in evidence and showed that L&B was entitled

to $98,125 for its attorney's fees against the approximately $991,000 settlement deposit of M.M.'s case.  M.M. testified that he received nothing out of that settlement deposit.

IOLTA records received at trial showed that M.M.'s $991,249.01 settlement was credited to the IOLTA on August 16, 2016.  Those same records showed a credit balance of $179,797.16 just before the deposit of M.M.'s settlement, and a balance of $54,615.52 seven days after M.M.'s settlement was deposited.  SA Chan testified that no part of M.M.'s settlement was paid to M.M.  Fund records show that M.M. received $100,000.  The victim impact statement from M.M.'s referral counsel, M.W., showed that M.M. received a settlement from M.W.'s insurance carrier of $100,000, leaving a net of $242,502.16 due to M.M.  *See* Chan Declaration, ¶ 4, attached hereto.

### F.   W.M. and Estate of P.M. - $24,382.37 each

Former client T.B. testified at trial that, after he suffered medical malpractice for a botched hip surgery, he contacted family friends and attorneys W.M. and P.M.  W.M. and P.M. then referred T.B.'s case to L&B.  The government introduced the L&B-prepared closing statement for T.B.'s case that showed that W.M. and P.M. were each entitled to referral fees of $24,382.37.  SA Chan testified that he reviewed the IOLTA records and found no evidence of payment of those fees.  SA Chan also recently spoke to W.M., who told SA Chan that no referral fees for T.B.'s case were ever paid and that P.M. passed away after he and P.M. referred the case to L&B.

### G.   U.S. Claims/Opco - $1,785,872.00

At trial, the government proved that defendant pledged attorney's fees that he expected from a future case settlement in exchange for a $700,000 advance from U.S. Claims/Opco.  The

obligation was memorialized in a "purchase, sale, assignment & equitable lien agreement" that identified the total advance plus origination cost of approximately $714,000.  The jury convicted defendant of the counts (16, 17) related to defendant defrauding U.S. Claims/Opco, based in part on evidence that defendant converted the advance proceeds – that defendant had represented would be for business use – to his personal use in Costa Rica.  Witness B.D., in-house counsel for U.S. Claims/Opco, authenticated the relevant advance documents and testified that defendant repaid no part of the $700,000 advance that defendant had obtained by fraud.  In connection with the L&B bankruptcy case, U.S. Claims/Opco filed a Proof of Claim under penalty of perjury that described the obligation, defendant's default, and the accruing interest on the advance of $714,350. Pursuant to that Proof of Claim, defendant owed U.S. Claims/Opco $1,035,808 as of December 31, 2018, with an additional $53,576 accruing every three months, or any portion thereof, thereafter until reaching a cap of $2,143,050.  *See* Proof of Claim no. 2092, *In re Layfield & Barrett APC*, no. 17-BK-19548 NB, filed April 23, 2018, attached hereto.  SA Chan has calculated, based on the foregoing advance documents and Proof of Claim that defendant owes restitution to U.S. Claims/Opco, as of May 12, 2022, of $1,785,872.00.

**H.   IRS - $1,497,479.60 (total)**

1.   Income Tax - $1,340,019.44

IRS revenue agent J.P. testified at trial to prove that defendant evaded the assessment of his income taxes as charged in counts 26 and 28.  Agent J.P. offered two scenarios that were based upon defendant's own belated tax returns and the tax due and owing for the income that defendant himself reported.  Agent J.P. offered a

11

third scenario that was based upon defendant's embezzlement of settlement funds due certain clients.[3]  Agent J.P. determined the tax due and owing as follows:

| Income/Source | Tax Due and Owing | Gov't Trial Exhibit |
|---|---|---|
| $1,762,000/defendant's 1040 filed September 2018 | $618,866 | 427 |
| $1,315,041/defendant's amended (1040x) filed October 2018 | $436,560 | 428 |
| $2,827,162/embezzlement of fees due certain clients[4] | $1,083,033 | 429 |

The government was not required to prove the precise amount of tax due and owing, and the jury was only required to find some tax due and owing.  (Court's Instruction No. 17, Dkt. 315.)  The determination of the amount of tax restitution is solely for the sentencing judge.  *See, e.g., United States v. Green*, 722 F.3d 1146 (9th Cir. 2013)(holding that *Apprendi* does not apply to restitution determinations).  While the government established each of the tax scenarios by a preponderance of the evidence, the government submits that the Court should select the scenario that most closely tracks the evidence, namely, that defendant received income from embezzlement that yielded the tax due and owing of $1,083,033 (plus interest, see table below).  That figure not only most closely tracks

---

[3]  Agent J.P. testified that, based on her review of IOLTA records, closing statements, and discussion with SA Chan, she determined the amount embezzled in tax year 2016 was $2,902,430.00, based on the following amounts due: client M.L., $287,054.00; referral counsel T.D.F., $150,000.00; client T.B., $42,874.00; client M.M. $442,502.00; and client J.N., $1,980,000.00.  The latter amount did not include amounts that defendant should have paid to MediCal pursuant to his fee agreement with J.N., also received in evidence.

[4]  See note 3.

12

the totality of the trial evidence, but it gives appropriate weight to defendant's admissions from his own filed returns that he, in fact, did owe taxes.

The IRS is entitled to pre-judgment interest on the tax due and owing.  To May 12, 2022, the interest on each of the three scenarios is:

| Tax due and owing | Interest as of May 12, 2022 |
|---|---|
| $618,866 | $146,847.03 |
| $436,560 | $103,588.73 |
| $1,083,033 | $256,986.44 |

### 2.   Payroll Tax - $157,460.16

At trial, SA Chan testified that defendant failed to collect and pay over $128,763.74.  Interest on unpaid payroll taxes shall accrue from the due date until paid.  26 U.S.C. § 6601.  SA Chan has calculated that payroll tax, based upon the amount established at trial, plus interest at the applicable statutory rate as of May 12, 2022, is $157,460.16.

### I.   California State Bar Client Security Fund - $3,427,496.45[5]

As stated above, defendant owes the Fund for money that the Fund paid out to defendant's former clients whom defendant defrauded.

### IV.  OTHER TERMS AND CONDITIONS OF RESTITUTION

The government requests that the Court also make the following orders:

---

[5]  This figure includes principal payments by the Fund in the amount of $2,796,057.58; interest, accrued as of May 12, 2022, in the amount of $615,241.87; and a processing cost of $16,198.  *See* concurrently lodged chart.

Restitution, except for restitution owed the Internal Revenue Service, shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least 10% of defendant's gross monthly income but not less than $150, whichever is greater, shall be made during the period of supervised release and shall begin 90 days after the commencement of supervision. The parties agree that nominal restitution payments should be ordered because, and the Court should find that, defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

[The government requests that Court include standard language for the priority of restitution payments: first, to individual victims; then, to the corporate victim; then, to the Fund; and then, to the United States government. If the defendant makes a partial payment, each payee shall receive approximately proportional payment pursuant to such priority.][6]

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest.

---

[6] With respect to the individual victims specifically identified as restitution payees, pursuant to 18 U.S.C. § 3664(j)(1), restitution shall first be paid to those individual victims before any restitution is paid to the Fund.

14

Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

Nothing in this order shall foreclose or limit the ability of the Internal Revenue Service to examine and make adjustments to defendant's return(s) for calendar year 2016 with respect to returns already filed or to be filed.  Furthermore, nothing in this order shall foreclose the right of the Internal Revenue Service to assess civil penalties against defendant for any tax year.

1

<u>DECLARATION OF SAM CHAN</u>

2  I, Sam Chan, declare as follows:

3      1.   I am a special agent with IRS, Criminal Investigation.  I

4  make this declaration in support of the government's restitution

5  position for defendant Philip James Layfield ("defendant").  I have

6  personal knowledge of the facts set forth herein, unless otherwise

7  stated, and could and would testify to those facts fully and

8  truthfully if called and sworn as a witness.  Because I am making

9  this declaration for the limited purpose of addressing issues related

10  to restitution, I have not included every fact known to me concerning

11  this investigation.

12     2.   I testified as a witness at defendant's trial.  During my

13  trial testimony, which I incorporate herein by reference, I explained

14  my background and involvement in this case, and I summarized the

15  voluminous records I reviewed in connection with this matter,

16  including financial records showing defendant's receipt and

17  expenditure of client settlement money and, in some cases, payments

18  to or for the benefit of clients or referral counsel.

19     3.   Section III of the government's restitution position for

20  sentencing identifies certain former clients, referral counsel, and

21  litigation lender U.S. Claims/Opco; the amount due each for

22  restitution; and the evidence to support those amounts.  The evidence

23  and information described in Section III is true and correct to the

24  best of my knowledge as: (1) I testified thereto as so described, (2)

25  I have reviewed the evidence so described, and (3) the concurrently

26  lodged and updated spreadsheet from the California State Bar Client

27  Security Fund, showing principal and interest due as of May 12, 2022

28

1  for the 89 former clients of defendant who received Fund payouts, is
2  consistent with the previously filed Fund spreadsheet.

3        4.   Specifically with respect to client M.M. (Section III.E), I
4  determined the amount of restitution due M.M. based not only on the
5  foregoing, but on the Victim-Impact statement submitted by M.M.'s
6  former attorney, M.W., whom I know from the investigation to be one
7  of the attorneys that M.M. retained before the referral to
8  defendant's firm.   In M.W.'s Victim-Impact statement, M.W. stated
9  that M.M. sued him for malpractice for the same case in which
10 defendant was involved, from which M.M. received $100,000.   M.W. also
11 stated that he personally paid M.M. an additional approximately
12 $93,000.   I have, therefore, reduced the amount of restitution that I
13 believe is due M.M., from the L&B closing statement's net to M.M. of
14 $442,502.16, by $100,000 (the amount paid to M.M. by the Fund) and
15 another $100,000 (the amount paid to M.M. by M.W.'s insurer), for a
16 net due M.M. of $242,502.16.   I do not believe that defendant should
17 be credited for any amount that M.W. directly paid M.M. as that
18 amount (approximately $93,000) was not related to compensation owed
19 *by defendant.*

20       5.   Specifically with regard to the estate of P.M. (Section
21 III.F), I spoke to W.M., who told me that P.M. was his son and former
22 law partner who is deceased.   W.M. told me that he would distribute
23 P.M.'s restitution to P.M.'s heirs.

24       6.   Specifically with regard to U.S. Claims/Opco (Section
25 III.G), I reviewed the purchase agreement with U.S. Claims/Opco,
26 signed by defendant and that formed the basis for defendant's receipt
27 of approximately $700,000 on the eve of his departure for Costa Rica,
28 that was received in evidence at trial.   I also reviewed the U.S.

                                    2

1  Claims/Opco sworn Proof of Claim in the Layfield & Barrett, APC,

2  bankruptcy case, no. 17-BK-19548-NB, Claim no. 209, filed April 23,

3  2018 (a true and correct copy of which is attached hereto as Exhibit

4  A).  Based on that evidence and information, I estimated restitution

5  due that victim by following the schedule for payment as submitted by

6  U.S. Claims/Opco in its Proof of Claim and adding $53,576 per the

7  purchase agreement's terms every three months, or portion thereof, to

8  May 12, 2022.

9      7.  Section III.H. describes the restitution that I believe is

10  due the Internal Revenue Service for defendant's personal income tax

11  due and owing for calendar year 2016 based on defendant's convictions

12  for tax evasion (counts 26 and 28) and failure to pay over payroll

13  tax for Qtr 2 for 2017 (count 27).  I received the information for

14  the interest due in the table at Section III.H.1, and the interest

15  due on the payroll liability, in Section III.H.2, from Revenue Agent

16  Sean Murphy whom I know to have been an IRS Revenue Agent for 12

17  years and whose position includes determining tax due and owing and

18  interest thereon.

19      I declare under penalty of perjury under the laws of the United

20  States of America that the foregoing is true and correct and that

21  this declaration is executed in Santa Ana, California, on April 21,

22  2022.

23

24                                     SAM CHAN

25

26

27

28

3

EXHIBIT A

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | Layfield & Barrett, APC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL  District of  California (State) |
| Case number | 2:17-bk-19548-NB |

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | US Claims Opco LLC <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor   US Claims |
| 2. **Has this claim been acquired from someone else?** | ☒ No <br> ☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> ▉ M. ▉▉▉▉▉▉▉ <br> Name <br><br> ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ <br> Number      Street <br><br> ▉▉▉      ▉▉▉▉▉ <br> City        State        ZIP Code <br><br> Contact phone ____▉▉▉▉▉▉____ <br><br> Contact email ▉▉▉▉▉▉▉▉▉▉ | **Where should payments to the creditor be sent?** (if different) <br><br> Name <br><br> Number      Street <br><br> City        State        ZIP Code <br><br> Contact phone _____ <br><br> Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> _____ | |
| 4. **Does this claim amend one already filed?** | ☐ No <br> ☒ Yes. Claim number on court claims registry (if known) ___209___       Filed on ▉▉▉▉▉ <br> M M  /  D D  /  Y Y Y Y |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No <br> ☐ Yes. Who made the earlier filing? _____ |

Official Form 410                              **Proof of Claim**                              page 1

American LegalNet, Inc. <br> www.FormsWorkFlow.com

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?**   $ _____767,926.00_____   Does this amount include interest or other charges?

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached addendum. _____

**9. Is all or part of the claim secured?**

☐ No

☒ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☒ Other. Describe:   Purchase of portion of attorney fee portion of settlement

**Basis for perfection:**   UCC Financing Statement

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $ ___767,926.00___

**Amount of the claim that is secured:**   $ ___767,926.00___

**Amount of the claim that is unsecured:**   $ ____0.00____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ ___767,926.00___

**Annual Interest Rate** (when case was filed)   __30__ %

☒ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

Official Form 410     **Proof of Claim**     page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_____) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___04/23/2018___
MM / DD / YYYY

Signature: /s/ M. B████████

**Print the name of the person who is completing and signing this claim:**

Name: ██ M. B███████████
First name        Middle name        Last name

Title: General Counsel

Company: US Claims Opco LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: ████████████████████████████
Number    Street

Contact phone: ████████████        Email: ████████████████

American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
Case No. 2:17-bk-19548-NB
Chapter 11

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | **ADDENDUM TO AMENDED** |
| | **)** | **PROOF OF CLAIM** |
| Layfield & Barrett, APC, | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

On or about June 9, 2017, Layfield & Barrett, APC ("Debtor") sold, and US Claims Opco LLC ("US Claims") purchased, a portion of Debtor's interest in and claim for payment from the proceeds to be paid pursuant to a settlement ("the Settlement") of a personal injury claim by Jasmine Esmeralda Pineda arising from an incident that occurred on or about December 14, 2014 ("the Litigation"). The Settlement provides for the payment of $3.5 million ("the Settlement Proceeds"), and Debtor is entitled to receive $1.4 million from the Settlement Proceeds as compensation for legal services performed in settlement of the Litigation. *See* copy of the June 9, 2017 Purchase Agreement, which is attached as Exhibit A.

For the foregoing reasons, US Claims owns the portion of Debtor's interest in the Settlement Proceeds and has a right of payment from the Settlement.

First, the transaction between Debtor and US Claims, as a sale and purchase of an interest in the anticipated proceeds of a claim, cannot be classified as a debt subject to bankruptcy protection. Historically, an interest in the proceeds of potential or pending litigation has been recognized as a sufficient property interest which could be sold or in which a security interest could be granted. That interest has been consistently classified as a "general intangible." *See, e.g., Cuda v. Nigro (In re Northview Motors)*, 202 B.R. 389, 395-96 (Bankr. W.D. Pa. 1996); *Board of County Commissioners v. Berkeley*, 40 Colo. App. 431, 436-437; 580 P.2d 1251 (1978); *In re Slippery Rock Forging*, 99 B.R. 679 (BANKR. W.D. PA. 1989); *In re Estate of Hill,* 27 Ore. App. 893, 557 P.2d 1367 (1976); *Phoenix Marine,* 20 B.R. 424 (BANKR. E.D. VA. 1982); *In re Lanpiris,* 194 B.R. 3 (Bankr. D. N. H. 1996); *In re Silvernail Mirror and Glass, Inc.,* 142 B.R. 987, 989 (B.R. N.D. Fla. 1992). Many of these cases specifically classified the transaction as granting only an interest in the *proceeds* of the claim, rather than interest in the litigation itself. *Friedman, Lobe and Block v. CLW,* 9 Wn. App. 319, 512 P.2d 769 (1973); *Hill*, 27 Ore. App. at 901-902; *Northview*, 202 B.R. at 396; *Gold Medal Products, Inc. v. Love Enterprises, Inc.,* 766 S.W.2d 759 (Mo. Ct. App. 1989). Since the exchange of "property" for the "right to payment" does not occur between the payor/defendant and US Claims, the well-established case law treatment of an interest in proceeds of litigation as a general intangible applies.

Revised Article 9 brings general intangibles into several new subsets, one of which appears directly applicable here:  the new sub-classification of a "payment intangible," a  subset

of the collateral category "general intangibles." A "payment intangible" is defined as a "general intangible under which the account debtor's (i.e., a defendant's) principal obligation is a monetary obligation." That test fits the defendant/payor's obligation to pay damages to the seller/personal injury plaintiff if the seller/personal injury plaintiff wins the claim underlying the Interest. Accordingly, Section 9-109(a)(3) (Cal. U. Comm. Code § 9109(a)(3)) clearly makes revised Article 9 applicable to a "sale of payment intangibles", and the sale of the interest is therefore governed by revised Article 9. Given the sale/purchase quality of the transaction, Debtor cannot claim a debt in a property interest which he or she no longer owns. Thus, Debtor's sale of an interest in the anticipated proceeds of its claim cannot be classified as a debt entitled to bankruptcy protection.

Second, even assuming that the transaction is determined to be a secured financing transaction pursuant to which US Claims made loans to Debtor, Debtor's repayment obligation to US Claims is secured by a lien and security interest granted by US Claims in Debtor's interest in and claims for payment against the Settlement Proceeds. *See* Ex. A, June 9, 2017 Purchase Agreement, at ¶ 5. Moreover, in such event, the lien and security interest in favor US Claims is perfected pursuant to the UCC-1 Financing Statement filed with the California Secretary of State prior to the Petition Date, a copy of which is attached as Exhibit B.

In addition to the above contractual bases for recovery, US Claims recently discovered facts establishing that it was fraudulently induced to enter into the Purchase Agreement. Under the Purchase Agreement, Debtor represented and warranted, among other things, that (a) it was "not subject to any outstanding judgment, levy, claim, or lien of any nature;" (b) Debtor would "in good faith fully participate in the Litigation and cooperate in all respects with the prosecution of the Litigation to a successful conclusion and collection of all amounts due on account thereof, including the Proceeds;" and (c) "no other person is entitled to a fee, payment, commission or otherwise in respect of any matters provided for herein." Ex. A, at ¶¶ 3(g), (n), and (o). Debtor further warranted: "All statements of Seller made to Purchaser in this Agreement or in any other document or communication made in connection with this Agreement are true, accurate and complete and. do not omit to disclose anything which make such statements incomplete or materially misleading and the information set forth in the Recitals first appearing above is true and correct in all material respects." *Id.* at ¶ 3(l).

On March 8, 2018, *after* the deadline for filing proofs of claim in this proceeding, US Claims found out for the first time that Debtor made material misrepresentations and omissions in connection with the Purchase Agreement. Debtor failed to disclose that, two years before entering into the Purchase Agreement, it had associated itself with another law firm, The Dominguez Firm, Inc. ("TDF"), as counsel for the plaintiffs in the Litigation. Specifically, in early 2015, TDF and Debtor had entered into an agreement by virtue of which Debtor agreed to equally split the attorney's fees resulting from the Litigation. *See* "Motion for Order Approving Settlement with The Dominguez Firm, Inc." (Dkt. 240, at pp. 8-9) Moreover, Debtor's conduct made it impossible for the Trustee to compile evidence to substantiate Debtor's portion of the fee award and, as a result, Debtor's participation in the anticipated attorney's fees are now expected to be further reduced to a 45% participation. *See id.* When US Claims entered into the Purchase Agreement with Debtor, it expected the attorney fee payout to Debtor to be about $1.4 million, based on Debtor's representations and promises to assist in collecting the fee award, which is why the value of the Purchase Agreement was approximately half that amount ($714,000). In reality, however, Debtor's payout will be about $483,243.75, an amount which is not expected to

be enough to pay US Claims any portion of its Proceeds because of other liens which were also not disclosed to US Claims by Debtor.

      US Claims first found out about Debtor's prior association with the other firm when it reviewed the declarations the declarations and exhibits supporting the Trustee's "Motion for Order Approving Settlement with The Dominguez Firm, Inc." (Dkt. 240), filed February 27, 2018.  This motion, along with US Claims' review of it, occurred after the deadline for filing proofs of claim, thereby necessitating this amended proof of claim.

# EXHIBIT A



USCLAIMS

1221 N. Church St., Ste. 103
Moorestown, NJ 08057
Toll Free: (855) 340-8388
Fax: (888) 491-3613

## PURCHASE, SALE, ASSIGNMENT & EQUITABLE LIEN AGREEMENT
This is not a loan. This is a purchase and sale of property rights.

### DISCLOSURE STATEMENT
Dated: June 8, 2017

**1. Seller:** Philip Layfield , Esquire, Individually and on behalf of Layfield & Barrett, APC and Maximum Legal Holdings, LLC (the "Seller," "I," or "me"), with a principal place of business at 633 West 5th Street Suite 3300 Los Angeles, CA 90071 and with Employer Identification Number: 82-1581343.

**2. Claim:** Claim(s) by Jasmine Esmeralda Pineda, et al. (the "Claimant") arising from an accident/incident occurring on or about December 14, 2014 (the "Litigation") against or involving Pineda, et al vs. County of Riverside, CA, et al and/or all proper defendants, including an action pending in the California State Superior Court, Riverside County bearing Index # RIC1507590. Seller was engaged to represent the Claimant in the Litigation.

**3. Total of Advance:** $714,350.00 ("Purchase Price")

**4. Total to Be Paid by Seller:** 7.50% for every three months, or portion of three months, from the date of the Purchase, Sale, Assignment & Equitable Lien Agreement (the "Agreement") until the date the proceeds subject of the Agreement (the "Property") are delivered to US Claims Opco LLC ("USC"), plus a document review and processing fee in the amount of $350.00 (the "Processing Fee") and a broker fee in the amount of $14,000.00 (the "Origination Fee"), to be deducted from the Purchase Price. In no event shall the amount due to USC hereunder exceed three (3) times the Purchase Price.

**5. Prior Liens to be Paid Off (if any):** The Purchaser will make the following payments on my behalf, deducted from the Purchase Price, and I will receive the remainder of the Purchase Price pursuant to my funding instructions to US Claims:

   NA

**6. Compounding Period:** None.

Seller's Initials: P/L

7. Annualized Rate: 30%[1]

8. Illustrative Payment Schedule:

| Purchase Price | $714,350.00 |
|---|---|
| Processing Fee | $350.00 |
| Origination Fee to Advanced Legal Capital, LLC | $14,000.00 |
| Payoff Previous Lien to | $0.00 |
| Net Amount Received by Me | $700,000.00 |

| Date of Payment to USC | Number of Months | Amount of USC's Property/Amount due USC |
|---|---|---|
| On or before September 8, 2017 | 03 | $767,926 |
| After September 8, 2017 and on or before December 8, 2017 | 06 | $821,503 |
| After December 8, 2017 and on or before March 8, 2018 | 09 | $875,079 |
| After March 8, 2018 and on or before June 8, 2018 | 12 | $928,655 |
| After June 8, 2018 and on or before September 8, 2018 | 15 | $982,231 |
| After September 8, 2018 and on or before December 8, 2018 | 18 | $1,035,808 |

After December 8, 2018, USC's Property will increase by $53576 for each additional 3-month period (or portion thereof), as described in the section entitled "Total to Be Paid by Seller." USC's Property will CAP at $2,143,050.00, which is 3 times the Purchase Price.

I HAVE READ THIS DISCLOSURE STATEMENT AND THE AGREEMENT. I UNDERSTAND AND AGREE TO THE TERMS OF THE ADVANCE I AM RECEIVING FROM US CLAIMS. I ALSO REPRESENT THAT THERE ARE NO OUTSTANDING LIENS AGAINST ME AND THAT I HAVE NOT ASSIGNED THE PROCEEDS FROM THE LITIGATION, OR ANY PORTION THEREOF, TO ANY PERSON, FIRM OR CORPORATION, EXCEPT AS SPECIFICALLY LISTED ABOVE IN SECTION 5 OF THIS DISCLOSURE STATEMENT.

SELLER:

_____
Philip Layfield, Esquire, Individually and on behalf of Layfield & Barrett

_____
Philip Layfield, Esquire, Individually and on behalf of Maximum Legal Holdings, LLC

---

[1] This annualized rate is an estimate and assumes the advance is recovered exactly 365 days from the date of the Agreement. My actual rate may vary considerably from this estimate and will likely be higher depending upon the actual time periods involved.

Seller's Initials: _PL_

 USCLAIMS

## PURCHASE, SALE, ASSIGNMENT & EQUITABLE LIEN AGREEMENT
### This is not a loan. This is a purchase and sale of property rights.

**THIS AGREEMENT** (the "Agreement") is made and dated as of June 8, 2017, between Seller and US Claims Opco LLC (the "Purchaser" or "USC"), whose address is 1221 N. Church Street, Suite 103, Moorestown, NJ 08057. Unless otherwise defined in this Agreement, all capitalized terms are defined in the disclosure statement dated as of today's date, and attached to and made part of this Agreement (the "Disclosure Statement").

    A. Seller has been engaged to represent the Claimant in the Litigation. The Litigation has been settled for the sum of $3,500,000.00, and Seller is entitled to receive **$1,400,000.00** from such settlement as compensation for legal services performed in connection with the Litigation (the "Proceeds").

B. USC has agreed to purchase from Seller a portion of the Proceeds in exchange for the Purchase Price. Seller has agreed to pay a Processing Fee and, if applicable, an Origination Fee. The Processing Fee and the Origination Fee (if any) will be deducted from the Purchase Price to be paid to Seller at Closing. Seller understands and agrees that USC shall be entitled to discharge any adverse claims against any of the Proceeds whether or not such adverse claims are disclosed, at Seller's cost, and any such amounts paid by Purchaser will be deducted from the Purchase Price.

## USC AND SELLER AGREE AS FOLLOWS:

### 1. PURCHASE, SALE, ASSIGNMENT AND GRANTING OF EQUITABLE LIEN

    a. **Immediate Assignment:** To the extent permitted by applicable law, Seller hereby sells and assigns to USC and USC hereby purchases from Seller, Seller's entire right, title, and interest in, to and under a portion of the Proceeds as described in the Disclosure Statement. The portion of the Proceeds subject of this Agreement shall be referenced herein as the "Property".

    b. **Springing Assignment:** To the extent that a current assignment of the Proceeds or any portion thereof is impermissible under applicable law, then paragraph 1(a)(i) shall be deemed null and void and in such event, Seller agrees and sells and assigns to USC and USC hereby purchases from Seller, Seller's entire right, title and interest in, to and under a portion of the Proceeds at the instant such Proceeds come into being by virtue of a judgment, settlement, verdict or other disposition of the Litigation with the amount of such Proceeds to be determined as per the Disclosure Statement. Furthermore, in such event, to the fullest extent permitted by law, Seller hereby grants to USC an equitable lien, in, to and upon Seller's right to the Proceeds resulting from the Litigation and the claims asserted therein to secure USC's receipt of the benefits of the bargain it is making under the terms of this Agreement.

    c. **Delivery of Property.** Seller agrees and acknowledges that USC shall be immediately paid from the Proceeds collected by Seller as a result of the Litigation. Seller's use of any Proceeds prior to the full payment to USC of its Property may constitute an illegal conversion and may be a crime.

    d. **Purchase Price:** In full payment for the Property and in consideration of its sale and assignment to USC, USC shall pay Seller the Purchase Price at Closing, per Paragraph 2 below upon satisfaction of all Conditions Precedent as hereinafter defined and Purchaser's satisfaction that all the representations are truthful and complete in all respects.

### 2. CLOSING. USC will pay Seller the Purchase Price at "Closing," which means five (5) business days after: (a) satisfaction of the Conditions Precedent per Section 4 below; (b) delivery to Purchaser of all documents that US Claims requests, including without limitation (i) the fully executed Agreement and (ii) evidence of the settlement satisfactory to Purchaser; and (c) Purchaser's satisfaction that all representations are truthful and complete in all respects.

3. **SELLER'S REPRESENTATIONS, COVENANTS AND WARRANTIES.** Seller represents, covenants and warrants as follows:

   a.  The tax identification number of Seller is the one identified in the Disclosure Statement.

   b.  Seller's principal place of business is the address first set forth above. Seller will notify USC in writing within 72 hours if the principal place of business changes.

   c.  If Seller is a legal entity, Seller represents that it is in good standing with the corresponding authorities and that the undersigned has full power and authority to enter into this Agreement and execute the Agreement and any other document in connection with the transaction contemplated hereunder.

   d.  Seller recognizes and agrees that this transaction is of a commercial nature and, if Seller is a natural person, that the Purchase Price will not be used for personal, family or household purposes.

   e.  Seller has the authority to sell the Property to Purchaser, without the need to obtain the consent of any third party.

   f.  The following is a complete list of all equity partners, shareholders and/or owners of the Seller, if applicable:

         Philip Layfield, 100% owner

   g.  Seller is not subject to any outstanding judgment, levy, claim, or lien of any nature.

   h.  There are no lawsuits pending or threatened against Seller, and Seller knows of no basis for any such lawsuit or claim against Seller.

   i.  There are no security interests, whether perfected or not, which do or could encumber the Property.

   j.  Neither the Seller nor any partner, shareholder and/or equity owner of the Seller (if applicable) is indebted to any present or former spouse for support, maintenance or similar obligations, nor is Seller nor any partner, shareholder and/or equity owner of Seller (if applicable) indebted for child support or other similar obligations, and Seller has never received Aid to Families with Dependent Children, food stamp benefits or low income energy assistance benefits, and the Proceeds are not subject to any lien by any governmental agency to which payment for such benefits would be owed.

   k.  Seller and each partner, shareholder and/or equity owner of Seller (if applicable) has paid all Federal, state and local taxes due through and including the date hereof, or has made adequate provision for such payments.

   l.  All statements of Seller made to Purchaser in this Agreement or in any other document or communication made in connection with this Agreement are true, accurate and complete and do not omit to disclose anything which make such statements incomplete or materially misleading and the information set forth in the Recitals first appearing above is true and correct in all material respects.

   m.  Seller hereby authorizes Purchaser or its agents to conduct such credit and other searches as may be necessary in order to confirm the foregoing and shall cooperate fully with Purchaser in this regard, including the execution of such other or further documents as may, at the sole option and in the sole discretion of Purchaser, be determined to be needed or reasonable.

   n.  Seller will in good faith fully participate in the Litigation and cooperate in all respects with the prosecution of the Litigation to a successful conclusion and collection of all amounts due on account thereof, including the Proceeds.

   o.  No broker, finder or other person was involved or instrumental in arranging for the within transaction, and no other person is entitled to a fee, payment, commission or otherwise in respect of any matters provided for herein.

   p.  This transaction is a purchase and sale.

   q.  Seller has not assigned all or any portion of the Proceeds to any person or entity, except to Purchaser as set forth herein. Seller will not hereafter assign or grant to any party any interest in or to the Proceeds nor permit or suffer the attachment of any lien in or to the Proceeds. Any assignment, sale, conveyance, hypothecation, security interest or lien, or attempt to do any of the foregoing by Seller in violation of this Paragraph 3 shall be wholly void and of no effect.

4. **CONDITIONS PRECEDENT.** Notwithstanding anything herein to the contrary, the parties' respective obligations are subject to and conditional upon the satisfaction of the following conditions (the "Conditions Precedent"): (a) receipt or completion by USC of searches that USC may require, in its discretion, which may

include State and Local UCC searches, Federal and State Tax Lien searches and Bankruptcy searches; (b) receipt by USC of properly executed Agreement; (c) receipt by USC of a copy of the settlement agreement; and, (d) any other condition that USC requires in writing.

5. **GRANT OF SECURITY INTEREST.** By signing this Agreement, Seller grants to USC a security interest and a lien in the settlement of the Litigation and the Proceeds (the "Collateral"). USC shall have all rights and remedies of a secured party under the Uniform Commercial Code. Seller authorizes USC to file one or more UCC financing statements regarding their security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by USC to perfect and maintain the perfection of USC's security interest.

6. **EVENTS OF DEFAULT.** The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

   a. The failure by Seller to pay the Property to USC within thirty (30) days after the Proceeds are received by Seller upon payment of the Proceeds to Seller;

   b. Seller's failure to perform or comply with any of the obligations, covenants or agreements contained in this Agreement, including but not limited to a timely response by Seller to a request from USC for information; or

   c. If USC discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to USC in this Agreement.

7. **AGREEMENT TO ARBITRATE.**

   a. **Agreement.** USC and Seller agree that any and all controversies, claims, disputes, suits or causes of action arising out of or relating to this Agreement, to the negotiations thereto related or to the breach thereof, or to the formation, validity and/or enforceability of this agreement to arbitrate or the Agreement (each, a "Claim"), including the question of arbitrability of any such Claim, *shall* be settled by binding arbitration. This agreement to arbitrate is binding upon and inures to the benefit of each of USC's and Seller's respective heirs, executors, administrators, successors and assigns, as applicable (each, a "Party," and collectively, the "Parties").

   b. **Initiation of Arbitration.** Arbitration shall be initiated by serving with a written demand for arbitration. Arbitration must be initiated within a reasonable time after a Claim has accrued. In no event shall a Claim be entertained by the arbitrator if the demand (or counter-demand, as the case may be) is filed after the date when institution of a suit based on such Claim would be barred by the applicable statute of limitations. If a Party raises untimeliness of the filing of the demand or counter-demand as a defense, the arbitrator must resolve that question prior to holding the hearing on the merits of that Claim. If a Party refuses to arbitrate and court intervention is required to compel arbitration, that Party shall be responsible for paying the fees and expenses (including attorneys' fees) incurred by the Party seeking an order to compel arbitration.

   c. **Administration.** The arbitration shall not be administered by any arbitration organization but shall be privately administered by the arbitrator appointed pursuant to this Section 8. The Commercial Rules of the American Arbitration Association (the "AAA Rules") shall govern the arbitration process and the arbitrator must follow the AAA Rules, except those regarding the administration of the arbitration process by the American Arbitration Association (the "AAA") or those as to which this agreement to arbitrate otherwise provides. In the case of inconsistencies between this agreement to arbitrate and the AAA Rules, the agreement shall govern.

   d. **The Arbitrator.** The arbitration shall be held before a single neutral arbitrator, to be selected by agreement between the Parties from the roster of neutrals of the New Jersey Academy of Mediators and Arbitrators for the region of central New Jersey (the "Roster"). If the Parties are unable to agree upon an arbitrator within 15 calendar days after the arbitration is initiated, each Party will have 15 additional calendar days to select an appointing arbitrator from the Roster. The appointing arbitrators shall then

select and appoint the single arbitrator from the Roster within 10 calendar days. If a Party fails to timely select an appointing arbitrator, the other Party's(ies') appointing arbitrator shall select the single arbitrator from the Roster. Each Party is responsible to directly pay the fees for that Party's appointing arbitrator and an equal amount of the total fees of the single arbitrator fees as these become due.

e. **Arbitration Process.** The arbitration will be held in central New Jersey. Each Party shall be entitled to submit one set of interrogatories and one request for production of documents. Any additional discovery shall be allowed only as agreed by the Parties or at the discretion of the arbitrator. All discovery shall be conducted in accordance with, and governed by the Federal Rules of Civil Procedure. The arbitration proceeding and all information disclosed during the arbitration shall be maintained as confidential.

f. **Other Provisions.** No arbitration of a Claim shall include (by consolidation, joinder or other method) a person or entity who is not a Party, except by written consent containing a reference to this Agreement and the specific Claim to be arbitrated and the signature of both Parties and the person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any Claim not described in the written consent or with a person or entity not named therein or who has not signed the consent. There shall be no right or authority for any Claim to be arbitrated on a class action basis or on any basis involving Claims brought in a purported representative capacity on behalf of the general public or other persons or entities similarly situated. SELLER UNDERSTANDS THAT SELLER WILL NOT HAVE AND HEREBY WAIVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING OR RELATING TO ANY CLAIM OR TO SEEK REMEDIES IN COURT. SELLER FURTHER UNDERSTANDS THAT OTHER RIGHTS THAT SELLER WOULD HAVE IF SELLER WENT TO COURT MAY NOT BE AVAILABLE IN ARBITRATION.

1. **The Award.** The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in any competent court with jurisdiction. Such award shall identify the substantially prevailing Party and shall award that Party fees and expenses of arbitration, including attorneys' fees, expert fees, arbitrator fees and costs of arbitration.

8. **WAIVERS.** SELLER HEREBY UNCONDITIONALLY: (A) RELEASES AND WAIVES ALL CLAIMS THAT THIS TRANSACTION IS OTHER THAN A PURCHASE AND SALE; (B) WAIVES ANY CLAIMS THAT THE PROCEEDS ARE NOT ASSIGNABLE, THAT THIS TRANSACTION IS A LOAN OR THAT ANY OTHER PROVISION OF THIS AGREEMENT AND THE EXHIBITS IS INVALID OR UNENFORCEABLE IN ANY RESPECT; (C) WAIVES ANY AND ALL RIGHTS TO BRING ANY CLAIM AGAINST USC AS A CLASS ACTION OR TO JOIN OR OTHERWISE PARTICIPATE IN A CLASS ACTION AGAINST USC; AND, (D) WAIVES THE RIGHT TO JURY TRIAL IN ANY COURT ACTION, TO THE EXTENT THAT THE AGREEMENT TO ARBITRATE IS INVALIDATED OR HELD UNENFORCEABLE IN WHOLE OR IN PART.

9. **ASSIGNMENT.** This Agreement will be binding upon and inure to the benefit of USC and Seller, and each of our respective heirs, executors, administrators, successors and assigns, as applicable. Seller understands and agrees that Seller has no right or power to assign Seller's rights or obligations under this Agreement, and that USC may assign or transfer its obligations or rights, without Seller's prior approval, provided that the assignee specifically agrees to be bound by the terms and conditions hereof. Seller acknowledges that this Agreement or the rights thereunder may be assigned to a third party who will rely upon the truth and accuracy of the representations and warranties that Seller has given USC in this Agreement and otherwise in connection with this transaction. When requested by USC or any assignee, Seller will sign and deliver any and all reasonably requested documents as USC or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.

10. **AUTHORIZATIONS.** I expressly authorize USC, its agents, or designees to: (a) Endorse on my behalf any and all settlement checks payable to me regarding the Litigation, as may be necessary for the consummation of the transaction contemplated herein. This authorization shall survive my death or disability. (b) Contact me by phone (including mobile phone), email and regular mail to send offers and information for potential future transactions, including sending up to 5 texts a month to my mobile phone using an autodialer. My consent is not a condition of any future sale. I understand

~~that I can withdraw my consent by replying "STOP" to a text from USC; I can request additional~~
~~information by texting "HELP;" and message and data rates may apply.~~ (c) Conduct background reports, searches or checks regarding my past activity which USC deems necessary or advisable in its sole discretion, including without limitation, those pertaining to credit history, criminal background, liens and judgments.

## 11. MISCELLANEOUS

a. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. An electronic copy of a fully executed version of this Agreement (e.g., on portable document format (.pdf)) will be considered for all purposes as originals.

b. **Section Headings**. The section headings contained in this Agreement are for reference only and shall not affect in any way the meaning or interpretation of this Agreement.

c. **Entire Agreement**. This Agreement, together with the Disclosure Statement and the Exhibit, constitutes the entire agreement and understanding of the parties with respect to the purchase of the specific portion of the Proceeds contemplated hereby and supersedes any and all prior agreements and understanding with respect thereto.

d. **Severability**. If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of (i) any other part of this Agreement, and the Agreement shall be modified to the extent legally possible to legally carry out the intent of this Agreement and (ii) any agreement between USC and any other party.

e. **Amendment and Waiver**. This Agreement may not be amended or modified and the performance of the parties and the covenants or agreements herein cannot be waived or modified except under an instrument signed by both parties. The waiver or modification by a party of performance, or of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent or other performance or breach thereof.

f. **Attorney's Fees**. Should USC retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing USC's rights under this Agreement and the amount of USC's Property shall be increased in an amount equal to USC's costs and expenses.

**Governing Law/Venue**. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York without regard to its choice of law provisions.

SELLER:

_____
Philip Layfield , Esquire, Individually and on behalf of Layfield & Barrett

_____
Philip Layfield, Esquire, Individually and on behalf of Maximum Legal Holdings, LLC

Date:  6/9/17

BUYER:
US CLAIMS OPCO LLC

By:  _____

Name:  Robert Rigal

Title:  Managing Director

Date:  _____

## US CLAIMS--FUNDING INSTRUCTION SHEET

**SELLER, PHILIP LAYFIELD, ESQUIRE, LAYFIELD & BARRETT AND MAXIMUM LEGAL HOLDINGS, LLC, SHALL NOT SELL ANY PORTION OF THE PROCEEDS OF MY CLAIM TO ANY OTHER FUNDING OR LENDING ENTITY.**

| | |
|---|---|
| Purchase Price | $714,350.00 |
| Processing Fee | $350.00 |
| Origination Fee to Advanced Legal Capital, LLC | $14,000.00 |
| If applicable, Payoff Prior Funding to | $0.00 |
| *Net Amount Received by Me* | $700,000.00 |

Signed agreements may take up to 48 hours (2 business days) to process. Call for details.

**OPTION 1:    CASH TRANSFER**

☐   🌐 MoneyGram.         Quick Cash (up to $5,000)

The funds will be collected in the State of _____
** Valid Photo ID Required (Please Provide One of the Following):
☐  Passport     ☐  Driver License   ☐  State ID
     Expiration Date_____
** ~~Two forms of ID required for amounts over $3,000.00 (one of the above and ss card)~~

**OPTION 2:    ACH OR DOMESTIC WIRE TRANSFER– Account MUST be in Client's Name**
(US Claims cannot transfer funds to Debit Cards or Direct Deposits)

☐   ACH   ████████
☑   Checking Account
☐   Savings Account

1.   Account Number (print clearly)      *45251924*

████    ████████    *3140742* ████
        ████ *FSB*
        *400-531-81* ████

**OPTION 3:    CHECK**

☐   Route to the Attorney
☐   U.S. Mail        Allow 7-10 Business Days
☐   FEDEX          (No Weekend Delivery)

**AUTHORIZATION TO PAY THIRD PARTY VENDORS:** I hereby authorize US Claims to pay the following third party vendor(s), and I understand that any amounts paid to such third party vendor(s) shall be deducted from the Purchase Price to be paid to me:
None - not applicable

Seller's Signature: _____     Date: 6/9/17
                 Philip Layfield , Esquire, Individually and on
                 behalf of Layfield & Barrett

Seller's Signature: _____     Date: 6/9/17
                 Philip Layfield , Esquire, Individually and on
                 behalf of Maximum Legal Holdings, LLC

[AF-CI-3/15]                 Agreement- Page 6 of 6

# EXHIBIT B

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   22734 - DRB CAPITAL

```
  CT Lien Solutions            59275008
  P.O. Box 29071
  Glendale, CA 91209-9071      CALI
```

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| LayField | Philip | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 31381 Trigo Trail | Coto De Caza | CA | 92679 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Layfield & Barrett, APC | | | | |
| **OR** 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 633 West 5th Street, Suite 3300 | Los Angeles | CA | 90071 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| US Claims Opco LLC | | | | |
| **OR** 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1221 N. Church Street, Suite 103 | Moorestown | NJ | 08057 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All right, title and interest in, to and under the proceeds, accounts, awards of attorneys' fees and/or costs, payment intangibles or contractual rights and any and all derivatives thereof, whether presently existing or hereafter acquired, related to those certain litigation entitled:

Jasmine Esmeralda Pineda, et al. v. Pineda, et al vs. County of Riverside, CA, et al,, pending in the California State Superior Court, Riverside County bearing case number RIC1507590 .

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
59275008                    PS - Layfield, Philip

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282